UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RICHARD WILLIAMS,

                              Plaintiff,

                                                9:11-CV-1158
v.                                               (TJM/TWD)

MARK LEONARD, IMAM
KHALIL ABDUL KABIR,
T. LAVALLEY, JOE HASKELL,

                              Defendants.
_____

APPEARANCES:                                 OF COUNSEL:

RICHARD WILLIAMS, 95-A-7827
Plaintiff pro se
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821

HON. ERIC T. SCHNEIDERMAN              MELISSA A. LATINO, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## <u>REPORT-RECOMMENDATION AND ORDER</u>

This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy,

Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Plaintiff Richard Williams, an inmate at Great Meadow Correctional Facility, alleges that

Defendants violated his constitutional rights by (1) refusing to allow him to wear his pants at the length required by his Muslim faith; (2) preventing him from celebrating the holy day of Eid el-Adha with family members; and (3) raising meal prices for the guests of Muslim inmates. (Dkt. No. 1.) Plaintiff seeks damages and injunctive relief allowing him to (1) wear his pants above his ankles; (2) celebrate both Eid al-Fitr and Eid el-Adha with family; and (3) pay the same meal prices that members of other religions and organizations pay for their visitors' meals. *Id.* at 13. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 33.) For the reasons discussed below, I recommend that Defendants' motion be granted in part and denied in part.

## I.     FACTUAL AND PROCEDURAL SUMMARY

### A.     Facts Regarding Restrictions on Pant Length

Plaintiff is a devout Muslim. (Dkt. No. 1 at 4.) He alleges that his religion requires him to wear his pants above his ankles. *Id*. at 5. He alleges that it is impermissible for Muslims to wear garments below the ankles. *Id*. at 5-6. In 2007, when the events of which Plaintiff complains began, the New York State Department of Corrections and Community Supervision's ("DOCCS") official policy stated that inmates were not allowed to wear their pants above their ankles. *Id*. at 54.

On June 1, 2007, an unnamed correction officer stopped Plaintiff and said that he was "making a strong statement about being in a gang because [his] pants legs were above [his] ankles." (Dkt. No. 1 at 51.) Plaintiff filed a grievance regarding the incident. *Id*.

A hearing was conducted regarding the grievance. (Dkt. No. 1 at 53.) Plaintiff alleges that non-defendant Sergeant Williams stated at the hearing that he had discussed the issue of

pants length with non-defendant Imam Elmi.  *Id*.  After that discussion, Sergeant Williams

understood that Muslims are required to wear their pants above the ankles.  *Id*.

At the hearing, Plaintiff and the grievance committee discussed alternatives that would

allow Plaintiff "to practice his religious beliefs without disrupting the order of the facility."  (Dkt.

No. 1 at 53.)  The alternatives considered were: (1) giving a list of Muslim inmates to the State

Shop Supervisor to allow alterations to pants; (2) requiring Muslim inmates to submit a written

request for alterations; and/or (3) giving Muslim inmates wearing their pants above their ankles a

stamped identification card indicating their religion.  *Id.*

Plaintiff's grievance was denied on June 25, 2007.  (Dkt. No. 1 at 53.)  Plaintiff appealed

the decision.  *Id*.  Plaintiff's appeal was denied at the superintendent level on July 6, 2007.  *Id.* at

52.  Plaintiff  appealed that decision.  *Id*.  On August 1, 2007, the Central Office Review

Committee ("CORC") unanimously denied Plaintiff's appeal.  *Id*. at 54.  CORC stated "that

inmates are not permitted to alter state issue clothing . . . .  Any inmate altering clothing will be

held accountable for any portion of the replacement costs through department restitution policy.

CORC advises the grievant to address any concerns regarding his religion to the facility Imam."

*Id*.  DOCCS did not address the issue of a pant length above the ankle signaling gang affiliation

in this or subsequent grievance responses.  (Dkt. No. 1 at 20, 25-27, 54, 60.)

It is unclear from the complaint precisely what occurred over the next two years.

However, sometime before the second half of 2009, CORC determined that Muslims could wear

their pants above their ankles during religious services and prayer.  (Dkt. No. 1 at 60.)

On August 24, 2009, Defendant Imam Khalil Abdulkhabir[1] wrote to Plaintiff.  (Dkt. No. 1 at 20.)  Defendant Abdulkhabir stated that "after consultation with other Imams" it had been decided "that the pant length can be at the ankle bone."  *Id.*  This position had been submitted for departmental review, and a response was pending.  *Id.*  Plaintiff responded to the letter on October 28, 2009.  *Id.* at 28.  Plaintiff stated that the position described by Defendant Abdulkhabir "is going against what the Prophet . . . said."  *Id.*  Although it is not entirely clear from the letter, it appears that Plaintiff believes that a pant length *at* the ankle bone does not satisfy the religious requirement that Muslims wear their pants *above* their ankles.  *Id.*

On November 30, 2009, non-defendant Kenneth Perlman, the Deputy Commissioner of Program Services for DOCCS, wrote to Plaintiff.  (Dkt. No. 1 at 60.)  He noted that Plaintiff could wear his pants above his ankles during religious services and prayers.  *Id.*  He stated that the Office of Ministerial, Family and Volunteer Services was reviewing the issue, but that Plaintiff must comply with all DOCCS policies regarding clothing and dress pending that review. *Id.*

Plaintiff responded to Mr. Perlman's letter on December 17, 2009.  (Dkt. No. 1 at 59.) Plaintiff inquired about who had told Mr. Perlman that Muslims were only required to wear their pants above their ankles during religious services and prayers.  *Id.*  Plaintiff stated that Defendant Abdulkhabir "told us he never told anyone at ministerial services that."  *Id.*

On January 2, 2010, Plaintiff filed another grievance requesting that he be allowed to wear his pants above his ankle.  (Dkt. No. 1 at 15.)  Plaintiff explained that based on the letter

---

[1]        Defendant Abdulkhabir's name is spelled in different ways throughout the record. The Court has used the spelling from the August 24, 2009, letter to Plaintiff, which was prepared by Defendant Abdulkhabir and is presumably correct.

from Mr. Perlman, he "went to the state shop and had [his] pants done in accordance with the above-mentioned letter." *Id.* Plaintiff explained that on January 2, 2010, he was "threaten[ed] with keep-lock for complying with the decision that was sent from CORC until the matter of wearing the pants in accordance to our religion is resolved." *Id*. Plaintiff noted that the only time he wore his pants above the ankle was during religious services and prayers. *Id.* Plaintiff requested that no retaliatory actions be taken in connection with his grievance. *Id.*

On February 9, 2010, Defendant Superintendent LaValley wrote to Plaintiff. (Dkt. No. 1 at 55.) Defendant LaValley stated:

> As you are aware, based upon the letter sent to you dated August 24, 2009, from Imam Khalil Abdulkhabir, "Your pant length at the ankle bone which does satisfy the religious requirement is discreet and maintains the integrity of our faith practice."
>
> You are expected to follow the established rules. Should the rules change, you will be informed.
>
> I have enclosed a photograph that shows the ankle bone. Your pant length can not be above the ankle bone. . . .
>
> A copy of the photograph will be made available to security staff in an effort to ensure compliance with this policy.

*Id*.

It is not clear what document Defendant LaValley was quoting because the copy of the letter from Defendant Abdulkhabir dated August 24, 2009, attached to the complaint does not contain the quoted language. (Dkt. No. 1 at 20.)

On February 25, 2010, non-defendant Imam Elmi wrote to the supervisor of the Inmate Grievance Resolution Committee. (Dkt. No. 1 at 62.) He stated:

> The religion of Islam commands that Muslims should not wear their

garments below the ankle bone. This matter is under review by central office, the latest correspondence from central office was "inmates can wear their pants at the ankle bone level." Until further directions, inmates would be able to hem their pants at the ankle bone through the facility state shop.

*Id*.

On March 16, 2010, Defendant LaValley responded to a grievance filed by Plaintiff on February 24, 2010. (Dkt. No. 1 at 25.) Defendant LaValley stated:

Based on a recommendation from the Office of Ministerial Services, inmates of the Islamic or Muslim faith need only wear their pants raised during services or prayer. At all other times, the pant length must be at the ankle bone. This satisfies the religious requirement, is discreet, and maintains the integrity of the faith practice. If grievant takes issue with this determination, he will need to address this matter with the courts.

*Id*.

Plaintiff appealed Defendant LaValley's decision. (Dkt. No. 1 at 25.) CORC upheld Defendant LaValley's decision on May 5, 2010. *Id*. at 26. CORC cited its 2009 decision, which held that Muslim inmates' pants "need to be raised only during services and prayer." *Id*.

On March 22, 2010, Plaintiff wrote a letter to the grievance office regarding religious harassment. (Dkt. No. 1 at 16.) Plaintiff explained that he was leaving the school building after a program when the gate officer "denied me 2:30pm Rec. because he said my pants were too high." *Id*. Plaintiff explained he had been wearing the same pants "going to chow and morning program and leaving the school building at 10:35 AM. He did not pull me [to] the side and say anything." *Id*. Plaintiff asked that the gate officer be given a copy of the letter from CORC explaining that his pants could be worn at the ankle bone. *Id*. Plaintiff requested that he be allowed to wear his pants in accordance with the CORC standard and requested that no

retaliatory actions be taken against him because of the grievance. *Id.* at 17.

On March 31, 2010, Plaintiff filed another grievance. (Dkt. No. 1 at 18.) Plaintiff stated that Defendant Abdulkhabir had compromised the Islamic religion by stating that it was acceptable for pants to be worn at the ankle bone. *Id.* Plaintiff requested that Defendant LaValley and his Deputy of Security speak to Imam Elmi about "where does the ankle start" for the purposes of the Muslim faith. *Id.* Plaintiff requested that Defendant LaValley withdraw the letter he was circulating to his staff. *Id.* Plaintiff asked who informed DOCCS officials that Muslims were only required to wear their pants raised during services and prayer. *Id.* Plaintiff noted that Defendant Abdulkhabir told him that he had never said that either verbally or in writing. *Id.* Plaintiff asked that he be allowed to wear his pants "at the tip of my boots until this matter is tak[en] care of." *Id.* at 19. Finally, Plaintiff asked that "staff stop the harassment when I wear my pants on Friday to services . . . I wear my pants in accordance with . . . the C.O.R.C. statement." *Id.*

In November 2013, DOCCS revised its inmate clothing policy, titled Directive No. 3081. (Dkt. No. 33-7 at 2.) The revised policy allows male inmates to hem their pants "'to reach the top of their ankle bone.'" *Id.* at 4.

The policy was revised after DOCCS decided to "re-evaluate the standards and limitations for religious clothing and whether a male inmate should be permitted to hem his pants." (Dkt. No. 33-3 at 3 ¶ 12). Cheryl Morris, the Director of Ministerial, Family and Volunteer Services for DOCCS since 2010, contacted Muslim chaplains about the concerns they had faced regarding this issue. *Id.* at 3 ¶ 15. She "learned that some Islamic male inmates were requesting and/or attempting to hem or . . . shorten [their] pant length without State approval . . .

." *Id.* at 3 ¶ 16. Ms. Morris then researched the Qu'ran and Hadith and "found that wearing garments above the ankle was a religious tradition practiced by some members of the Islamic faith." *Id.* at 3 ¶ 17. She verified this with Mohammed Ahmed, the Ministerial Program Coordinator. *Id.* at 4 ¶ 19. "The focus was on whether the [pants] fell <u>below</u> the ankle." *Id.* at 4 ¶ 20 (emphasis in original). Ms. Morris brought this issue to the Religious Review Committee. *Id.* at 4 ¶ 21. The Committee included Ms. Morris, the Assistant Commissioner for Program Services, the Assistant Commissioner for Facility Operations, and two representatives of DOCCS Counsel's Office. *Id.* at 5 ¶ 22. After weighing an inmate's right to practice his religion against "various penological interests," the Committee decided to revise the Directive to allow inmates to hem their pants "'to reach the top of the[ir] ankle bone.'" *Id.* at 5 ¶¶ 23-34, 35. The revised directive was reviewed by Mr. Ahmed who then consulted with Imams. (Dkt. No. 33-3 at 8 ¶ 38.) They agreed that the revision was acceptable and did not violate the Islamic faith. *Id.* ¶ 39. The revised policy became effective on November 29, 2013. *Id.* 2 ¶ 7.

The revised policy does not specify a particular pant length. Ms. Morris declares that an exact measurement or pant length was not specified because "DOCCS used the ankle bone as a guide." (Dkt. No. 33-3 at 7 ¶ 34.) She stated that "[t]his standard could be uniformly applied to each and every inmate." *Id.* With this standard, "every male inmate's pants would fall at the same location of his body," and it would avoid monitoring difficulties. *Id.* at 7 ¶¶ 33-34. Defendants recognize that "it may be preferable for many inmates to wear their . . . pants . . . one or more inches above the ankle." (Dkt. No. 33-4 at 3 ¶ 13.) However, Mr. Ahmed declared that the revised DOCCS policy "complies with Islamic law and dress code." *Id.* Defendants "decided not to define a specific pant length or a specific measurement of a hem, such as an inch

hem, because this length or measurement could easily fall differently on each inmate's person

depending on height, weight or such other factors.  This too was difficult to monitor and

administer."  (Dkt. No. 33-3 at 7 ¶ 33.)  So, instead of setting a definite measurement, DOCCS

decided to use the ankle as a guide.  *Id.* ¶ 34.  Ms. Morris states that:

> [i]t would pose a threat to security and considerable logistical
> difficulties on staff to allow each inmate to dictate what exact length
> or height above the ankles they believe meets their religious criteria.
> It would be extremely difficult for staff to monitor the manner in
> which each inmate wears his pants, and to continuously ascertain who
> is wearing his pants one or two inches above the ankle for legitimate
> religious purposes, rather than non-religious purposes, such as to
> identify with a gang or hide contraband.  Therefore, there has to be
> uniformity in the standards and limitations on clothing.

*Id.* at 6 ¶ 32.

## B.    Facts Regarding Family Participation in Eid el-Adha

DOCCS implemented a policy limiting family participation in Eid el-Adha because of

the:

> increasing number of represented religions within DOCCS and
> substantially growing costs and expenses and administrative burden
> on correctional facilities to provide and/or facilitate family
> participation at all faith groups' religious events, such as the extra
> cost of providing additional security and staff, food preparation and
> clean up, and the extra cost of supplying additional food for meals for
> family members.

(Dkt. No. 33-3 at 9 ¶ 46.)

The same DOCCS policy applies for members of other religions.  (Dkt. No. 33-4 at 4 ¶

20.)  However, a different policy applies Native Americans because in 1999:

> the State entered into a Stipulation of Dismissal Subject to Conditions
> . . . dismissing a pending legal action. . . .  A condition of this
> Stipulation was that traditional Native Americans could practice all

> their sacred seasonal ceremonies. Family participation at these
> Native American religious ceremonies was considered essential.
> More specifically, DOCCS recognized in the Stipulation that Native
> Americans believe that family is important to the religious celebration
> and for that reason, it does not separate religiously from family
> celebrations and allow[s] the eight sacred seasonal holy days to be
> celebrated in a unique way.

*Id.* "DOCCS continued and continues to provide and/or facilitate family events and festivals to the general population each year. Thus, DOCCS provides inmates with additional opportunities to celebrate with family beyond just religious events." (Dkt. No. 33-3 at 10 ¶ 50.)

On December 8, 2008, Plaintiff filed a grievance regarding DOCCS policy barring family participation in the celebration of Eid el-Adha. (Dkt. No. 1 at 63.) Plaintiff asserted that Defendant Mark Leonard, the Director of Ministerial Services, was responsible for the new policy. *Id*. Plaintiff stated that the new policy violated his First Amendment rights because the Muslim faith requires that the holy days of Eid el-Adha and Eid al-Fitr be marked with "prayer and sermon, family attendance, and joyous festivities." *Id*. Plaintiff noted that the DOCCS policy still allowed family participation in Eid al-Fitr. *Id*. Plaintiff stated that the new policy violated the Equal Protection Clause because Native Americans were allowed to have family members participate in nine different holy days. *Id*. at 63-64. Plaintiff requested that both of the Eids be designated as family events. *Id*. at 64.

On December 9, 2008, the Inmate Grievance Program ("IGP") Supervisor sent non-defendant Imam Elmi a letter regarding Plaintiff's grievance. (Dkt. No. 1 at 65.) Imam Elmi was asked to attempt to informally resolve the grievance or provide the IGP with information, facts, or documentation regarding the issues raised in the grievance. *Id.*

On January 8, 2009, an investigative report was prepared regarding Plaintiff's grievance.

(Dkt. No. 1 at 67.)  The investigative report noted that Imam Elmi confirmed that in past years, family designations were given to both Eid holidays.  *Id.*  However, the new policy was that there would be only one family event allowed for each religious group with the exception of Native Americans.  *Id.*

A hearing was conducted regarding Plaintiff's grievance on January 9, 2009.  (Dkt. No. 1 at 66.)  The two inmate representatives on the committee recommended granting Plaintiff's grievance.  *Id.*  They stated:

> The evidence provided to support this grievance clearly substantiates that all Islamic Religious Eid Events (Eid Al-Fitr and Eid Al-Adha) have been afforded the privilege to have immediate family member[s] attend these Events as a <u>Religious Holy Observance</u> in accordance to Islamic Religious practices . . . <u>Which specifically requires that all family members are required to observe the Eid Prayers in a community prayer setting in accordance to Islamic Holy Tradition</u> . . . Prayer, Sermon, and Family Attendance in conjunction with Festive Celebrations . . . Has always been Officially Recognized by The New York State Department of Correctional Services and Ministerial Services . . . For almost 20 years!  Therefore, in light of this significant fact, it appears there exists "<u>No Penological Interest</u>" that would support the discontinuation of family members to continue to attend this family event!  Wherefore, in conclusion based on this long existing Departmental Observance, this grievance should be granted without prejudice!

*Id.* (ellipses, capitalization, and emphases in original).

The staff representatives on the committee recommended that the grievance be denied "to the extent that per policy and procedures one family event is allowed per religious organization." (Dkt. No. 1 at 66.)

After the hearing, the Inmate Grievance Department sent Plaintiff a letter informing him that no decision had been reached on his grievance because the committee was deadlocked.

(Dkt. No. 1 at 68.)  Accordingly, Plaintiff's grievance was automatically forwarded to the superintendent's office for review.  *Id*.

On January 22, 2009, Plaintiff's grievance was denied at the superintendent's level.[2] (Dkt. No. 1 at 69.)  The denial stated that "Central Office allows one family event per year, with the exemption of the Native American faith group.  A Native American religious ceremony is observed with a family meal.  The other religions do not require a family meal as part of the religious observance."  *Id*.

On August 4, 2009, Plaintiff filed another grievance regarding the Eid celebrations.  (Dkt. No. 1 at 70-75.)  He expressed again that family participation in both holy days is mandated by the Islamic faith and that it was unfair for Native Americans to be allowed nine family holidays while Muslims received only one.  *Id*.

On August 24, 2009, Plaintiff received a letter from Defendant Abdulkhabir.  (Dkt. No. 1 at 20.)  Defendant Abdulkhabir noted that family participation in Eid celebrations is stressed, especially for Eid el-Adha.  *Id*.  However, he noted that the growing number of religions caused the department to limit the number of family celebrations.  *Id.*

In June 2010, Plaintiff filed an Article 78 proceeding in Albany County Supreme Court regarding this issue.  (Dkt. No. 1 at 3-4.)  The proceeding was dismissed on procedural grounds in November 2010.  *Id*. at 4.

### C.    Facts Regarding Meal Prices

Before May 2010, the price for Eid feast meals was $4.75 per adult and fifty cents per

---

[2]    Defendant LaValley's signature does not appear on the form.  The appeal appears to have been assigned to a subordinate.

child.  (Dkt. No. 1 at 11.)  On July 10, 2010, Plaintiff learned that prices for Eid feasts had been set at $5.75 per person for both adults and children.  *Id*.  Plaintiff alleges that other religious communities pay only fifty cents per meal for visiting children's meals.  *Id*.  Plaintiff alleges that the meal price was increased only after he had "submitted litigation in the Courts in [r]egards to Islamic issues."  *Id*.

### D.  Procedural History

On September 28, 2011, Plaintiff filed this action alleging that Defendants violated his constitutional rights by (1) refusing to allow him to wear his pants at the length required by his Muslim faith; (2) preventing him from celebrating the holy day of Eid el-Adha with family members; and (3) raising meal prices for the guests of Muslim inmates.  (Dkt. No. 1.)  On November 18, 2011, Defendants moved to dismiss Plaintiff's complaint.  (Dkt. No. 12.)  I recommended that Defendants' motion to dismiss be granted with respect to (1) the claims for damages against Defendants in their official capacities; (2) any claim asserted on behalf of other inmates and/or their guests; (3) the First Amendment and Religious Land Use and Institutionalized Persons Act ("RLUIPA") claims for damages regarding the length of Plaintiff's pants; (4) the First Amendment, RLUIPA, and equal protection claims for damages regarding family participation in Eid el-Adha; and (5) any claim asserting a generalized right to visitation. (Dkt. No. 20.)  I recommended that Defendants be directed to answer the following claims (1) the First Amendment claim for injunctive relief regarding the length of Plaintiff's pants; (2) the RLUIPA claim for injunctive relief regarding the length of Plaintiff's pants; (3) the First Amendment claim for injunctive relief regarding family participation in Eid el-Adha; (4) the RLUIPA claim for injunctive relief regarding family participation in Eid el-Adha; (5) the equal

protection claim for injunctive relief regarding family participation in Eid el-Adha; and (6) the equal protection claim for damages and injunctive relief regarding meal prices. *Id.*

On September 30, 2013, Judge McAvoy adopted the Report-Recommendation in part and rejected it in part. (Dkt. No. 24.) Judge McAvoy found that Defendants were not entitled to qualified immunity on the record before the Court. *Id.* at 4-10. Accordingly, he directed Defendants to respond to the First Amendment and RLUIPA claims regarding the length of Plaintiff's pants, the First Amendment, RLUIPA, and equal protection claims regarding Eid el-Adha, and the equal protection claim regarding meal prices as to both damages and injunctive relief. *Id.* at 11-12.

Defendants now move for summary judgment. (Dkt. No. 33.) Plaintiff has opposed the motion. (Dkt. No. 35.) Defendants have filed a reply. (Dkt. No. 36.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## II.     LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986).  Rather, a dispute regarding

a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In

determining whether a genuine issue of material[3] fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball*

*Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

## III.    CLAIMS REGARDING RESTRICTIONS ON PANT LENGTH

Plaintiff claims that Defendants' refusal to allow him to wear his pants above his ankles

violates his Islamic beliefs.  (Dkt. No. 1.)  Defendants argue that Plaintiff's First Amendment and

RLUIPA claims regarding the length of his pants are now moot because of the revised policy.  *Id.*

Defendants also argue that they did not violate Plaintiff's First Amendment rights and RLUIPA.

(Dkt. No. 33-2 at 7.)  Finally, Defendants argue that they are entitled to qualified immunity.  *Id.*

at 11.  For the reasons discussed below, I recommend that the Court deny Defendant's motion for

summary judgment of Plaintiff's First Amendment and RLUIPA claims concerning the length of

his pants.

### A.    Mootness

Defendants argue that the revised policy mooted Plaintiff's claims regarding the length of

his pants.  (Dkt. No. 33-2 at 5-7.)  For the reasons discussed below, I recommend the Court reject

this argument.

"'[A] defendant's voluntary cessation of a challenged practice does not deprive a federal

---

[3]        A fact is "material" only if it would have some effect on the outcome of the suit.
*Anderson*, 477 U.S. at 248.

court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). Accordingly, "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Id.* at 174. A defendant seeking to dismiss a case on grounds of mootness has "the 'heavy burden of persuad[ing]' the court that the challenged conduct cannot reasonably be expected to" continue or be repeated. *Id.* at 189 (citing *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203 (1968)).

Defendants argue since "Plaintiff is [now] allowed to hem his pants above his ankle" pursuant to the revised policy, Plaintiff's claim is moot. (Dkt. No. 33-2 at 6.) Plaintiff claims that Directive No. 3081 still violates the practice of the Islamic faith because his pants should rest "two (2) inches above the ankles."[4] (Dkt. No. 35 at 15 ¶ 13.) Plaintiff believes that his pants must fall above his ankles, "'preferably to the middle of the shins.'" *Id.*

Defendants have not met their heavy burden of showing that the challenged conduct cannot reasonably be expected to continue. The revised policy still does not allow the Plaintiff to hem his pants two inches above his ankles. Therefore, Plaintiff's claims are not moot because Defendants have not made it "absolutely clear" that Plaintiff's constitutional rights will not be violated in the future. Accordingly, I recommend that the Court reject Defendants' argument concerning the mootness of Plaintiff's claims.

### B.    First Amendment

Plaintiff alleges that his First Amendment rights have been violated by Defendants'

---

[4]    This is the first time Plaintiff has specified an exact measurement standard. Prior to this, Plaintiff has only mentioned "above his ankles."

restriction on the length of his pants. Defendants argue that because they had legitimate

penological interests, they did not violate Plaintiff's First Amendment rights. (Dkt. No. 33-2 at

7.) For the reasons discussed below, I recommend that Defendants' motion for summary

judgment of Plaintiff's First Amendment claim concerning the length of his pants be denied.

Prisoners retain some measure of the constitutional right to the free exercise of religion

guaranteed by the First Amendment. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003).

However, due to the unique concerns of the prison setting, prisoners' free exercise rights must be

balanced against the interests of prison officials engaged in the complex duties of administering

the penal system. *Id*. Thus, a prison regulation or individualized decision to deny a prisoner the

ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than

that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a

[prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate

penological interests." *Salahuddin*, 467 F.3d at 274 (quoting *O'Lone v. Estate of Shabazz*, 482

U.S. 342, 349 (1987)) (punctuation omitted).

First, to establish a free exercise claim, a prisoner "must show at the threshold that the

disputed conduct substantially burdens[5] his sincerely held religious beliefs." *Salahuddin*, 467

---

[5]     Although the Second Circuit has applied the "substantial burden" test in its most
recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the
test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must
show a substantial burden on their religious exercise in order to maintain free exercise claims.
Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the
substantial burden requirement, the court would proceed as if the requirement applied. Likewise,
the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address
Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by
the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that
we should find any particular burdened religious practice to be peripheral or tangential to
[plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied."

F.3d at 274-75 (citing *Ford*, 352 F.3d at 591). A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature. *Ford*, 352 F.3d at 590.

Here, Defendants do not dispute that Plaintiff sincerely believes that his pant length must be above his ankle. Thus, there is no dispute that Plaintiff has a sincerely held belief regarding the length of his pants.

Second, Plaintiff must prove that Defendants substantially burdened Plaintiff's sincerely held belief. A prisoner's sincerely held religious belief is "substantially burdened" where "the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 476-77 (2d Cir. 1996) (punctuation omitted) (holding that Rastafarian prisoner's sincerely held religious belief that he was prohibited from submitting to a test for latent tuberculosis was "substantially burdened" where he was forced to choose between "submitting to the test or adhering to [his] beliefs and enduring medical keeplock."). "Testimony from religious authorities that the observance in question is not important or is not actually burdened by defendants' regulations is not determinative of the issue." *Jones v. Goord*, 435 F. Supp. 2d 221, 256 (S.D.N.Y. 2006).

Here, before enacting revised Directive 3081, Defendants prohibited Plaintiff from wearing pants that were hemmed to fall above his ankle. With the revised Directive, Defendants still prohibit Plaintiff from wearing his pants two inches above his ankle bone. Defendants

---

*Pugh v. Goord*, 571 F. Supp. 2d 477, 497 n.10 (S.D.N.Y. 2008) (citations and some punctuation omitted). In *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014), the Second Circuit stated that it had not decided the issue and noted that plaintiff in the case before it had challenged the standard. *Holland*, 758 F.3d at 220. However, the court stated that "we need not decide the issue here." *Id.* at 221.

warned Plaintiff that if an inmate altered clothing, the inmate will be responsible for any portion

of the replacement costs. (Dkt. No. 1 at 54.) Defendant LaValley told Plaintiff that security staff

would enforce this rule. *Id.* at 55. Plaintiff complained that on January 2, 2010, he was

"threaten[ed] with keep-lock for complying with the decision that was sent from CORC until the

matter of wearing the pants in accordance to our religion is resolved." *Id.* at 15. Because

Defendants' policy put Plaintiff in a position where he had to choose between following his

belief or abiding by Defendants' policy, there are genuine issues of material fact as to whether

Defendants substantially burdened Plaintiff's exercise of religion.

Once a plaintiff establishes that a sincerely held religious belief has been substantially

burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate

penological interests that justify the impinging conduct." *Salahuddin*, 467 F.3d at 275 (quoting

*Ford*, 352 F.3d at 595) (punctuation omitted). When determining whether the burden is

reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid,

rational connection to a legitimate governmental objective; (2) whether the prisoner has an

alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison

resources of accommodating the right; and (4) the existence of alternative means of facilitating

the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological

interests. *Id*. at 274-75.

Regarding the first factor, although the defendants' burden is "relatively limited," "the

legitimate penological interest advanced must have been the *actual* reason for the defendants'

actions." *Kalwasinski v. Maxymillian*, 9:09-CV-0214 (DNH/GHL), 2010 U.S. Dist LEXIS

140064, at *19, 2010 WL 5620908, at *6 (N.D.N.Y. Dec. 23, 2010[6]).[7]  "Post hoc justifications

with no record support will not suffice."  *Salahuddin*, 467 F.3d at 276-77.  Courts should defer to

the defendants' assertion, but courts cannot afford defendants with "unquestioning deference."

*Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015).

Here, Defendants contend that they "possessed strong penological interests to not allow

inmates to alter their state-issued clothing and to keep the inmate dress code standard and

uniform."  (Dkt. No. 33-2 at 6.)  Defendants argue that they are concerned with the "safety and

security of inmates and staff and administrative burden."  *Id.*  Defendants specifically claim to be

concerned with "inmate[s] [using] their pant length or manner in which they wore their pants to

identify in a gang affiliation or to conceal contraband or a weapon."  *Id.* at 6-7.

These are legitimate penological interests.  *See Salahuddin*, 467 F.3d at 275; *see also*

*Guillory v. Ellis*, 9:11-CV-600 (MAD/ATB), 2013 U.S. Dist. LEXIS 69183, at *28, 2013 WL

2145660, at *9 (N.D.N.Y Apr. 3 2013), *adopted by*, *Guillory v. Ellis*, 9:11-CV-600 (MAD/ATB),

2013 U.S. Dist. LEXIS 68752, 2013 WL 2145658 (N.D.N.Y. May 15, 2013)[8] ("Prison security is

a legitimate penological interest that justifies limitations on an inmate's First Amendment rights .

. . ."); *see also Miller v. Bouchard*, Civ. No. 9:10-CV-00983 (NAM/RFT), 2013 U.S. Dist.

LEXIS 41853, at *23, 2013 WL 1294417, at *9 (N.D.N.Y. Mar. 3, 2013), *adopted by*, *Miller v.*

---

[6]     Westlaw and LexisNexis list different dates for this decision.  The Court has used
the date provided by Westlaw.

[7]     The Court will provide Plaintiff with a copy of all of the unpublished decisions
cited in this Report-Recommendation in accordance with the Second Circuit's decision in *Lebron
v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[8]     Westlaw and LexisNexis list different dates for this decision.  The Court has used
the date provided by Westlaw.

*Bouchard*, Civ. No. 9:10-CV-00983 (NAM/RFT), 2013 U.S. Dist. LEXIS 41849, 2013 WL

1289526 (N.D.N.Y. Mar. 26, 2013) ("a prison facility has a legitimate penological interest in

maintaining safety and security within the facility").  However, there is nothing in the record to

support Defendants' alleged concern of inmates showing gang affiliation.  Defendants have not

shown expert testimony or incidents where hemmed pants have caused security concerns.  The

only instance where gang affiliation is mentioned in the record between 2007 and 2011 is when

an unnamed correction officer stopped Plaintiff and stated that he was "making a strong

statement about being in a gang because [his] pant legs were above [his] ankles."  (Dkt. No. 1 at

51.)  Defendants did not address the issue of gang affiliation in any of their grievance responses.

(Dkt. No. 1 at 20, 25-27, 54.)  Plaintiff filed a grievance after that incident.  (Dkt. No. 1 at 51.)

Defendants did not mention or address their concern of Plaintiff showing gang affiliation because

of his pant length in their grievance responses.  (Dkt. No. 1 at 20, 25-27, 54.)  Thus, there is a

genuine issue of material fact as to whether Defendants' alleged concerns were the actual reasons

behind their policy.

Plaintiff contends that "the reasons given by defendant[s] are not legitimate security

reasons."  (Dkt. No. 35 at 3.)  "[T]he burden remains with the prisoner to show that these

articulated concerns were irrational."  *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at

595) (punctuation omitted).  Plaintiff states that he "has almost currently over 19 years of

incarceration, and knows of no gang practice involving the rolling or shortening of the pants."

(Dkt. No. 35 at 4-5 ¶ 15.)

Even if the concerns that Defendants articulate now were the actual reasons for the

policy, Defendants must still demonstrate that the policy has a "valid, rational connection" to the

asserted legitimate penological interests.  Ms. Morris states that "many inmates roll or shorten their pants, often to the calf or knee, to identify themselves as being part of a certain gang."  (Dkt. No. 33-3 at 6 ¶ 28.)  Plaintiff is requesting to hem his pants above his ankles, not to the calf or knee.  Thus, there is a genuine issue of material fact as to whether Defendants' policy has a rational connection to their asserted legitimate penological interests.

Regarding the second factor, Defendants have not shown that Plaintiff has alternative means of exercising the alleged burdened right.  Defendants have prohibited Plaintiff from wearing his pants two inches above his ankle.  The revised policy only allows Plaintiff to hem his pants to reach the top of his ankle bone.  Accordingly, there is nothing in the record showing that Defendants have left any alternative means by which Plaintiff may exercise this right.  *Cf. Vann v. Fischer*, No. 11 Civ. 1958 (KPF), 2014 U.S. Dist. LEXIS 118247, 2014 WL 4188077 (S.D.N.Y. Aug. 25, 2014) (DOCCS directive requiring inmates of Santeria faith to wear beads in concealed manner allowed inmates to practice tenet of faith while minimizing security concerns).

Regarding the third factor, the Court must consider the impact on guards, inmates, and prison resources in accommodating Plaintiff's right.  As discussed above, Defendants have cited security and administrative concerns, but have not provided any specifics regarding how accommodating Plaintiff's right may deplete prison resources.  *See Lee v. Wenderlich*, 05-CV-6077, 2006 U.S. Dist. LEXIS 67731, at *18-19, 2006 WL 2711671, at *6 (W.D.N.Y. Sept. 21, 2006) (holding that defendants did not meet their burden where they simply made a conclusory statement claiming that they could not accommodate Plaintiff's right because it would lead to financial and administrative burdens).  Therefore, Defendants have not shown that they are entitled to judgment as a matter of law regarding the third factor.

22

Regarding the fourth factor, the Court must consider the existence of alternative means of facilitating Plaintiff's exercise of his right that would only have a *de minimis* adverse effect on Defendants' valid penological interests. Here, Plaintiff presented alternatives to Defendants. (Dkt. No. 1 at 53.) The alternatives presented were: (1) giving a list of Muslim inmates to the State Shop Supervisor to allow alterations to pants; (2) requiring Muslim inmates to submit a written request for alterations; and/or (3) giving Muslim inmates wearing their pants above their ankles a stamped identification card indicating their religion. *Id.* Defendants have not articulated why these alternatives would not adequately address their security and administrative concerns. The record only provides that after Plaintiff's hearing following the June 2007 incident, "it was [Plaintiff's] understanding that the alternatives presented would be considered prior to the decision being rendered." (Dkt. No. 1 at 52.) There is nothing in the record showing that Defendants in fact considered these alternatives. Further, Defendants have not independently considered alternative means, apart from prohibiting Plaintiff from wearing shortened pants, that may satisfy Defendants' concerns. Thus, there are genuine issues of material fact as to whether Defendants' legitimate penological interests were reasonable.

Overall, because there are genuine issues of material as to the reasonableness of Defendants' concerns, I recommend that Defendants' motion for summary judgment be denied concerning the First Amendment claim.

**C.     RLUIPA**

Plaintiff claims that the restriction on the length of his pants violates RLUIPA. Defendants argue that the restriction furthers the compelling governmental interests of ensuring inmate security and avoiding staff and administrative burden. (Dkt. No. 33-2 at 6.) For the

reasons discussed below, I recommend that Defendants' motion be denied with respect to Plaintiff's RLUIPA claim concerning the length of Plaintiff's pants.

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution[9] . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). "'[C]ontext matters' in the application of th[e compelling interest] standard." *Cutter*, 544 U.S. at 723. Accordingly, RLUIPA is not meant to "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Id.*

When reviewing a RLUIPA claim, "'a court must afford due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005). However, courts cannot afford defendants with "unquestioning deference." *Holt*, 135 S. Ct. at 864. "Prison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and courts should respect that expertise. But that respect does not justify the abdication of the responsibility . . . to apply RLUIPA's rigorous standard." *Id.*

First, Defendants argue that they have not substantially burdened Plaintiff's right to

---

[9]      An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia*, "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1) (2010).

exercise his religion. In 2013, Defendants revised Directive No. 3081 allowing inmates to wear pants that fall at their ankle bone. (Dkt. No. 33-7 at 4.) Defendants contend that this solution "not only satisfied the Islamic practice, but also complied with DOCCS policies by ensuring inmates could not abuse the allowance by short[ening] their pants for non-religious purposes and ensuring uniformity among standards and efficiency in implementing and enforcing this new policy." (Dkt. No. 33-4 at 7 ¶ 35.) As discussed above, there is a genuine issue of material fact as to whether Plaintiff's right was substantially burdened. Defendants argue that "[a]lthough some Muslims, including Plaintiff, may prefer to wear their pants farther above the ankle, according to Islamic religious leaders and high-ranking DOCCS officials at or above the ankle satisfies this Islamic tradition." (Dkt. No. 33-2 at 6.) The Islamic religious leaders and high-ranking DOCCS officials' conclusion is not determinative of the issue of whether the revised policy still burdens Plaintiff's rights. *See Jones*, 435 F. Supp. 2d at 256. Accordingly, there is a genuine issue of material fact that Defendants substantially burdened Plaintiff's right to exercise his religion.

Defendants argue that their policy restricting Plaintiff from further shortening his pant length advances the compelling governmental interests of the "safety and security of inmates and staff and administrative burden." (Dkt. No. 33-2 at 6.) Defendants are correct in arguing that these are compelling governmental interests. *See Holt*, 135 S. Ct. at 857-58; *see also Salahuddin*, 467 F.3d at 276-77. However, as discussed above, there is a genuine issue of material fact as to whether Defendants' compelling governmental interests are post-hoc rationales.

Even if Defendants' policy advances compelling governmental interests, Defendants must

show that the policy is the least restrictive means of furthering those compelling governmental interests. Defendants have not addressed whether prohibiting Plaintiff from wearing pants hemmed to reach above his ankle is the least restrictive means by which Defendants could satisfy their safety and security concerns.

In *Holt v. Hobbs*, the Supreme Court rejected the Arkansas Department of Correction's argument that it could not let inmates grow their half-inch beards because inmates could later "shave their beards and change their appearance" to enter restricted areas in the prison or to escape and avoid being apprehended. *Holt*, 135 S. Ct. at 864. The Court held that even if the Department's grooming policy furthered its interest in the identification of inmates, the Department's argument still failed because the Department could satisfy that concern using alternative means, namely by photographing inmates with and without their beards. *Id.* at 861, 865. Here, there is nothing in the record to show that Defendants even considered alternative means. Plaintiff discussed alternatives that would accommodate Plaintiff's right and possibly Defendants' concerns. (Dkt. No. 1 at 53.) Defendants have not explained why their security concerns could not be satisfied, for instance, by simply providing Muslim inmates wearing their pants above their ankles an identification card showing that they are wearing these pants because of their religion and not because of any gang affiliation. *See id.*

Before 2009, Defendants did not allow Plaintiff to hem his pants. Sometime before the second half of 2009, Defendants determined that Muslims could wear their pants above their ankles during religious services and prayer. *Id.* at 60. This revision suggests that Defendants were not furthering compelling governmental interests using the least restrictive means before 2009. Defendants have not shown that the 2009 revision was the least restrictive means by

26

which they could have furthered the alleged compelling governmental interests because they revised the policy again in November 2013. The newest revision permits male inmates to hem their pants to "'reach the top of their ankle bone.'" (Dkt. No. 33-7 at 4.) This suggests that Defendants were using the least restrictive means to further their interests between 2007 and 2013. Moreover, Defendants have not explained why pants hemmed to reach the top of inmates' ankle bone is less indicative of gang affiliation than pants hemmed two inches above the ankle. Accordingly, I recommend that Defendants' motion for summary judgment of Plaintiff's RLUIPA claim concerning the length of Plaintiff's pants be denied.

### D. Qualified Immunity

Defendants cursorily argue that they are entitled to qualified immunity regarding claims concerning the restrictions on pant length. (Dkt. No. 33-2 at 11.) Defendants in civil rights actions are entitled to qualified immunity from civil damages "unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams v. Smith*, 781 F.2d 319, 322 (2d Cir. 1986) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)). Thus, the qualified immunity inquiry in a prisoner civil rights case involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton*, 380 F.3d 57, 68-69 (2d Cir. 2004) (citations omitted), *accord*, *Higazy v. Templeton*, 505 F.3d 161, 169 n.8 (2d Cir. 2007) (citations omitted).

As discussed above, Plaintiff has alleged sufficient facts to raise a triable fact that Defendants violated Plaintiffs constitutional right. Plaintiff sincerely believes that his religion

requires him to wear pants that are hemmed to fall above his ankle. Defendants have prohibited Plaintiff from wearing such pants. Thus, there remains a genuine issue of material fact as to whether Defendants violated Plaintiffs constitutional right to exercise religion.

In determining whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted, courts in this circuit consider three factors: (1) whether the right in question was defined with 'reasonable specificity;' (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question;[10] and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citations omitted), *cert. denied*, 503 U.S. 962 (1992); *see also Pena v. DePrisco*, 432 F.3d 98, 115 (2d Cir. 2005); *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999); *McEvoy v. Spencer*, 124 F.3d 92, 97 (2d Cir. 1997); *Shechter v. Comptroller of N.Y.*, 79 F.3d 265, 271 (2d Cir. 1996); *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995); *Prue v. City of Syracuse*, 26 F.3d 14, 17-18 (2d Cir. 1994); *Calhoun v. N.Y. State Div. of Parole*, 999 F.2d 647, 654 (2d Cir. 1993). Prison officials' belief that they did not violate an inmate's constitutional rights is not reasonable simply because the officials relied upon the opinion of religious authorities "that a particular practice is not religiously mandated . . . ." *Id.*

In determining whether the right in question in a particular case was defined with reasonable specificity, courts must avoid "framing the constitutional right at too broad a level of generality." *Redd v. Wright*, 597 F.3d 532, 536 (2d. Cir. 2010). Characterizing the right at

---

[10] The Second Circuit has "specifically cautioned against the reliance on non-precedential summary orders in 'clearly established' analyses." *Matusick v. Erie Cnty. Water Auth.*, 793 F.3d 51, 81 (2d Cir. 2014).

question in a prisoner's First Amendment religion case as the right "not to be subjected to punishment . . . as a consequence of his religious beliefs," for example, is not "reasonably specific." *Id.* On the other hand, "[t]his does not mean that there must be a factual equivalency between the case at issue and prior cases. The 'salient question' instead is whether the case law at the time in question would have put reasonable officers on 'fair warning' that their conduct violated the plaintiff's rights." *Matusick v. Erie Cnty. Water Auth.*, 793 F.3d 51, 80 (2d Cir. 2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Further, "courts need not have ruled in favor of a prisoner under precisely the same factual circumstance in order for the rights to be clearly established." *Ford*, 352 F.3d at 597.

In my earlier Report-Recommendation, I recommended that Defendants be granted qualified immunity. Defendants had argued that they are entitled to qualified immunity because at "the time the defendants acted, there was no clearly established decisional law of the Supreme Court or of the Second Circuit that confirmed the right of a Muslim inmate to wear his pants above his ankles . . . ." (Dkt. No. 12-1 at 8.) Judge McAvoy rejected this argument. (Dkt. No. 24 at 6.)

Judge McAvoy stated that "[i]t is well established in the Second Circuit that 'prison officials may not substantially burden inmates' right to religious exercise without some justification . . . .'" (Dkt. No. 24 at 6, quoting *Salahuddin*, 467 F.3d at 275-76.) "[I]n light of pre-existing law, . . . the unlawfulness of [Defendants'] conduct would be apparent. This is so even though there are no cases from the Second Circuit or Supreme Court that specifically address whether a Muslim inmate may wear his pants at a particular length." *Id.* at 7.

Judge McAvoy further reasoned that:

29

the facts alleged in the Complaint are unclear as to when Defendants were advised that the practice of at-ankle-length pants outside of religious observations and above-ankle-length pants during religious observations was in keeping with Plaintiff's religious beliefs. Moreover, the allegations in the complaint indicate that before Defendants were purportedly advised of the propriety of the at-ankle-length/above-ankle-length protocol, they were advised by an imam that Muslims who practiced Islam should be allowed to wear their pants above the ankle at all times. See dkt. # 20, p.6.

(Dkt. No. 24 at 5.)

Judge McAvoy also stated that because Defendants did not identify any legitimate penological interests that justify the DOCCS policy, the Court was required to assume that such interests do not exist. (Dkt. No. 24 at 7.) Accordingly, "Defendants could have reasonably anticipated before that their refusals to allow Plaintiff to wear his pants above his ankles at all times substantially burdened his right to religious exercise without justification." *Id.*

On summary judgment, Defendants have not provided any evidence or argument addressing Judge McAvoy's qualified immunity analysis. Defendants merely argue that "under the given circumstances, reasonable officers would not have believed that their conduct was unlawful . . . ." (Dkt. No. 33-2 at 11; *see* Dkt. No. 33-3 at 11 ¶ 58.) Defendants argue that they "have established that the policy change in inmate clothing . . . is reasonably related to serving legitimate penological interests. Therefore, this action is not a violation of the [P]laintiff's constitutional rights." (Dkt. No. 33-2 at 11; *see* Dkt. No. 33-3 at 11 ¶ 58.) As discussed above, there are genuine issues of material fact as to whether Defendants' policy was justified by legitimate penological interests that were the "*actual*" reasons for Defendants' conduct. "The Second Circuit has held that qualified immunity is not appropriate at the summary judgment stage where genuine issues of material fact exist as to whether defendants had legitimate

penological justifications for denying plaintiffs certain opportunities for religious exercise."
*Pugh v. Goord*, 571 F. Supp. 2d 477, 512 (S.D.N.Y. 2008). Accordingly, I recommend that the
Court deny Defendants qualified immunity at this stage.

## IV.     FAMILY PARTICIPATION IN EID EL-ADHA

Plaintiff claims that Defendants Mark Leonard and Imam Abdulkhabir violated his
constitutional rights by refusing to allow family members to participate in Eid el-Adha. (Dkt.
No. 1 at 8.) Defendants move for summary judgment of this claim. (Dkt. No. 33.) For the
reasons discussed below, I recommend that the Court deny Defendants' motion for summary
judgment of Plaintiff's First Amendment and RLUIPA claims concerning family participation in
Eid el-Adha. I recommend that Defendants be denied qualified immunity at this stage. I further
recommend that the Court grant Defendants' motion for summary judgment of Plaintiff's Equal
Protection Clause claim concerning family participation in Eid el-Adha.

### A.     First Amendment

Plaintiff claims that Defendants violated his First Amendment rights by prohibiting
family participation in Eid el-Adha. (Dkt. No. 1 at 8.) Defendants argue that this policy does not
violate Plaintiff's constitutional rights. (Dkt. No. 33-2.)

First, as discussed above, to establish a free exercise claim, a prisoner "must show at the
threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."
*Salahuddin*, 467 F.3d at 274-75 (citing *Ford*, 352 F.3d at 591). A religious belief is "sincerely
held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature.
*Ford*, 352 F.3d at 590.

Here, Plaintiff sincerely believes that Eid el-Adha, a religious event, must be celebrated

with a "prayer and sermon, family attendance, and joyous festivities, etc." (Dkt. No. 1 at 63.)

Defendants do not contest that this is Plaintiff's sincerely held religious belief. Thus, there is no

dispute that Plaintiff sincerely believes that he must celebrate Eid el-Adha with family.

Second, Plaintiff must prove that the Defendants substantially burdened his sincerely held

belief. A prisoner's sincerely held religious belief is "substantially burdened" where "the state

puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly*,

76 F.3d at 476-77 (punctuation omitted). Here, Defendants' policy does not allow Plaintiff to

practice his belief that Eid el-Adha must be celebrated with family. Defendants contend that

Plaintiff is still able to practice his religion, as "[n]o religious service or festival has been

reduced. Islamic inmates are still provided with prayers services, festivals and food on these

obligatory days." (Dkt. No. 33-4 at 5 ¶ 25.) Allowing Plaintiff to practice his religion through

other services does not determine this issue. *See Holt*, 135 S. Ct. at 862 (holding that "the

District Court erred by concluding that the grooming policy did not substantially burden

petitioner's religious exercise" because he was able to practice his religion in other ways).

Accordingly, there is a genuine of material fact that Defendants have substantially burdened his

right to exercise religion.

Once a plaintiff establishes that a sincerely held religious belief has been substantially

burdened, "[t]he defendants then bear the relatively limited burden of identifying the legitimate

penological interests that justify the impinging conduct; the burden remains with the prisoner to

show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting

*Ford*, 352 F.3d at 595) (punctuation omitted). "'[A] generally applicable policy will not be held

to violate a [prisoner's] right to free exercise of religion if that policy is reasonably related to

legitimate penological interests.'" *Hall*, 408 F. App'x at 387-88 (citations omitted).

Defendants argue that the limitation on family participation was implemented because of legitimate penological interests, including "administrative and fiscal burdens imposed on staff and DOCCS." (Dkt. No. 33-2 at 8-10; Dkt. No. 33-3 at 11 ¶ 58.) These are legitimate penological interests. *See Salahuddin*, 467 F.3d at 275. However, Defendants have not demonstrated that they in fact relied on those penological interests. *See id.* at 274-75 (holding that defendants were not entitled to summary judgment where defendants cited to legitimate penological concerns about security and fiscal, space, and staffing limitations, but did not point to anything in the record showing that they in fact relied on those legitimate penological justifications). The Court cannot "manufacture facts out of thin air." *Id.* at 275. [I]t is the [D]efendants' duty on summary judgment to cite record evidence to this effect." *Id.* Defendants do not point to anything in the record showing that staffing and administrative concerns existed and that they relied upon those concerns when creating this policy. Accordingly, without support in the record, the Court cannot state that the Defendants were in fact concerned about security and fiscal and administrative burdens. Therefore, I recommend that Defendants motion be denied with respect to Plaintiff's First Amendment claim relating to family participation in Eid el-Adha.

### B.    RLUIPA

Plaintiff claims that prohibiting family participation in Eid el-Adha violates RLUIPA. Defendants argue that the DOCCS policy was implemented to further the compelling governmental interests of ensuring inmate security and consideration of costs and limited resources. (Dkt. No. 33-2 at 8.) Defendants contend that the "policy did not affect the provision

of religious services in the facility. No holy days or religious services, festivals, or events were reduced or eliminated for inmates." (Dkt. 33-3 at 9.) Defendants have not provided any evidence in the record to support the claim that they actually relied on considerations of costs and security when enforcing this policy. RLUIPA claims are addressed substantially in the same manner as First Amendment claims. Accordingly, I recommend that Defendants' motion be denied with respect to Plantiff's RLUIPA claim for limiting family participation in Eid el-Adha.

**C.     Equal Protection**

Plaintiff argues that the policy prohibiting family participation in Eid el-Adha violates the Equal Protection Clause. (Dkt. No. 1 at 63.) Defendants argue that the policy was not discriminatory in nature. (Dkt. No. 33-2 at 9.) For the reasons discussed below, I recommend that Defendants' motion for summary judgment of this claim be granted.

The Equal Protection Clause provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). Governmental action may also violate the Equal Protection Clause where the defendants intentionally treat the plaintiff "differently from others with no rational basis for the difference in treatment." *Id*. (citing *Vill. of*

*Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  However, "[t]he Supreme Court has specifically held that in the prison context, the Equal Protection clause does not require that 'every religious sect or group within a prison . . . have identical facilities or personnel.'"  *Pugh*, 571 F. Supp. 2d at 502 (citations omitted).

A plaintiff asserting an equal protection claim must show that "(1) he was treated differently from similarly situated individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right, acted out of malice, or acted irrationally and arbitrarily."  *Philip v. Brown*, 9:10-CV-0643 (FJS/GHL), 2011 U.S. Dist. LEXIS 18873, at *6-7 , 2011 WL 768975, at *2 (N.D.N.Y. Feb. 4, 2011).

Here, Plaintiff has shown that he was treated differently from similarly situated individuals.  He alleges that the new policy allows Native Americans to have family members participate in nine different holy days whereas he and other Muslim inmates are only allowed family participation in one of the two Eid celebrations.  (Dkt. No. 1 at 63-64.)

However, Plaintiff fails to show that Defendants treated him "differently from others with no rational basis for the difference in treatment."  *Bizzarro*, 394 F.3d at 86 (citations omitted).  Defendants applied the same policy to members of all other religions and excused Native Americans because of a stipulation.  (Dkt. No. 33-4 at 4 ¶ 20.)  This is evidence that the disparity resulting from the implementation of this policy was not a result of purposeful discrimination.  *See Smith v. Perlman*, No. 11-CV-20 (MAD/CFH), 2014 U.S. Dist. LEXIS 175341, at *39-42, 2014 WL 7333229, at *13-14 (N.D.N.Y. Feb. 18, 2014) (holding that there was no issue of material fact where evidence showed that defendants allowed Native Americans more family participation events per year because of a stipulation).  The record does not show

that Defendants intentionally implemented this policy against Plaintiff for discriminatory purposes. Therefore, Plaintiff has failed to show an issue of material fact with respect to his equal protection claim. Accordingly, I recommend that Defendants' motion be granted with respect to Plaintiff's equal protection claim concerning the limitation on family participation in Eid el-Adha.[11]

### D.    Qualified Immunity

In their motion for summary judgment, Defendants cursorily argue that they are entitled to qualified immunity because, "under the given circumstances, reasonable officers would not have believed that their conduct was unlawful." (Dkt. No. 33-2 at 11.) In my earlier Report-Recommendation, I recommended that Defendants be granted qualified immunity. (Dkt. No. 20 at 24.) Judge McAvoy did not grant Defendants qualified immunity for the First Amendment, RLUIPA, and equal protection claims regarding family participation in the Eid el-Adha observation for the same reasons discussed above concerning the pant length claims. (Dkt. No. 24 at 9.) Judge McAvoy held that the "absence in the record of a legitimate penological interest justifying the exclusion of family members from this particular holiday–but not others–creates a question of fact preventing the application of immunity on this claim at this time." (Dkt. No. 24 at 9.)

Here, in their motion for summary judgment, Defendants cited to legitimate penological interests, including administrative and fiscal burdens imposed on staff and DOCCS. However, as

---

[11]    Defendants also argue that they are entitled to qualified immunity against Plaintiff's equal protection concerning family participation. I will not address that argument because I recommend that Defendants should be granted their motion for summary judgment with respect to this claim.

discussed above, there is nothing in the record to show that Defendants in fact relied on those legitimate penological interests. Without determining whether Defendants relied on the justifications they mention, the Court cannot state that it was "reasonable for [Defendants] to believe that the facts as they stand . . . showed no violation of a clearly established right." *Salahuddin*, 467 F.3d at 275-76. Accordingly, I recommend that Defendants not be granted qualified immunity with respect to Plaintiff's First Amendment and RLUIPA claims concerning family participation at this stage.

## V.    CLAIMS REGARDING MEAL PRICES

Plaintiff claims that Defendant Joe Haskell, the Director of the Division of Nutritional Services for DOCCS, discriminated against Muslims in general, and Plaintiff in particular, by overcharging for meals during family events and Eid feasts. (Dkt. No. 1 at 10.) Defendants move for summary judgment, citing to administrative costs and resources as legitimate penological interests justifying this policy. (Dkt. No. 33-2 at 11.) For the reasons discussed below, I recommend that Defendants' motion for summary judgment of Plaintiff's equal protection claim concerning meal prices be denied.

### A.    Equal Protection

Plaintiff claims that the rise in meal prices violated his right to equal protection. (Dkt. No. 1 at 12.) Plaintiff has shown that he was treated differently from similarly situated individuals. He and other Muslim inmates are required to pay an adult price for a child visitor while other religions only pay fifty cents per child visitor. (Dkt. No. 1 at 10-11.)

Defendants do not explain why increasing meal prices for child visitors of Muslim inmates is a reasonable method by which administrative costs and resources will be saved.

Although in a prison setting, every religious group is not required to have identical facilities or personnel, the Equal Protection Clause calls for a rational basis for differences in treatment. *Bizzarro*, 394 F.3d at 86 (quoting *LeClair*, 627 F.2d at 609-10).

Defendants merely conclude that the meal pricing is reasonably related to legitimate penological interests including administrative costs and resources. (Dkt. No. 33-2 at 11.) These conclusory statements fail to address why the meal policy treats Plaintiff "differently from others with no rational basis for the difference in treatment." *Bizzarro*, 394 F.3d at 86 (citations omitted).

Accordingly, viewing the facts in the light most favorable to Plaintiff and drawing all inferences in his favor, with adequate consideration to Defendants' conclusory statements, I conclude that there exists an issue of material fact regarding whether Defendants' selective treatment was based on the impermissible consideration of Plaintiff's religion. Therefore, I recommend that Defendants' motion for summary judgment of Plaintiff's equal protection claim concerning meal prices be denied.

### B. Qualified Immunity

Defendants argue that they are "entitled to qualified immunity on all causes of action in the Complaint.[12]" (Dkt. No. 36 at 2.) As stated above, although Defendants mention reasons for the difference in meal prices, there are genuine issues of material fact as to whether the policy was justified by legitimate penological interests. "The Second Circuit has held that qualified

---

[12] Defendants broadly assert entitlement to qualified immunity from all of Plaintiff's claims. Defendants make no specific argument regarding Plaintiff's claim concerning meal prices. For efficiency purposes, the Court will address qualified immunity specifically in relation to Plaintiff's claim concerning meal prices.

immunity is not appropriate at the summary judgment stage where genuine issues of material fact exist as to whether defendants had legitimate penological justifications for denying plaintiffs certain opportunities for religious exercise." *Pugh*, 571 F. Supp. 2d at 512. Accordingly, I recommend that Defendant's motion be denied at this stage.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 33.) be **GRANTED** in part and **DENIED** in part. It is recommended that Defendants' motion for summary judgment be granted for the Equal Protection Clause claim for injunctive relief regarding family participation in Eid el-Adha. It is recommended that Defendants' motion for summary judgment be denied for the following claims: (1) the First Amendment claim for injunctive relief and damages regarding the length of Plaintiff's pants; (2) the RLUIPA claim for injunctive relief and damages regarding the length of Plaintiff's pants; (3) the First Amendment claim for injunctive relief and damages regarding family participation in Eid el-Adha; (4) the RLUIPA claim for injunctive relief and damages regarding family participation in Eid el-Adha; and (5) the Equal Protection Clause claim for injunctive relief and damages regarding meal prices; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Kalwasinski v. Maxymillian*, 9:09-CV-0214 (DNH/GHL), 2010 U.S. Dist LEXIS 140064, at *19, 2010 WL 5620908, at *6 (N.D.N.Y. Dec. 23, 2010); *Guillory v. Ellis*, 9:11-CV-600 (MAD/ATB), 2013 U.S. Dist. LEXIS 69183, 2013 WL 2145660 (N.D.N.Y Apr. 3 2013); *Miller v. Bouchard*, Civ. No. 9:10-CV-00983 (NAM/RFT), 2013 U.S. Dist. LEXIS 41853, 2013 WL 1294417 (N.D.N.Y. Mar. 3, 2013); *Lee v. Wenderlich*, 05-CV-6077, 2006 U.S. Dist. LEXIS 67731, 2006 WL 2711671, (W.D.N.Y. Sept.

21, 2006); *Philip v. Brown*, 9:10-CV-0643 (FJS/GHL), 2011 U.S. Dist. LEXIS 18873, 2011 WL 768975 (N.D.N.Y. Feb. 4, 2011); *Smith v. Perlman*, No. 11-CV-20 (MAD/CFH), 2014 U.S. Dist. LEXIS 175341, 2014 WL 7333229 (N.D.N.Y. Feb. 18, 2014); *Vann v. Fischer*, No. 11 Civ. 1958 (KPF), 2014 U.S. Dist. LEXIS 118247, 2014 WL 4188077 (S.D.N.Y. Aug. 25, 2014).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: March 19, 2015
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

2013 WL 2145660
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick GUILLORY, Plaintiff,

v.

Kurt ELLIS, et al, Defendants.

No. 9:11–CV–600 (MAD/ATB). | April 3, 2013.

**Attorneys and Law Firms**

Patrick Guillory, pro se.

Adele M. Taylor–Scott, Asst. Attorney General for Defendants.

**ORDER and REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants subjected him to religious discrimination, denial of access to courts, and retaliation for the exercise of his First Amendment Rights, while he was incarcerated at Mid–State Correctional Facility. (Compl.; Dkt. 1). Plaintiff seeks monetary and injunctive relief.

Presently on the docket, although not all before this court, are seven pending motions. (Dkt.Nos.119, 122, 123, 139, 140, 144, 145). Plaintiff has filed a motion to reconsider Judge D'Agostino's October 9, 2012 order affirming my orders of June 13, 2012 and September 11, 2012. (Dkt. No. 122). He has filed another motion to compel discovery (Dkt. No. 119); two motions to change venue (Dkt. No. 139, 145); a motion for recusal [1] (Dkt. No. 140); and a letter-request requesting a court appearance or in the alternative, an order preventing further retaliation against him (Dkt. No. 144).

Defendants have filed a motion for judgment on the pleadings, and plaintiff has filed a response in opposition to that motion. (Dkt.Nos.123, 129). On November 8, 2012, Judge D'Agostino stayed plaintiff's motion to compel discovery (Dkt. No. 119) and his motion for reconsideration

(Dkt. No. 122). I will discuss plaintiff's motion for recusal before I consider the other issues before me.

**DISCUSSION**

**I.** *Recusal*

**A. Legal Standards**

A federal judge must recuse himself in any proceeding where "his impartiality might reasonably be questioned [or] he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding ...." *See* 28 U.S.C. § 455. In cases where a judge's impartiality might reasonably be questioned, the issue for consideration is not whether the judge is in fact subjectively impartial, but whether the objective facts suggest impartiality. *See Liteky v. United States,* 510 U.S. 540, 548 (1994). The ultimate inquiry is whether "a reasonable person, knowing all the facts, [would] conclude that the trial judge's impartiality could reasonably be questioned." *Hughes v. City of Albany,* 33 F.Supp.2d 152, 153 (N.D.N.Y.) (Kahn, J.) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)), *aff'd,*189 F.3d 461 (2d Cir.1999). However, a judge "is as much obliged not to recuse himself when it is not called for as he is obliged when it is." *Drexel,* 861 F.2d at 1312 (citation omitted). The burden is on the party seeking recusal to prove that recusal is required. *Galet v. Carolace Embroidery Co .,* No. 97 Civ. 5702, 1999 WL 38843, at \*1 (S.D.N.Y. Jan. 28, 1999).

**B.** *Application*

In his motion, plaintiff claims that the judges assigned to this case "knew" that Jewish inmates were being "beaten, starved, and having their property destroyed for simply engaging in protected conduct."(Dkt. No. 140 at 1). He then states that "these reckless Jew haters" had plaintiff's side locks cut off when he had been given permission to wear these locks for three years. (*Id.*) Plaintiff also suggests that any delay in the resolution of his action indicates that the judges are "sitting on the bench eating cheetos doing nothing whatsoever with the exception of kissing all of the defendants' motions."(*Id.*)

**\*2** Deliberate attempts by a party to insult a judge must not result in recusal. Nor do conclusory allegations of a judge's bias or hatred against particular parties or groups of people warrant recusal. The plaintiff has offered no objective facts to suggest that this court has any personal bias against plaintiff or his religion, or any interest, financial or otherwise,

in the litigation. The fact that the court has ruled against plaintiff in certain matters is insufficient to establish that the judge is biased against plaintiff or his religion. *See Clemmons v. Commissioner of Soc. Sec.,* No. 11–CV–1645, 2011 WL 6130926, at *6–7 (E.D.N.Y. Dec. 8, 2011) (judicial rulings alone will almost never constitute a valid basis for a bias or partiality motion); *Farkas v. Ellis,* 768 F.Supp. 476 (S.D.N.Y.1991) (discussing motions and bases for recusal).

The plaintiff's bizarre allegations have little if anything to do with the issues in this case, and are utterly irrelevant to the issue of whether the assigned judge should be recused. Plaintiff's First Amendment religion claims in this action are limited to two instances in which his right to attend religious services was allegedly restricted, and one instance in which plaintiff claims that Jewish people were treated "differently." This action has nothing to do with the alleged removal of plaintiff's hair, and this court had no way of knowing how plaintiff wore his hair or whether correctional officials were planning on cutting it. [2]

Plaintiff's suggestion that his court intentionally delayed this case to facilitate alleged mistreatment beyond the scope of his complaint, is completely misplaced. This is not the only action, nor the only prisoner civil rights action that requires this court's attention. Plaintiff has filed a multiplicity of motions in this action, many of which were devoid of merit, which substantially contributed to the delays in his case. [3] The court did grant, at least in part, plaintiff's meritorious motions, such as one of his motions to compel discovery. (Dkt. No. 108). Plaintiff has also filed at least one needless and unauthorized appeal to the Second Circuit, which also delayed his case. Thus, delays in plaintiff's action do not support plaintiff's claim that the court is biased against him or that all the court does is procrastinate and favor defense motions. Therefore, I will deny plaintiff's request to recuse myself from this case and will continue to address the other motions pending before me.

## II. *Change of Venue*

### A. Legal Standards
In a civil action in which jurisdiction is ***not*** based solely on the diversity of citizenship, venue is proper "only in the judicial district where any defendant resides, if all defendants reside in the same state; where a substantial part of the events or omissions giving rise to the claim occurred or where a substantial part of the property which is the subject of

the action is situated; or where any defendant is subject to personal jurisdiction at the time the action is commenced if there is no other district in which the action may otherwise be brought. 28 U.S.C. § 1391(b).

**\*3** The relevant [4] law provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The decision to transfer is in the discretion of the judge, however, in making this determination, the court considers:

> (1) the convenience of witnesses, (2) the location of relevant documents and the relative ease of access to sources of proof, (3) the convenience of the parties, (4) the locus of operative facts, (5) the availability of process to compel the attendance of unwilling witnesses, (6) the relative means of the parties, (7) the forum's familiarity with the governing law, (8) the weight accorded plaintiff's choice of forum, and (9) trial efficiency and the interest of justice based on the totality of the circumstances.

*Wilshire Credit Corp. v. Capital Management Corp.,* 976 F.Supp. 174, 181 (W.D.N.Y.1997).

The purpose of section 1404 is to have federal civil suits tried in the district most suitable in terms of convenience, efficiency, and justice. *Garnet Analytics, Inc. v. Diversified Solutions, Inc.,* No. 12–CV–716, 2012 WL 5878664, at *5 (D.Conn. Nov. 21, 2012). The moving party bears a substantial burden to establish that transfer of the case is in the interest of justice. *Family Realty & Construction Co., LTD. v. Manufacturers and Traders Trust,* 931 F.Supp. 141, 143 (N.D.N.Y.1996) (citing *Lappe v. American Honda Motor Co.,* 857 F.Supp. 222, 229 (N.D.N.Y.1994), *aff'd sub nom. Lappe v. Honda Motor Co. of Japan,* No. 95–7389, 1996 WL 170209 (2d Cir. Apr. 11, 1996)). The court will not transfer a case without a "clear-cut and convincing [5] showing that the balance of convenience weighs strongly in favor of the transferee court." *Id.* (quoting *Lappe, supra.*)(footnote added).

### B. Application
Although plaintiff has filed what appear to be two motions to change venue in this case, it appears from reading the motions that they are both addressed to judges in the Eastern and Southern Districts of New York. (Dkt.Nos.139, 145). Plaintiff apparently believes that he may ask a judge or judges in the Eastern and Southern Districts to transfer plaintiff's case out

of the Northern District of New York. Plaintiff is mistaken in this belief. In his motion, plaintiff does not cite to any case pending in the Eastern or the Southern District in which plaintiff may make his motion.

To the extent that he is asking this court to transfer his case to one of those districts, plaintiff's motion must be denied. The parties to this action are all in the Northern District of New York, the events took place in the Northern District of New York, and the documents and witnesses are all in this district. Plaintiff originally brought this action in the Northern District of New York, and his reasons for transfer have no merit whatsoever; thus, his original proper choice of venue should control. Finally, because all the defendants, witnesses, and documents are in this district, it would be highly inconvenient to transfer this case to a district that is totally unrelated to the original action and where the original action could not have been brought. To the extent that plaintiff's papers may be read as asking this court to transfer the action, it is denied.

### III. *Judgment on the Pleadings*

**\*4** After the pleadings are closed, a motion to dismiss for failure to state a claim is properly brought as a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).*Maggette v. Dalsheim,* 709 F.2d 800, 801 (2d Cir.1983) (citations omitted).*See*Fed.R.Civ.P. 12(b), 12(c) and 12(h) (2). The motion for judgment on the pleadings is then treated according to the same standard as a motion under Rule 12(b) (6).*L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 429–30 (2d Cir.2011); *Cleveland v. Caplaw Enterprises,* 448 F.3d 518, 521 (2d Cir.2006).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007))."[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel.*

*Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia– Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated in the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). With this standard in mind, the court will turn to the individual claims remaining in plaintiff's action.

### IV. *Religion Claims*

#### A. Legal Standards

#### 1. First Amendment

Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz,* 482 U.S.342 (1987) and *Turner v. Safely,* 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588.

**\*5** In *O'Lone,* the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner,* 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4 (2d Cir.2006) (citations omitted). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of

beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett,* No. 02–CV–349, 2007 WL 1017102, at \*4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin,* 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford,* 352 F.3d at 595.

### 2. Religious Land Use and Institutionalized Persons Act
RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial. *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (citing 42 U.S.C. § 2000cc2(b)). The burden then shifts to the government to show that the burden furthers a compelling governmental interest **and** that it is the **least restrictive** means of achieving that interest. *Id.* The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."42 U.S.C. § 2000cc–5(7)(A).

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs."*Singh v. Goord,* 520 F.Supp.2d 487, 498

(S.D.N.Y.2007) (citing, *inter alia, Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck,* 379 F.Supp.2d 550, 557 (S.D.N.Y .2005)). Furthermore, the substantial evidence test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d Cir.2004) (discussing in a footnote the applicability of the "time-honored maxim *'de minimis non curat lex'* " ). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003) (discussing First Amendment protections).

### B. Application
 \*6 With respect to plaintiff's first two claims, defendants argue that one instance of interference with a religious service does not state either a First Amendment or a RLUIPA claim. Defendants cite two cases for this proposition. *See Wagnoon v. Gatson,* No. 00 Civ. 3722, 2001 WL 709276, at \*8 (S.D.N.Y. June 25, 2001); *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622, at \*15 (S.D.N.Y. Oct. 15, 1999).[6] Neither of these cases supports the defendants argument for dismissal.

In *Wagnoon,* plaintiff alleged that one defendant interfered with plaintiff's midday prayers on one occasion, ordering him to return to the yard area where he had been working. 2001 WL 709276, at \*3. There were no more facts discussed by the court in support of plaintiff's claim in *Wagnoon.*In *Troy,* plaintiff claimed that the defendant was assigned the duty of escorting inmates to their religious services. 1999 WL 825622, at \* 14. The *Troy* defendant was also responsible for responding to emergency calls, and while en route to escorting plaintiff to his services, the defendant received, and responded to, an emergency call, which prevented him from bringing plaintiff to his services. *Id.* Thus, plaintiff missed one religious service, and plaintiff alleged that this conduct deprived him of his First Amendment rights. In granting **summary judgment,** the court stated that "courts in the Second Circuit have held that an inmate's right to practice his religion is not substantially burdened if an inmate missed one religious service for *a valid reason.*"*Id.* (emphasis added).

This case is factually distinguishable from both of the above actions. While it may be true that in many cases, if plaintiff misses one religious service, there is no constitutional or statutory violation. However, the *Troy* court was considering a motion for summary judgment and qualified that proposition with the phrase "for a valid reason." In *Wagnoon,* while the court was considering a motion to dismiss for failure to state a claim, plaintiff's prayer was merely interrupted on one occasion.

In this case, plaintiff alleges, **two** days on which he was not allowed to attend services, albeit by two different defendants. The more important difference in this case is that plaintiff alleges that the reason for the denial of religious services was not "valid." In fact, plaintiff alleges that on December 7, 2011, defendant Ready affirmatively prevented plaintiff from attending a service when plaintiff was on the call-out list, while making disparaging remarks about his religion. Plaintiff also alleges that defendant Ready prevented plaintiff from attending the service on December 7, 2010 in retaliation for having filed a successful grievance against defendants Johnston and Ellis. Although this is also a separate claim of retaliation, the claim supports an inference, based only on the facts asserted in the complaint, that the denial of the religious service on December 7, 2010 was willful.

**\*7** In *Shakur v. Selsky,* 391 F.3d 106, 110–20 (2d Cir.2004), the Second Circuit held that the plaintiff inmate stated a First Amendment claim where he alleged that corrections officers maliciously and intentionally prevented him from attending an important religious feast and rejected the argument that missing one religious feast was "de minimis." In *Mills v. Fischer,* No. 11–276, 2012 WL 4215891, at *1–2 (2d Cir. Sept. 21, 2012), the court stated that where plaintiffs alleged only rudeness, but not malice, they would fail to state a plausible claim. To his complaint in this action, plaintiff attached the earlier grievance that he claims was the cause of defendant Ready's retaliatory behavior. (Dkt. No. 1 at 42–43, 45).

While it is unclear how plaintiff's claims would fare after a well-supported summary judgment motion, Judge D'Agostino found that plaintiff's complaint stated a claim for a violation of his First Amendment and RUILPA rights when she initially reviewed the complaint. Based upon plaintiff's allegation that the defendants intentionally prevented him from attending services, and at least once, engaged in that conduct in retaliation for plaintiff filing a grievance, this court cannot recommend dismissal for failure to state a claim. [7]

The March 20, 2011 incident involving defendant Ellis also may not be dismissed purely for failure to state a claim. Plaintiff alleges that he was scheduled to meet with Rabbis from Brooklyn for celebration of the Purim holiday for one and one half hours, but defendant Ellis intentionally terminated the service after a matter of minutes. Judge D'Agostino found that "construed liberally," these facts stated a "plausible claim" against defendant Ellis. (Dkt. No. 19 at 22). In a footnote, Judge D'Agostino cited *Shakur* for the proposition that a court should not dismiss a case "sua sponte" even if plaintiff alleged the interference with only one feast. (*Id.* at 22 n. 8). At this point, the court has no more information about the facts in this case than it had at the time the complaint was first filed, and defendants have alleged only that one incident is insufficient to state a First Amendment or RLUIPA claim. Because there is case law, holding that the facts of the incident can determine whether a violation has occurred, the court will recommend denying defendants motion for judgment on the pleadings as to both the First Amendment and the RLUIPA claims against defendants Ellis and Ready, including plaintiff's separate claim against defendant Ready, alleging that his actions were in retaliation for plaintiff's earlier grievance. [8]

### V. *Equal Protection*

#### A. Legal Standards
The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated people alike. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985)). Generally, the equal protection clause has been "concerned with governmental 'classifications that affect some groups of citizens differently than others.' " *Engquist v. Or. Dep't of Agric.,* 533 U.S. 591, 601 (2008). To establish an equal protection violation, the plaintiff must show that the defendants applied a different standard to similarly situated individuals. *Skehan v. Village of Mamaroneck,* 465 F.3d 96, 111 (2d Cir.2006). Plaintiff must first show that he was treated differently than others similarly situated because of intentional or purposeful discrimination.*Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Then, plaintiff must show that the difference in treatment cannot survive the appropriate level of scrutiny. *Id.*

#### B. Application

**\*8** Plaintiff simply alleges that defendant Ready treated inmates of the Jewish religion differently than he treated those of other religions. (Compl.¶ 40). While Judge D'Agostino allowed this particular claim to proceed at that "early stage," she noted that the allegations were "very sparse." (Dkt. No. 19 at 26). The fact that Judge D'Agostino allowed this claim to proceed does not guarantee that the claim will survive a motion to dismiss. Sua sponte dismissals are disfavored because the defendant is not required to answer, and plaintiff never has the opportunity to be heard in opposition. *See Snider v. Melindez,* 199 F.3d 108, 113 (2d Cir.1999) (sua sponte dismissal permitted in some circumstances, but disfavored).*See also Johnson v. Burge,* No. 11–2563, 2012 WL 6621308, at \*2 (2d Cir. Dec. 20, 2012) (it is bad practice for a district court to dismiss without affording plaintiff the opportunity to be heard in opposition).

In his opposition to the motion for judgment on the pleadings, plaintiff states that Judge D'Agostino already found that he pleaded the Equal Protection claim sufficiently, and to hold otherwise would be to overrule her order and to act inconsistently with the controlling law. (Dkt. No. 129 at 11–14). Plaintiff states that he has given defendants sufficient notice of what plaintiff is claiming against them. However, this court cannot agree. As stated above, an Equal Protection claim must state that the defendants applied a different standard to similarly situated individuals. In *Ashcroft,* the Supreme Court stated that although the pleading standard does not require "detailed factual allegations," it does demand "more than an unadorned, thedefendant-unlawfully-harmed-me-accusation." 556 U.S. at 677. Furthermore, a complaint does not suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.' " *Id.* (citing *Twombly,* 550 U.S. at 555, 557).

Plaintiff's Equal Protection argument is one such claim. Although he alleges that defendant Ready treated Jewish inmates "differently," there is no indication of what plaintiff meant by that and how they were treated differently. Plaintiff still does not elaborate in his response to defendants motion. He has not even cited one instance in which another religion was treated "differently" by defendant Ready. Essentially, plaintiff makes a "naked" assertion that has no factual "enhancement" and should be dismissed. It is unclear how defendant Ready would be able to respond to a claim of unequal treatment if he does not know to what unequal treatment plaintiff refers, when it occurred, or who was responsible. Plaintiff must remember that he is suing individuals, and that the defendant must have had

*personal responsibility* for the conduct making up plaintiff's claim. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

The Equal Protection claim, as it stands may not survive the motion for judgment on the pleadings. However, if the court adopts this recommendation, plaintiff may be given the opportunity to propose an amendment that would allege any specific instance in which he was treated differently, than any other inmate, under the same circumstances because plaintiff was Jewish. [9] Plaintiff may move to amend to add the specific factual circumstances that lead him to believe that an inmate of another religion was treated in a more advantageous manner because of his religion.

## VI. *Mail/Access to Courts/Retaliation*

### A. Legal Standards

#### 1. Mail

**\*9** Among the protections enjoyed by prison inmates, subject to appropriate limitations, is the right "to the free flow of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek,* No. 05–CV–172 (GLS/DRH), 2007 WL 3254373, at \*6 (N.D.N.Y. Nov. 2, 2007) (Sharpe, J.) (quoting *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003))."The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise."*Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, at \*5 (S.D.N.Y. March 29, 2001). This right, however, must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002) (citing, *inter alia, U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996))."The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)).

Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably

related to the legitimate penological interests."*Turner v. Safley,* 482 U.S. at 89. Applying this precept, "[c]ourts have constitutionally afforded greater protection ... to outgoing mail than to incoming mail."*Davis,* 320 F.3d at 351 (citations omitted). Nonetheless, the Second Circuit has held that " 'where good cause is shown, outgoing mail can be read' without violating inmates' First Amendment rights."*Workman,* 80 F.3d at 698 (quoting *Wolfish v. Levi,* 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979)).

Prison security is a legitimate penological interest that justifies limitations on an inmate's First Amendment rights related to regular mail. *See Cancel v. Goord,* 2001 WL 303713, at *6. "[T]he interception of a prisoner's correspondence does not violate that individual's First Amendment rights 'if prison officials had good or reasonable cause to inspect the mail.' " *Knight v. Keane,* No. 99 Civ. 3955, 2005 U.S. Dist. LEXIS 18702, at * 18 (S.D .N.Y. August 26, 2005) (citing *United States v. Felipe,* 148 F.3d 101, 108 (2d Cir.1998) (Report–Recommendation), *adopted* 2006 WL 89929 (S.D.N.Y. Jan. 12, 2006). Legal mail is entitled to a higher degree of protection than regular mail, and "prison policies or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail. *Cancel v. Goord,* 2001 WL 303713, at *6–7 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)).

**2. Access to Courts**

 **\*10** Legal mail claims are sometimes related to claims that defendants have denied an inmate access to courts by interfering with legal mail. It is well-settled that inmates have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 823 (1977). The Supreme Court held in *Bounds* that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."*430 U.S. at 828.*

"Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995). In addition, "to establish

a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Lewis v. Casey,* 518 U.S. 343, 351 (1996).*See Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008). In order to show actual injury, the defendants' conduct must have "hindered [plaintiff's] efforts to pursue a legal claim." 518 U.S. at 351.

**3. Retaliation**
In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Id.* at 381 (citations omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."*Bennett,* 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977).) Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**B. Application**
 **\*11** Plaintiff alleges that after he filed a grievance against defendant Ready, which was denied on January 14, 2011, defendants Kupiec and Marlenga began to lose and/or destroy plaintiff's packages that were received in the mail room.

(Compl.¶ 57). Although defendants argue that plaintiff has not stated a First Amendment claim against Kupiec or Marlenga for denial of access to courts, defendants do not address the retaliation claim with respect to these two defendants, relating to any of his mail claims. Without further establishment of the facts in this case, including affidavits by defendants, this court is presented with nothing more that the facts as stated by plaintiff in his complaint, together with any attachments therein. If defendants began destroying or interfering with plaintiff's mail, legal or otherwise, in retaliation for plaintiff's grievances, then plaintiff has stated a constitutional claim, even if standing alone, the interference with mail or alleged destruction of property would not have risen to the level of a constitutional violation. Thus, this court will not recommend dismissal of any of the mail claims against defendants Kupiec and Marlenga.

In making this recommendation, the court does not make any rulings regarding whether these claims would withstand a properly supported motion for summary judgment.

## VII. *Personal Involvement*

### A. Legal Standards

As stated above, personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event.*Id.* See also *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

### B. Application

Defendants argue that plaintiff has not shown the personal involvement of either defendant Fischer, the Commissioner of the Department of Corrections and Community Supervision ("DOCCS") or defendant Boll, Counsel to DOCCS. Judge D'Agostino found that at that early stage of the proceeding, plaintiff's allegations, "while rather sparse" against the supervisory defendants, were sufficient to justify keeping them in the action and requiring a response.

**\*12** In plaintiff's response to defendants' motion, he claims that he has "so many documents from Fischer and Boll that [he] can flood the docket."(Dkt. No. 129 at 22). The mere receipt of a letter or similar complaint is insufficient to constitute personal involvement; otherwise, a plaintiff could create personal involvement by any supervisor simply by writing a letter. See *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002). In order for a letter to suffice to establish personal involvement, plaintiff would have to show that the supervisor conducted a personal investigation or personally took action on the letter or grievance. *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009); *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S . D.N.Y.2004). However, personal action does *not* include referring the letter to a subordinate for investigation. *Id.* (citing *Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)); *Hartnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008).

Plaintiff's response implies that he can make the appropriate showing. Because this court is recommending that this action proceed at least to a properly supported motion for summary judgment, the court will not recommend dismissing the action as against defendants Fischer and Boll based on lack of personal involvement. Even if the court recommended dismissing based on failure to state a claim, plaintiff would generally have the opportunity to move to amend his complaint to state the requisite facts. See *Cuoco v. Moritsugo,* 222 F.3d 99, 112 (2d Cir.2000) (a district court should not dismiss a pro se complaint on the pleadings without granting leave to amend *at least once* when a liberal reading of the complaint gives any indication that a valid complaint may be stated). [10]

**WHEREFORE,** based on the findings above, it is

**ORDERED,** that plaintiff's motion to recuse this court (Dkt. No. 140) is **DENIED,** and it is

**ORDERED,** that to the extent plaintiff's motions to change venue (Dkt. Nos.139, 145) are directed at this court, they are **DENIED,** and it is

**ORDERED,** that plaintiff's motion for a "court appearance" (Dkt. No. 144) is **DENIED,** and it is

**RECOMMENDED,** that defendants' motion for judgment on the pleadings (Dkt. No. 123) be **GRANTED ONLY AS TO THE EQUAL PROTECTION CLAIM AS AGAINST DEFENDANT READY,** and the complaint be **DISMISSED WITHOUT PREJUDICE AS TO THE EQUAL PROTECTION CLAIM,** and it is

**RECOMMENDED,** that defendants' motion for judgment on the pleadings (Dkt. No. 123) be **DENIED IN ALL OTHER RESPECTS,** and it is

**RECOMMENDED,** that if the court accepts this Recommendation, the stay be lifted, and that the defendants be Ordered to respond to plaintiff's motion to compel (Dkt. No. 119) within 21 days of the decision on this Report–Recommendation. [11]

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.***Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir.1989)*); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

## Footnotes

1   The motion actually asks for my recusal as well as that of Judge D'Agostino. (Dkt. No. 140). However, I can only address the motion as it relates to me. The disqualification of a federal justice, judge, or magistrate judge is governed by 28 U.S.C. § 455, which specifically states that it is a judge's obligation to "disqualify himself." 28 U.S.C. § 455(a). Consistent with that language, courts uniformly recognize that a motion to recuse is directed to the presiding judge. *See, e.g., In re Certain Underwriter, 294 F.3d 297, 302 (2d Cir.2002)* (disqualification rests with the presiding judge) (citing *In re Drexel Burnham Lambert, Inc., 861 F.2d 1307, 1312 (2d Cir.1988)* (same).

2   The court notes that plaintiff has moved for a "court appearance" so that the judges may look at what has been done to his hair, which, again, is completely unrelated to the claims before me. (Dkt. No. 144). To the extent that plaintiff moves for a "court appearance," his motion will be denied.

3   The docket sheet in this action is currently 23 pages long and contains 147 entries. Approximately 32 of those documents are "motions" by plaintiff that the court has had to, or is now addressing. (Dkt.Nos.4–6, 8, 16, 22, 35, 44, 48, 51–52, 59, 64–65, 66, 68–69, 81,88, 90, 94, 96, 101–103, 119, 122, 135, 139–40, 144–45). This does not include letters requesting that the court update him on the status of his action or making other requests from the clerk.

4   Section 1404(a) was amended in 2011 to additionally provide for a change of venue to "any district or division to which all parties have consented."28 U.S.C. § 1404(a). However, the amended section applies only to cases filed or removed after January 6, 2012, thirty days after the effective date of December 7, 2011. The amendment is not applicable to plaintiff's action which was filed on May 31, 2011. In any event, there is no indication that all of the parties would consent to the transfer of this action to either the Eastern or the Southern District as plaintiff requests.

5   It has also been held, albeit in another district, that the burden on the moving party is by a preponderance of the evidence. *See Figgie Internat'l, Inc. v. Destileria Serrales, Inc., 925 F.Supp. 411, 413 (D.S.C.1996)* (citation omitted). However, more recent cases have indicated that the moving party must show that the transferee forum is "clearly more convenient and that a transfer will promote the interests of justice rather than simply shift the inconvenience from one party to the other."*See Warfield Elec. Co ., Inc. v. Warfield Electric of Texas, Inc.,* No. 99 C 2901, 1999 U.S. Dist. LEXIS 20160, *6 (N.D.Ill.Dec. 29, 1999) (citations omitted).

6   *Wagnoon* is attached to defendants' motion papers as Ex. C, and *Troy* is attached as Ex. A. (Dkt. No. 123–4, 123–1).

7   Plaintiff has attached a CORC decision from April 13, 2011 to his complaint. (Dkt. No. 1 at 58). The court notes that the CORC found that the December 7, 2010 incident was an "isolated incident," but this finding is not controlling without additional information or affidavits from defendants.

8   This court makes no ruling or recommendation regarding whether the case would survive a properly supported motion for summary judgment, which could include affidavits from defendants.

9   The court notes that plaintiff's Equal Protection claim is based upon his allegation that defendant Ready told plaintiff on December 7, 2010, that Ready was not calling the Sergeant for plaintiff "or any other Jew." (Compl.¶ 40). While, if true, this statement may indicate that defendant Ready did not like Jewish people, it does not follow that defendant treated those of another religion differently.

10    If the plaintiff decides to move to amend his complaint, in an attempt to remedy the defects in his Equal Protection claim, he may
      wish to consider amending his allegations with respect to the personal involvement of defendants Fischer and Boll.

11    Lifting the stay may also affect plaintiff's motion for reconsideration (Dkt. No. 122), but that motion is before Judge D'Agostino and
      she can direct how, if at all, that motion will proceed.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5620908
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edward KALWASINSKI, Plaintiff,
v.
Terri MAXYMILLIAN, Michael
Hogan, Donald Sawyer, Defendants.

No. 9:09–CV–0214 (DNH/
GHL).  |  Dec. 23, 2010.

**Attorneys and Law Firms**

Edward Kalwasinski, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Dean J. Higgins, Esq., of Counsel, Albany, NY,
for Defendants.

*REPORT–RECOMMENDATION and ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

 **\*1** This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me
for Report and Recommendation by the Honorable David
N. Hurd, United States District Judge, pursuant to 28
U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Edward
Kalwasinski alleges that Defendants violated his right to
exercise his religion at the Central New York Psychiatric
Center ("CNYPC"). Currently pending before the Court are
cross-motions for summary judgment pursuant to Federal
Rule of Civil Procedure 56. (Dkt. Nos. 33 and 37.)For the
reasons that follow, I recommend that Defendants' motion be
granted in part and denied in part and that Plaintiff's motion
be denied.

**I. FACTUAL AND PROCEDURAL SUMMARY**
On June 13, 2007, Plaintiff was civilly committed to CNYPC
pursuant to Article 10 of New York's Mental Hygiene Law.
(Dkt. No. 1 at 3 ¶¶ 1–2.)Plaintiff informed "administrators"[1]
that he was a Muslim and needed to participate in all of the
activities required by his faith, including prayer, meals, and
ceremonies. *Id.* at 3–4 ¶ 3.

Plaintiff alleges that Defendants Terri Maxymillian (the
director of the Sex Offender Treatment Program at CNYPC),
Michael Hogan (the commissioner of the New York Office of
Mental Health), and Donald Sawyer (the executive director of
CNYPC) violated his constitutional rights by (1) not allowing
Al–Jumuʻah prayer on Fridays; (2) forcing Plaintiff to eat
food from bowls and with plastic silverware contaminated
with pork from prior meals eaten by non-Muslims; (3)
denying Plaintiff sacred foods during holidays; (4) forcing
Plaintiff to eat fish on Fridays "as the church of Catholics
require[s]"; and (5) forcing Plaintiff to attend Sex Offender
Treatment Program ("SOTP") classes on Fridays. *Id.* at 4–5
¶¶ 4–7.[2]

**II. APPLICABLE LEGAL STANDARDS**

**A. Legal Standard Governing Motions for Summary
Judgment**
Under Federal Rule of Civil Procedure 56, summary
judgment is warranted if "the pleadings, the discovery and
disclosure materials on file, and any affidavits show that
there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of
law."Fed.R.Civ.P. 56(c)(2). The party moving for summary
judgment bears the initial burden of showing, through the
production of admissible evidence, that no genuine issue of
material fact exists. Only after the moving party has met this
burden is the nonmoving party required to produce evidence
demonstrating that genuine issues of material fact exist.
*Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006).
The nonmoving party must do more than "rest upon the
mere allegations ... of the [plaintiff's] pleading" or "simply
show that there is some metaphysical doubt as to the material
facts."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574, 585–86 (1986). Rather, a dispute regarding
a material fact is *genuine*"if the evidence is such that a
reasonable jury could return a verdict for the nonmoving
party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248
(1986). In determining whether a genuine issue of material[3]
fact exists, the Court must resolve all ambiguities and draw
all reasonable inferences against the moving party. *Major
League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309
(2d Cir.2008).

**B. Legal Standard Governing Motion to Dismiss for
Failure to State a Claim**
 **\*2** To the extent that a defendant's motion for summary
judgment under Federal Rule of Civil Procedure 56 is based

entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment."*Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F .R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ."*Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally."*Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."*Iqbal,* 129 S.Ct. at 1949.

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Religion Claims

#### 1. *Applicable Standard*

Depending on the circumstances, different standards apply to claims that state actors have violated an individual's right to freely exercise religion. Generally, in order to satisfy the Free Exercise Clause of the First Amendment, government actions that substantially burden a religious practice must be justified by a compelling government interest. *Sherbert v. Verner,* 374 U.S. 398 (1963). However, due to the unique concerns of the prison setting, prisoners' First Amendment free exercise rights must be balanced against the interests of prison officials engaged in the complex duties of administering the penal system. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). Thus, a prison regulation or individualized decision to deny a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests."*Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987) (punctuation omitted).

**\*3** The Second Circuit has not decided which standard applies to individuals, like Plaintiff, who are civilly committed to locked psychiatric facilities that share characteristics with penal institutions. District courts in the Second Circuit are split on the issue. *Compare Carney v. Hogan,* No. 9:08–CV–1251 (DNH/ATB), 2010 U.S. Dist. LEXIS 59439, at *8, 2010 WL 2519121, at *3 (N.D.N.Y. Mar. 30, 2010) (applying substantial burden/compelling interest test to CNYPC patient's free exercise claim) *and Pratt v. Hogan,* 631 F.Supp.2d 192, 198 (N.D.N.Y.2009) (same) (Hurd, J.), *with Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 U.S. Dist. LEXIS 48753, at *16–17, 2008 WL 2543573, at *6 (S.D.N.Y. June 25, 2008) (applying legitimate penological purpose test to Mid–Hudson Psychiatric Center patient's free exercise claim) *and Abdul–Matiyn v. Pataki,* No. 9:06–CV–1503, 2008 U.S. Dist. LEXIS 118430, at *32, 2008 WL 974409, at *12 (N.D.N.Y. Apr. 8, 2008) (applying legitimate penological purpose test to CNYPC patient's free exercise claim) (Hurd, J.).[4] In an abundance of caution, I will consider Plaintiff's claims in the context of each standard.[5]

Plaintiff's religious rights are also protected by the Religious Land Use and Institutionalized Persons Act. ("RLUIPA"). [6] RLUIPA, like the Free Exercise Clause as applied to non-prisoners, applies a compelling governmental interest test. Specifically, RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution [7] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." [8] 42 U.S.C. § 2000cc–1(a).

### 2. *Al Jumu'ah Service*

Plaintiff alleges that Defendants violated his religious rights by failing to hold proper Al Jumu'ah services. (Dkt. No. 1 at 4 ¶ 4(a).) Defendants move for summary judgment of this claim, arguing that the unavailability of proper Al Jumu'ah services was caused by legitimate penological interests. (Dkt. No. 37–8 at 5.)

### a. *Facts*

"Al Jumu'ah is an important service for Muslims. Unlike other Muslim daily prayers, it is not a prayer that can be worshiped individually. It is a congregate prayer performed every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer.... There is no alternative means of attending Jumu'ah. Attendance at the congregational prayer is obligatory on all men in the Muslim religion."(Najeeullah Decl., Dkt. No. 37–5 ¶¶ 10–11.) Plaintiff alleges that CNYPC stopped offering Al Jumu'ah services in August 2008. (Dkt. No. 33–1 ¶ 1.)

At CNYPC, a Muslim prayer service or study class [9] is offered on Fridays from 9:30–10:30 a.m. (Defs.' Ex. 1, Dkt. No. 37–4 at 2.) Imam Malik Najeeullah presides. (Dkt. No. 37–5 ¶ 7.) Plaintiff's official schedule at CNYPC includes this event. (Defs.' Ex. 9, Dkt. No. 37–4 at 45.)Defendants state that "CNYPC was under the mistaken belief that the Al Jumu'ah prayer could be worshiped individually and that the regularly scheduled worship time for Muslims at 9:30 a.m. on Fridays was available to satisfy the desire of resident Muslims to worship the prayer."(Dziadyk Decl., Dkt. No. 37–6 ¶ 12.)

**\*4** On January 22, 2009, Plaintiff sent a complaint to Defendant Maxymillian objecting to the lack of Al Jumu'ah services. (Pl.'s Ex. C, Dkt. No. 33–2 at 11 ¶ 1.) Defendant

Maxymillian responded, stating that "CNYPC ... offers Muslim prayer services on Friday mornings that are led by Imam Najeeullah. Those services have not been changed nor has [Plaintiff] been denied the ability to attend."(Defs.' Ex. 7, Dkt. No. 37–4 at 40.)

On February 20, 2009, Plaintiff filed this action. (Dkt. No. 1.)

On March 18, 2009, Plaintiff sent a complaint to Defendant Sawyer in which he objected to the lack of Al Jumu'ah services. (Pl.'s Ex. G, Dkt. No. 33–2 at 17.)Defendant Sawyer responded that "Muslim services are offered on Fridays at 9:30 a.m. This time was set to meet both the needs of the residents and the Imam's schedule. The Imam has informed us that formal services do not need to happen at noon as residents can participate individually and from any location at that time." [10] *Id.* at 18.

On March 27, 2009, Imam Najeeullah issued a memorandum titled "Jumu'ah Prayer or the Friday Worship Service for Muslim[s]." (Pl.'s Ex. A, Dkt. No. 33–2 at 7.) It is not clear to whom the memorandum was directed, but the document states that Elaine Dziadyk (the supervisor of rehabilitation services) and S. Montrose (a social worker supervisor) received copies. *Id.* Imam Najeeullah explained that Al Jumu'ah should occur at approximately 1:15 p.m. during daylight savings time, that the prayer was "obligatory for all Muslims," and that the Friday morning Muslim study class at CNYPC was "not a Jumu'ah worship service." *Id.* Imam Najeeullah stated that his schedule did not allow him to facilitate a Friday Al Jumu'ah prayer service at CNYPC, but that "[t]here should always be a qualified Imam available to facilitate this service if it is allowed."*Id.*

On May 1, 2009, John Culkin, the Director of the Bureau of Sex Offender Evaluation and Treatment, responded to an April 7, 2009, letter from Plaintiff. (Pl.'s Ex. D, Dkt. No. 33–2 at 15; Defs.' Ex. 8, Dkt. No. 37–4 at 42.)Mr. Culkin stated that "[p]er staff at Central New York Psychiatric Center, the facility offers Muslim prayer services at 9:30 am on Friday mornings. These services have not changed nor have you been denied the right to attend them as currently scheduled. The Imam has additionally informed [CNYPC] staff that formal services do not need to occur at noon as residents can participate individually and from any location at that time."*Id.*

On May 19, 2009, Mental Hygiene Legal Services wrote to Mr. Culkin, enclosing a copy of a letter from Imam Najeeullah. (Pl.'s Ex. E, Dkt. No. 33–2 at 16.)Mental Hygiene

Legal Services noted that Imam Najeeullah's letter stated "that the Jumu'ah worship service is 'obligatory for all Muslims,' just as 'Sunday worship service is for all Christians' " and that "the 'study classes' he does host on Thursdays and Fridays are 'not a Jumu'ah worship service.' " *Id.*

**\*5** On October 23, 2009, Defendants Sawyer and Maxymillian responded to Plaintiff's interrogatories. (Dkt. No. 37–4 at 52–66.)In those responses, Defendants reiterated their answers to Plaintiff's grievances and stated that Imam Abdullah Muhammad had informed them that congregate prayer was not necessary for Al Jumu'ah. *Id.*

On January 13, 2010, Imam Abdullah Muhammad wrote to Deputy Attorney General Dean J. Higgins, counsel for Defendants in this action. (Pl.'s Ex. B, Dkt. No. 33–2 at 8.) He stated that he was writing to "clarify a gross misunderstanding" that Al Jumu'ah "can be performed individually." *Id.* He explained that "[a]ttendance at the congregational prayer is obligatory on all men ... So, it is impossible for me to advise anyone that Jumu'ah prayer can be performed individually. What I did say, and it may be the source of the misunderstanding, is that the [five] daily prayers can be performed individually under circumstances such as those found in jails, prisons, and other institutions."*Id.*

At some point, officials at CNYPC came to understand that "Al Jumu'ah is a congregate prayer that can[ ]not be worshiped individually."(Dziadyk Decl., Dkt. No. 37–6 ¶¶ 13.) Thereafter, the facility "commenced a search for a Muslim Imam to conduct the service."*Id.* ¶ 14. CNYPC officials asked Imam Najeeullah to preside at the service. *Id.* ¶ 15. Imam Najeeullah is employed part-time by both the New York Department of Correctional Services ("DOCS") at Marcy Correctional Facility and the Department of Mental Health at CNYPC. (Najeeullah Decl., Dkt. No. 37–5 ¶¶ 2–3.) Imam Najeeullah attempted to get permission from DOCS to conduct a service at CNYPC, but his request was denied because it would conflict with his schedule of services at Marcy. *Id.* ¶ 12.

Imam Najeeullah has worked with CNYPC officials "to identify an eligible Imam who would be able to conduct services at the Center," but no such individual has been found. (Dkt. No. 37–5 ¶ 13.) At one point, an individual was "identified ..., but it was determined that he was not eligible" because of "issues in his background." *Id.* ¶ 14; Dkt. No. 37–6 ¶ 18. Defendants do not identify what these "issues" were or why they rendered the individual unsuitable. Defendants

state that the search is ongoing. (Dkt. No. 37–5 ¶ 16; Dkt. No. 37–6 ¶ 19.)

On February 4, 2010, Stephen C. Clark, the principal attorney for the Mental Hygiene Legal Service for the Fourth Judicial Department, wrote to Plaintiff. (Pl.'s Ex. C, Dkt. No. 33–2 at 9–10.)Mr. Clark reported that he had met with members of the CNYPC staff, including Defendants Sawyer and Maxymillian, to discuss the lack of Al Jumu'ah services at CNYPC. *Id.* at 9. Defendant Sawyer stated that CNYPC was "actively attempting" to find someone and "insured that he would continue to work to bring this matter to a quick resolution."*Id.* Mr. Clark inquired whether Plaintiff would be interested in being trained to lead Al Jumu'ah services because Defendant Sawyer "seemed to indicate that the hospital would be willing to entertain getting appropriate training for someone currently there [ ] to run such services."*Id.*

**b.** *Analysis*

**\*6** Under the legitimate penological interest test, a prisoner "must show at the threshold that the disputed conduct substantially burdens [11] his sincerely held religious beliefs."*Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). Defendants do not dispute that Plaintiff's religious beliefs are sincerely held or that the lack of Al Jumu'ah services burdened those beliefs. Indeed, for the purposes of the pending motions, Defendants concede that Al Jumu'ah "is a central religious service of the Muslim faith" and that "[t]here is no alternative to the Al Jumu'ah worship."(Dkt. No. 37–8 at 5.) Therefore, I find that Plaintiff holds a sincere religious belief that has been substantially burdened. The issue, then, is whether Defendants have established as a matter of law that this burden was caused by a legitimate or compelling governmental interest.

Under the deferential legitimate penological interest test, once a plaintiff establishes that his or her sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational."*Salahuddin,* 467 F.3d at 275 (quoting *Ford,* 352 F.3d at 595) (punctuation omitted). Although the defendants' burden is "relatively limited," the legitimate penological interest advanced must have been the *actual* reason for the defendants'

actions. "Post hoc justifications with no record support will not suffice." *Salahuddin,* 467 F.3d at 276–77.

Here, Defendants rely on a post hoc justification. Defendants state that they

> are not opposed to permitting Plaintiff's participation in the congregate Al Jumu'ah; however ... there is currently no Imam available to conduct the service ... [T]he Imam and the CNYPC staff are addressing this issue and have instituted a search for a person to conduct the service. Once an Imam is identified, the service will be instituted and Plaintiff will be permitted to attend.

(Dkt. No. 37–8 at 5.) This was not the reason that Defendants initially gave for not offering the Al Jumu'ah service. Rather, Defendants initially responded to Plaintiff's complaints by stating that they believed that the Friday morning session offered by Imam Najeeullah was sufficient and that no congregate Al Jumu'ah service was required.[12] Defendants admit in their motion papers that this belief was "mistaken." (Dkt. No. 37–6 ¶ 12.) Defendants persisted in this "mistaken belief" for at least seventeen months, from the time that they ceased offering Al Jumu'ah services in approximately August 2008 until January 2010, when Imam Muhammad wrote to defense counsel to correct Defendants' "gross misunderstanding." (Dkt. No. 37–4 at 40; Dkt. No. 33–2 at 8.) Indeed, individuals associated with CNYPC continued to assert their belief that Al Jumu'ah was not required for several months after Plaintiff filed this action. (Dkt. No. 37–4 at 42.)Thus, the initial denial of Al Jumu'ah was due not to the lack of an Imam as Defendants now contend, but rather to a misunderstanding of the religious significance of Al Jumu'ah. It was not until after Imam Muhammad corrected this misunderstanding that Defendants began to search for an Imam who could preside at Al Jumu'ah.

**\*7** Even if Defendants' justification were not post hoc, it would be insufficient to support a finding, as a matter of law, that the denial of Al Jumu'ah was motivated by a legitimate penological interest. As another judge in this District has observed, the legitimate penological interest inquiry "is particularly fact-lad[ ]en and often ill-suited for resolution on [a] motion for summary judgment ..."*Jackson v. Boucaud,* No. 9:08–CV–1373 (TJM/DEP), 2009 U.S. Dist. LEXIS 125893, at \*26, 2009 WL 6066799, at \*7

(N.D.N.Y. Dec. 31, 2009).[13] Here, Defendants simply have not provided the Court with enough information to analyze the issue. Defendants do not provide any details at all about why the search for an Imam has been unsuccessful, other than to state that one potential Imam was not eligible because of unspecified "issues in his background." (Dkt. No. 37–6 ¶ 18.)

Defendants' justification, and the lack of detail they provide about it, is similar to that asserted in a recent case from the District of Connecticut.*Vega v. Lantz,* No. 304CV1215DFM, 2009 U.S. Dist. LEXIS 88550, 2009 WL 3157586 (D.Con. Sept. 25, 2009).[14] In *Vega,* a state prisoner claimed that his free exercise and RLUIPA rights were violated because the facility routinely cancelled Al Jumu'ah. *Vega,* 2009 WL 315786, at \*1. The defendants conceded that Al Jumu'ah had been frequently cancelled over a four-year period, but argued that cancellation was necessary "when there is no chaplain available or in case of a security lockdown."*Id.* at \*11. The court denied the defendants' motion for summary judgment because the defendants "provide[d] no explanation for the frequent cancellation of Jumah, or of the insufficient and unequal staffing that allegedly underlies it."*Id.* Thus, the court found, the defendants had failed "to carry their burden of showing that the frequent cancellation of Jumah is either rationally related to a legitimate penological interest ... or in furtherance of a compelling governmental interest."*Id.*

Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing Plaintiff's claim regarding the Al Jumu'ah service.

### 3. *Bowls and Utensils*

Plaintiff alleges that Defendants violated his religious rights by "forcing Plaintiff to eat food from bowls contaminated with pork from prior meals eat [en] by non-Muslims."(Dkt. No. 1 at 4 ¶ 4(b).) Defendants move for summary judgment dismissing this claim, arguing that Plaintiff's religious beliefs have not been burdened. (Dkt. No. 37–8 at 6.) Defendants are correct.

Imam Najeeullah declares that there is "no prohibition" on eating from a bowl or using a utensil previously used by a non-Muslim to eat pork "so long as they have been washed and sanitized ..." (Dkt. No. 37–5 ¶¶ 18–19.) Valerie Fasteson, the Director of Nutritional Services for CNYPC, declares that plates, bowls, and utensils are "thoroughly washed and sanitized" before they are reused. (Dkt. No. 37–7 ¶ 6.) CNYPC residents can also request disposable plates and

tableware that would be used only once and then discarded. *Id.* ¶ 7. Plaintiff has not made such a request. *Id.*

**\*8** In opposition to Defendants' motion for summary judgment, Plaintiff admits that "all bowls and utensils are washed and sanitized after use and before re-use and such washing is consistent with the tenets of the Muslim faith."(Dkt. No. 37–1 ¶ 20; Dkt. No. 40 ¶ 9.)

Therefore, Plaintiff has not raised a triable issue of fact that his sincerely held religious beliefs have been burdened and I recommend that the Court dismiss Plaintiff's claim regarding the contamination of bowls and utensils.

### 4. *Food Issues*

Plaintiff alleges that his religion requires him to eat Halal foods and that Defendants violated his constitutional rights by forcing him "to eat meals issued for Christian and Catholic religions, e.g.: Friday Muslims must eat fish as the church of Catholics require."(Dkt. No. 1 at 5 ¶ 5.) It is not entirely clear whether Plaintiff objects to the lack of a Halal menu or to the fact that fish is served on Fridays. Defendants argue that serving fish on Fridays does not burden Plaintiff's religious beliefs and that they are not constitutionally required to provide an entirely Halal menu. (Dkt. No. 37–8 at 5–6.)

#### a. *Fish on Friday*

Imam Najeeullah declares that "[f]ish is an acceptable food for a Muslim diet and the service of fish would violate no tenet of our faith."(Dkt. No. 37–5 ¶ 21.) Plaintiff admits in his reply papers that fish is a permissible food under Islamic law. (Dkt. No. 40 ¶ 8.) Therefore, Plaintiff has not raised a triable issue of fact that his sincerely held religious beliefs were burdened by the fact that fish was served on Fridays at CNYPC and I recommend that the Court grant Defendants' motion for summary judgment with respect to the claim that CNYPC's practice of serving fish on Fridays violated Plaintiff's rights under the Free Exercise Clause or RLUIPA . [15]

#### b. *Halal Foods*

Plaintiff may also be claiming that Defendants violated his free exercise and RLUIPA rights because CNYPC does not offer a Halal menu. (Dkt. No. 1 at 5 ¶ 5.) Defendants move for summary judgment of this claim. (Dkt. No. 37–8 at 5–6.)

The Second Circuit has "clearly established that a prisoner has a right to a diet consistent with his or her religious

scruples."*Ford,* 352 F.3d at 597. However, "[a]ll that is required for a prison diet not to burden an inmate's free exercise of religion is the provision of a diet sufficient to sustain the prisoner's good health without violating [his religion's] dietary laws."*Muhammad v. Warithu–Deen Umar,* 98 F.Supp.2d 337, 344 (W.D.N.Y.2000) (citing *Abdul–Malik v. Goord,* No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at \*6 (S.D.N.Y. Feb. 27, 1997)). [16]

Defendants assert that meals at CNYPC "do not violate any tenets of the Muslim faith."(Dkt. No. 37–1 ¶ 19.) For this proposition, Defendants cite the declarations of Valerie Fasteson and Imam Najeeullah. *Id.* Neither of the declarations cited by Defendants show that CNYPC meals do not violate Muslim dietary laws. Ms. Fasteson declares that "[a]lthough the dietary service does not serve a strictly Halal diet, we do serve meals that are not violative of Muslim tenets. We do serve an alternative diet that, upon information and belief and based on the declaration of Imam Najeeullah ..., does accommodate the Muslim faith. This would include an option that would insure a pork free diet."(Dkt. No. 37–7 ¶ 5.) Imam Najeeullah's declaration does not state that CNYPC's alternative diet accommodates the Muslim faith. Rather, Imam Najeeullah merely states that fish in an acceptable food for a Muslim diet and that "the Halal diet is important to a Muslim's faith ... I will work with CNYPC staff to try and find ways to make a Halal diet possible."(Dkt. No. 37–5 ¶¶ 21–22.) These vague declarations stand in stark contrast to the evidence presented in a case cited by Defendants, *Majid v. Fischer,* No. 07 Civ. 4584, 2009 U.S. Dist. LEXIS 71616 (S.D.N.Y. Jul. 31, 2009). [17] There, the defendants provided the court with a report from an Imam explicitly stating that the pork-free menu offered by DOCS was "adequate and sufficient for Muslims under Islamic law and does not require Muslims to choose between violating their religious practice or starving."*Majid,* Dkt. No. 37–10 at 8.

**\*9** Moreover, Defendants have not provided the Court with enough evidence to establish as a matter of law that CNYPC provides a pork-free diet that is sufficient to sustain Plaintiff's good health. Indeed, the only reference in the record to the nutritional quality of the alternative menu is one sentence in the Inpatient Operations Manual stating that CNYPC's pork-free diet "meets 100 percent of the RDA."(Defs.' Ex. 3, Dkt. No. 37–4 at 24.)Defendants do not note this fact in their memorandum of law or ask the Court to draw any conclusions from it.

Additionally, Defendants have not provided any evidence regarding the legitimate penological or compelling interests supporting the menu at CNYPC. Although Defendants cite cases upholding DOCS' menu in the face of First Amendment and RLUIPA challenges by Muslim inmates, Defendants have not provided the Court with any evidence that CNYPC's menu is similar to DOCS' or that it is driven by similar penological interests. In contrast to the dearth of detail here, the defendants in *Majid* provided the court with a declaration describing in detail the number of inmates who needed to be fed in the DOCS system, the nutritional and religious factors that DOCS considered in formulating menus, the cost of providing a pork-free (but non-Halal) menu as compared with the regular menu, and the problems associated with obtaining Halal meats. Thus, I find that Defendants have not established, as a matter of law, that CNYPC provided Plaintiff with a diet sufficient to maintain his good health without violating Muslim dietary laws. Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing this claim.

**5.** *Classes on Fridays and Denial of Sacred Foods on Holidays*

Defendant's motion for summary judgment does not address Plaintiff's claims that (1) being required to attend classes on Fridays violates his religious rights; or (2) Defendants violated Plaintiff's religious rights by denying him sacred foods on holidays. Therefore, I find that the claims should survive Defendants' motion for summary judgment.

**B. DUE PROCESS CLAIM**

Plaintiff claims that Defendants violated his Fifth and Fourteenth Amendment rights to due process. (Dkt. No. 1 at 7.) Regarding the due process issue, Plaintiff's complaint states only that "Plaintiff has not d[one] anything to lose his right[s] afforded by the" First Amendment. *Id.* Defendants argue that the complaint fails to state a due process claim. (Dkt. No. 37–8 at 6–7.)Defendants are correct. Plaintiff's due process claim simply duplicates his free exercise and RLUIPA claims. *See Velez v. Levy,* 401 F.3d 75, 94 (2d Cir.2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."). Therefore, I recommend that the Court grant Defendants' motion for summary judgment dismissing Plaintiff's due process claim.

**C. EIGHTH AMENDMENT CLAIM**

**\*10** Plaintiff claims that Defendants violated his Eighth Amendment rights. (Dkt. No. 1 at 8.) Defendants argue that the complaint fails to state an Eighth Amendment claim. (Dkt. No. 37–8 at 6–7.)Defendants are correct.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society."*Estelle,* 429 U.S. at 102. To satisfy the objective component of an Eighth Amendment claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities."*Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim."*Hudson v. McMillian,* 503 U.S. 1, 9 (1992). To satisfy the subjective component, the defendant's behavior must be "wanton." *Whitley v.. Albers,* 475 U.S. 312, 320 (1986). Where a prisoner claims that a defendant provided inadequate conditions of confinement, he must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302–03 (1991). A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."*Farmer,* 511 U.S. at 837.

Here, Plaintiff has not raised a triable issue of fact that Defendants deprived him of the minimal civilized measure of life's necessities or that they knew of and disregarded an excessive risk to Plaintiff's health or safety. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of Plaintiff's Eighth Amendment claim.

**D. PERSONAL INVOLVEMENT BY DEFENDANT HOGAN**

Defendants argue that any claims against Defendant Hogan should be dismissed because Plaintiff has failed to allege that Defendant Hogan was personally involved in any

constitutional violation. (Dkt. No. 37–8 at 7–8.)Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a *Bivens* cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [18] *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

**\*11** Here, the complaint does not mention Defendant Hogan at all other than in the caption and the list of parties. (Dkt. No. 1.) In response to interrogatories from Plaintiff, Defendant Sawyer stated that he could not recall Defendant Hogan making any inquiry about Plaintiff's March 18 complaint. (Dkt. No. 33–2 at 19.)Thus, the complaint fails to plausibly suggest, and the evidence fails to raise a triable issue, that Defendant Hogan was personally involved in any alleged constitutional violation. Therefore, I recommend that the Court dismiss Plaintiff's claims against Defendant Hogan.

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
Plaintiff's motion for summary judgment (Dkt. No. 33) focuses entirely on the lack of Al Jumu'ah services at

CNYPC. I have discussed all of the evidence submitted by Plaintiff regarding this issue above, in Section III(A)(2). In analyzing Plaintiff's motion for summary judgment, I must resolve all ambiguities and draw all reasonable inferences in Defendants' favor. *Major League Baseball Props., Inc.,* 542 F.3d at 309. Although, as discussed above, Defendants have not provided the Court with sufficient evidence to support summary judgment in their favor on the Al Jumu'ah issue, they have provided sufficient evidence to raise a triable issue of fact. A reasonable juror could find that Defendants had a legitimate penological or a compelling interest for the decision not to hold Al Jumu'ah services at the proper time. Therefore, I recommend that the Court deny Plaintiff's motion for summary judgment.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED IN PART AND DENIED IN PART.*I recommend that the Court grant Defendants' motion and dismiss the following claims: (1) the free exercise and RLUIPA claims regarding the use of bowls and utensils; (2) the free exercise and RLUIPA claims regarding CNYPC's practice of serving fish on Fridays; (3) any Establishment Clause claim regarding CNYPC's practice of serving fish on Fridays; (4) the due process claim; (5) the Eighth Amendment claim; and (6) all claims against Defendant Hogan; and it is further

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 33) be *DENIED;* and it is further

**RECOMMENDED** that the following claims survive the pending motions: (1) the free exercise and RLUIPA claims regarding the lack of Al Jumu'ah services at CNYPC; (2) the free exercise and RLUIPA claims regarding the lack of a Halal menu at CNYPC; (3) the claim regarding CNYPC's requirement that Plaintiff attend classes on Fridays; and (4) the claim that Defendants denied Plaintiff sacred foods on holidays. The parties should be prepared, in further proceedings, to fully brief whether the legitimate Penological interest or the compelling government interest test should be applied to this case; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Carney v. Hogan,* No. 9:08–CV–1251 (DNH/ATB), 2010 U.S. Dist. LEXIS 59439, 2010 WL 2519121 (N.D.N.Y. Mar. 30, 2010); *Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 U.S. Dist. LEXIS 48753, 2008 WL 2543573 (S.D.N.Y.

June 25, 2008); *Abdul–Matiyn v. Pataki,* No. 9:06–CV–1503, 2008 U.S. Dist. LEXIS 118430, 2008 WL 974409 (N.D.N.Y. Apr. 8, 2008); *Jackson v. Boucaud,* No. 9:08–CV–1373 (TJM/DEP), 2009 U.S. Dist. LEXIS 125893, 2009 WL 6066799 (N.D.N.Y. Dec. 31, 2009); *Vega v. Lantz,* No. 304CV1215DFM, 2009 U.S. Dist. LEXIS 88550, 2009 WL 3157586 (D.Conn. Sept. 25, 2009); and *Abdul–Malik v.. Goord,* No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402 (S.D.N.Y. Feb. 27, 1997) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*12** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.****Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

## Footnotes

1    The complaint does not identify these "administrators" by name.

2    Plaintiff's motion for summary judgment focuses entirely on the Al Jumu'ah issue. (Dkt.Nos.33–1, 33–2).Defendants, too, focus largely on the Al Jumu'ah issue.

3    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

4    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

5    Defendants' position is that the legitimate penological interest test should apply because "Plaintiff has made reference to prisoner litigation in his complaint and has not suggested that the analysis for a free exercise claim by an involuntarily committed individual is different from the analysis applied to prisoners' free exercise claims."(Dkt. No. 37–8 at 3, citation to complaint omitted.)

6    Although Plaintiff's complaint does not explicitly claim that Defendants are liable under RLUIPA, I am required to construe the complaint liberally, interpreting it to raise the strongest possible arguments that it suggests. *Chavis v. Chappius,* 618 F.3d 162 (2d Cir.2010). Moreover, Plaintiff refers to RLUIPA in his motion for summary judgment. (Dkt. No. 33–2 at 5.) Defendants do not address RLUIPA.

7    An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia,* "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1) (2010).

8    Although neither the Supreme Court nor the Second Circuit has yet decided the issue, the consensus of opinion among district courts in the Second Circuit is that RLUIPA does not authorize suits for money damages. *See Pugh v. Goord,* 571 F.Supp.2d 477, 506–09 (S.D.N.Y.2008). That issue is currently pending before the Supreme Court in *Sossamon v. Texas* (No. 08–1438, argued Nov. 2, 2010). That issue does not affect the analysis here because Plaintiff requests both money damages and injunctive relief. (Dkt. No. 1 at 7–9.)

9    At various times, CNYPC officials, including Defendants, have referred to this event as a "prayer service." (Dkt. No. 33–2 at 18; Dkt. No. 37–4 at 32, 40.)Imam Najeeullah, who presides over the event, refers to it as a "class." (Dkt. No. 33–2 at 16; Dkt. No. 37–5 ¶ 7.)

10    In response to interrogatories, Defendant Sawyer identified "the Imam" who had "informed" him on these matters as Imam Abdullah Muhammad. (Pl.'s Ex. G, Dkt. no. 33–2 at 19.)Imam Abdullah Mohammad is the Muslim Chaplain at Mohawk Correctional Facility. (Pl.'s Ex. B, Dkt. No. 33–2 at 8.)

11    Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.'The court then proceeded as if the substantial burden requirement applied."*Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

12    I note that such a justification would not, if asserted in the pending motion, be legally sufficient to entitle Defendants to summary judgment. *Ford,* 352 F.3d at 597–98. Even if this justification were legally sufficient, it would not be factually supported here. As Imam Muhammad indicated in his letter to defense counsel, he never intended for Defendants to believe that congregate Al Jumu'ah prayer is merely optional for Muslims.

13    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

14    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

15    Plaintiff may also be asserting an Establishment Clause claim regarding the service of fish on Fridays. Any such claim would be subject to dismissal for failure to state a claim. *See Travillion v. Leon,* 248 Fed. App'x 353, 355–56 (3d Cir.2007) (affirming trial court's 12(b)(6) dismissal of claim that jail's service of vegetarian menu during Lent violated Protestant inmate's rights under the Establishment Clause).

16    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

17    Defendants served a copy of this unpublished decision on Plaintiff with their summary judgment papers. (Dkt. No. 37–10.)

18    In *Iqbal,* 129 S.Ct. at 1949, the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's own purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). I will assume for the purposes of this motion that the *Colon* categories remain good law.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2711671
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Thomas L. LEE, Plaintiff,
v.
S. WENDERLICH, C. Woughter,
David P. Hallenbeck and Iman
Mamoun El-Hassan, Defendants.

No. 05-CV-6077.  |  Sept. 21, 2006.

**Attorneys and Law Firms**

Thomas L. Lee, Woodbourne, NY, pro se.

Tamara B. Christie, A.A.G., New York State Attorney
General's Office, Rochester, NY, for defendants.

### DECISION and ORDER

SIRAGUSA, J.

### INTRODUCTION

**\*1** This prisoner civil rights case, brought pursuant to 42
U.S.C. § 1983 (2003), is before the Court on plaintiff's motion
for partial summary judgment and defendants' cross-motion
for summary judgment pursuant to Federal Rule of Civil
Procedure 56(c). For the reasons stated below, plaintiff's
motion is denied and defendants' motion is granted in part,
and denied in part.

### BACKGROUND

Plaintiff is a Muslim inmate who is currently incarcerated
at Woodbourne Correctional Facility. Plaintiff alleges that
when he was incarcerated at the Elmira Correctional Facility
("Elmira"), defendants violated his rights under the First
and Fourteenth Amendments, as well as his rights under
the Religious Land Use and Institutionalized Persons Act
("RLUIPA"). (Compl. at 1-6.) Prior to the celebration of
the month of Ramadan in 2004, plaintiff was informed
by defendants of the rules and regulations applicable to
celebrants of that Muslim holiday. One of the rules stated:

> If you intentionally miss (3) call-outs
> during Ramadan, we will presume
> that you wish not to participate, and
> therefore, your name will be taken off
> the list.

(Hallenbeck Declaration (# 25), at 10.) On October 26,
2004, plaintiff was notified that his name was removed
from the Ramadan service list after missing three call-
outs. (Motion for Partial Summary Judgment, Lee Affidavit
(# 20) at 4.) On October 30, 2004, plaintiff filed an
inmate grievance complaint challenging the actions of
Acting Deputy Superintendent of Security S. Wenderlich
("Wenderlich"), Deputy Superintendent of Programs C.
Woughter ("Woughter"), Assistant Deputy Superintendent of
Programs David P. Hallenbeck ("Hallenbeck") and Muslim
Chaplain Imam Mamoun El-Hassan ("Imam"):

> The complaint arise [sic] challenging the actions of Acting
> Dep. Security, Mederlich [sic], Dep. Sup. Programs C.
> Woughter, Assist., Dep. of Programs Hallenbeck, and
> Imam El-hassan. [sic] The subject is a devout muslim [sic]
> of thirty years. Registered and approved [sic] to participate
> in "Ramadan." Thereafter, Lee had been allowed into
> the mosque at appox. 8:15 p.m., to shower and pray the
> "tarawith prayer," Because [sic] Lee is a cook for ramadan.
> [sic] Now on October 26 and 27 [th] [sic], I was denied acess
> [sic] into the masjid at night for the tarawith paryer [sic].
>
> As Lee was coming for [sic] the kitchen after cooking the
> meal. [sic] I was told that my name had been removed from
> the ramdan [sic] list because I had missed "three days" from
> [sic] coming to the mosque. I told the assigned officers that
> there must be some kind of mistake, [sic] I was then told to
> return to my housing area I then complied [sic]. Again on
> October 28 [th] [,] Lee took a day off from the dutys [sic] in
> the kitchen, and went to recreation for one hour and then
> proceeded to the mosque, and was once again told that my
> name had been taken off the ramadan [sic] list because I
> had missed three days[.] I then was told to return to my cell.
> As a result I was denied the right to partake in ramadan
> [sic] (prayer) and was denied the evening meal. As well as
> the benefit of the spiritual educational goal. [sic]

**\*2** The actions of the above mentioned employees and
Imam El-Hassan; [sic] removing inmate from the ramadan
[sic] list for missing "three days" is in violation of ones
[sic] First Amendment right under the United States

Constitution and Correction Law 601 Moreover, [sic] tese [sic] violate (RLUIPA).

(Inmate Grievance Complaint attached to Compl. at 9.) The Inmate Grievance Complaint also requested the following actions:

> Requests that a full hearing be conducted and that those responsible answer this grievance supporting there [sic] position[.] That my name and all others similarly situated be placed by on the ramadan [sic] list[.]

(*Id.*)On November 5, 2004, plaintiff received a response from Hallenbeck:

> Your name was removed from the list because of excessive unexcused absences. If you have a legitimate reason for any of your absences, please contact me with a full explanation.

(*Id.* at 23.)Plaintiff did not respond to Hallenbeck's letter. On December 9, 2004, plaintiff received a response from the grievance clerk denying his complaint. Specifically, the response noted:

> The Committee can not recommend grievant's action requested due to the response being responded to approximately 27-days later; due to the Imam being on vacation during the 27-days for response.

(*Id.* at 11.)The Grievance Committee's decision was upheld by the Superintendent on November 3, 2004. On December 22, 2004, plaintiff appealed the Superintendent's decision to the Central Office Review Committee ("CORC").*See Hemphill v. New York,* 380 F.3d 680, 682 (2d Cir.2004) (reviewing DOCS grievance procedure under N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7(c)(4)). On January 12, 2005, plaintiff's appeal request was unanimously denied by CORC, which stated:

> Contrary to the grievant's assertions, CORC has not been presented with sufficient evidence to substantiate any malfeasance by staff.

(Inmate Grievance Complaint attached to Compl. at 13.) Plaintiff asserts that as a result of defendants' actions, he was

denied his right to participate in Ramadan service for twenty-three days. Plaintiff has moved for summary judgment as to defendants Imam and Woughter. Defendants oppose plaintiff's motion and cross-move for summary judgement as to plaintiff's claims against all defendants.

## STANDARDS OF LAW

### Summary Judgment Standard

The standards for deciding a summary judgment motion under Fed.R.Civ.P. 56 are well established. Summary judgment shall be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Under the rule, the burden is on the moving party to inform the Court of the basis for the motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party has carried that burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Instead, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed.R.Civ.P. 56(e) (alteration in original)). At the summary judgment stage, when perusing the record to determine whether a rational fact-finder could find for the nonmovant, the Court must draw all reasonable inferences in favor of the nonmovant. *See Murray v. National Broadcasting Co.,* 844 F.2d 988, 992 (2d Cir.), *cert. denied,*488 U.S. 955 (1988). In their Notice of Cross-Motion (# 23) filed on March 23, 2006, defendants informed plaintiff of the need to respond to their motion pursuant to *Irby v. New York City Transit Authority,* 262 F.3d 412 (2d Cir.2001), and of the need to file a separate statement of facts, pursuant to Local Rule of Civil Procedure 56.1. Pl.'s Notice of Motion (# 23), at 1-2. Moreover, because plaintiff is proceeding pro se, the Court reads his pleadings "liberally and interpret[s] them to raise the strongest arguments that they suggest."*McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (citation and internal quotation marks omitted). However, the application of this different standard does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment.*Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995).

### Section 1983

**\*3** Plaintiff brings this action pursuant to 42 U.S.C. § 1983. In order to state a claim under § 1983, plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993).

### First Amendment Standard

Prisoners have a constitutional right to participate in congregate religious services. *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.), *cert. denied,*492 U.S. 909 (1989). Yet, a prisoner's right to practice his religion is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,*498 U.S. 951 (1990). Constitutional protections extend to prisoners insofar as the inmates must be given "reasonable opportunities ... to exercise the religious freedom guaranteed by the First and Fourteenth Amendment[s]."*Cruz v. Beto,* 405 U.S. 319, 322 n. 2 (1972).

The standard set forth in *Turner v. Safley,* 482 U.S. 78 (1987), for assessing a claim that prison officials impermissibly infringed on an inmate's free exercise of religion, requires the Court to consider whether the officials' conduct "is reasonably related to legitimate penological interests."*Id.* at 89; *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 353 (1987). Specifically, four factors must be considered:

> (1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; (2) whether the inmates have alternative means to exercise the right; (3) the impact that accommodation of the right will have on the prison system; and (4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

*Salahuddin v. Coughlin,* 993 F.2d 306, 308-09 (2d Cir.1993) (quoting *Benjamin,* 905 F.2d at 574).

### Procedural Due Process Standard

A procedural due process analysis proceeds with two questions. "The first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."*Kentucky Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460 (1989) (citations omitted). The Supreme Court held six years later, in *Sandin v. Conner,* 515 U.S. 472 (1995), that,

> Following *Wolff,* [1] we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause.... But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

**\*4** *Sandin,* 515 U.S. at 483-84 (citations omitted).

### Equal Protection Standard

The equal protection clause directs state actors to treat similarly situated people alike. *See Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). To prove an equal protection violation, claimants must prove purposeful discrimination, *see McCleskey v. Kemp,* 481 U.S. 279, 292 (1987), directed at an identifiable or suspect class. *See Kadrmas v. Dickinson Pub. Schs .,* 487 U.S. 450, 457-58 (1988).

### Religious Land Use and Institutionalized Persons Act Standard

Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA") in response to the Supreme Court's holding in *City of Boerne v. Flores,* 521 U.S. 507 (1997), declaring unconstitutional the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(b). RLUIPA applies both to programs or activities that receive federal financial assistance and to substantial burdens on religious exercise having an effect on interstate commerce. 42 U.S.C. § 2000cc-1 (b); *see also Mayweathers v. Terhune,* No. Civ. S961582LKKGGHP, 2001 WL 804140, \*3, 2001 U.S. Dist. LEXIS 22300, \*1 (E.D.Cal. July 2, 2001) (describing RLUIPA and sustaining its constitutional validity). The statute provides:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

> Under RLUIPA, once a plaintiff produces prima facie evidence to support a free exercise violation, the plaintiff bears the burden of persuasion on whether the regulation substantially burdens the plaintiff's exercise of religion and the state bears the burden of persuasion on all other elements.

*Cancel v. Mazzuca,* No. 01 Civ. 3129(NRB), 2003 WL 1702011, *6 (S.D.N.Y. Mar. 28, 2003).

**Personal Involvement of Supervisory Officials**

For a claim against state officials in their personal capacity to survive, a plaintiff must demonstrate "personal involvement of defendants in alleged constitutional deprivations...."*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted); *see also Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.1973) ("The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the defendant is required.").

Personal involvement of a supervisory official may be established:

> [B]y evidence that: (1) the [official] participated directly in the alleged constitutional violation, (2) the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [official] created a policy or custom under which unconstitutional practices occurred, or allowed the

continuance of such a policy or custom, (4) the [official] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [official] exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring.

**\*5** *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 254 (2d Cir.2001) (alterations in original) (quoting *Colon,* 58 F.3d at 873).

**Qualified Immunity Standard**

Where federal claims are involved, "qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Zahra v. Town of Southold,* 48 F.3d 674, 686 (2d Cir.1995) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 73 L.Ed.2d 396, 102 S.Ct. 2727 (1982)); *see also Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996) ("A government employee sued in her individual capacity for damages arising out of her performance of discretionary functions is entitled to qualified immunity where it was objectively reasonable to believe that her acts did not violate clearly established federally protected rights."). Under this formulation, all government officials are protected from liability in connection with their official acts provided that "it is objectively reasonable for [them] to believe that [they are] acting within constitutional and statutory bounds." *Zahra,* 48 F.3d at 686 (quoting *Natale v. Town of Ridgefield,* 927 F.2d 101, 104-05 (2d Cir.1991)).

### DISCUSSION

After thoroughly analyzing the claims presented by plaintiff and by defendants in support of their respective motions for summary judgment, the Court determines that neither is entitled to summary judgment on the basis of the First or Fourteenth Amendments, or RLUIPA.

***First Amendment Claim***

Addressing plaintiff's First Amendment claim, as stated above, four factors must be considered. Each will be discussed separately below.

### 1. Rational relation to a legitimate penological interest

Plaintiff argues that the three-absence rule had no rational relation to a legitimate penological interest. In his response to defendants' motion for summary judgment, plaintiff contests the validity of defendants' claim of conserving financial and administrative resources by enforcing the three-absence rule. Specifically, he states:

19. The plaintiff 42 U.S.C. § 1983 does not challenge the constitutionality of the "Ramadan Mubarak" rules and regulation[s] for ramadan [sic]. Although the Ramadan Mubarak rules and regulations are evidentiary in nature. [sic] For example, on p. 2 paragraph 6 states "a list of all Muslims will be given to Mr. Fletcher (food service manager) to assure the (count) of meals to prepare. Please contact the Imam for any questions."

20. Therefore, their [sic] was no "financial resources" being wasted as the defendants contend in there [sic] response. See (Declaration of El-Hassan and David Hallenbeck).

(Pl.'s Rule 56 Statement in Resp. to Defs.' Mot. for Summ. J. (# 33) at 5-6.) This statement seems to undermine plaintiff's argument that defendants' enforcement of the three-absence rule was not sufficiently related to penological interests. Plaintiff states that there was a list created and based on this list, a set number of special Ramadan meals would be prepared. Logically, if plaintiff failed to show up for these meals, the financial resources put into making them would seem to go to waste. Furthermore, plaintiff does not put forth any facts regarding the financial impact, if any, of missing these meals. Therefore, plaintiff has not met his burden of showing there was no legitimate penological interest in conserving financial and administrative resources by defendants' enforcement of the three unexcused absence rule.

 **\*6** With regard to this first factor of First Amendment analysis, defendants contend that they had a legitimate penological interest in implementing the three un-excused absence rule. In his declaration in support of defendants' motion, Hallenbeck listed several reasons why the three un-excused absences rule is used:

Allowing the inmates to participate in religious programs at the facility requires administrative accommodations as well as financial resources necessary to maintain the program. The purpose of the three (3) un-excused absences rule is to ensure that the administrative and financial resources necessary to implement and maintain the religious program(s) are not being wasted on inmates who do not sincerely wish to participate.

(Hallenbeck Declaration at 7.)

Rules designed to enforce the conservation of administrative and financial resources have been recognized by courts as a legitimate penological interest. *Orafan v. Goord,* 411 F.Supp.2d 153, 167 (N.D.N.Y.2006). In *Orafan,* prison officials denied Muslim inmates a separate Shiite service. The Court found it was reasonably related to legitimate penological interests because a separate service would have adversely impacted security, staffing and fiscal policies. *Id.* Specifically, prison officials submitted proof in admissible form that:

DOCS would have to increase the number of staff personnel, who would be required to escort inmates to and from the service as well as monitor the service. Increasing security staffing would result in an increase in work hours and overtime, which would constitute a significant payroll expense in a difficult fiscal climate. Identifying a separate space for the service would "pose a very difficult problem," especially because the two prayer services would need to occur at the same time, therefore possibly requiring an additional Mosque at each facility.

*Id.*

Here, however, the Court finds that Hallenbeck's declaration contains merely a conclusory statement. In *Orafan,* prison officials laid out specific reasons why not accommodating the prisoner's request would impose difficulties on their

fiscal and administrative services. Defendants do not provide specific facts regarding the financial and administrative burden sought to be avoided. Therefore, defendants have not met their burden of showing a legitimate penological interest in conserving financial and administrative resources by their enforcement of the three unexcused absence rule.

**2. Alternative means of exercising the right to religious freedom**

Plaintiff nowhere alleges that he was left without an alternate means of celebrating Ramadan. Therefore, plaintiff has not met his burden on this second factor of First Amendment analysis.

Defendants claim that plaintiff did have an alternative means to exercise his religious rights:

> From the evidence presented thus far, it is clear that, although he was removed from the Ramadan service list, plaintiff could have still practiced Islam. He could still pray and study. He could have worn religious clothing. He could have continued to avoid violations of religious rules. Finally, plaintiff could have been placed back on the Ramadan service call-out list, if he had provided Hallenbeck with a reason for missing the three Muslim meals.

**\*7** (Hallenbeck declaration at 7.) In *Withrow v. Bartlett,* 15 F.Supp.2d 292 (W.D.N.Y.1998), the Court found that the plaintiff, who had been denied the opportunity to pray in the recreational yard with other Muslims, had an alternative means of exercising his right to religious freedom. The Court based its reasoning on an affidavit of the ministerial program coordinator, who was the Islamic affairs specialist employed by DOCS:

> According to Imam Umar, DOCS has established programs for Muslim inmates, and those programs do accommodate the inmates' five daily religious obligations. As Umar indicated in his affidavit, the five daily prayer requirements can be met by way of formal prayer or informal prayer, if formal prayer is not practical at a

particular time and place. The formal prayer can be made up at another time. Inmates may pray when they wake, at various times during the day in their cells, and at night before they sleep. Plaintiff was allowed to go back to his cell during the recreational period, where he could engage in demonstrative prayer, or he could participate in group prayer in the Mosque or attend Muslim study groups at designated times and places. Plaintiff also had the option to remain in the yard, perform nondemonstrative prayer there, and make up his formal prayer obligation at some other time.

*Id.* at 296.

In this case, though, it is unclear from defendants' declaration whether plaintiff could have properly celebrated the holiday of Ramadan as a result of their three-absence rule. In *Withrow,* a religious leader testified that there was an alternate way for plaintiff to practice his religion. Here, in contrast, defendants merely assert, with no factual support, that plaintiff had a legitimate alternative means of celebrating Ramadan. Consequently, the Court finds that defendants have not met their burden of showing that plaintiff had an alternative means of exercising the right to religious freedom.

*3. Impact of the requested accommodation on the prison system*

The third factor in First Amendment analysis requires the Court to determine the effect of the three-absence rule on administrative and financial resources within the prison system. First, the Court notes that plaintiff has not submitted any proof in admissible form to show that allowing him to attend the Ramadan service, despite his three prior absences, would have no negative impact on the prison system.

As previously discussed in the first factor (rational relation to a legitimate penological interest), defendants have not met their burden of proving a significant negative impact. Defendants failed to submit any evidentiary proof showing the exact nature of administrative and financial resources that would be depleted as a result of a failure to enforce the three-absence rule. Thus, neither plaintiff nor defendants have submitted proof in admissible form to show their entitlement to judgment on this factor.

### 4. Absence of ready alternatives

**\*8** The final factor is whether there are alternatives to enforcement of the three-absences rule that would accommodate the inmate, but also be consistent with DOCS' legitimate concerns. As for the plaintiff, he has not submitted any proof in admissible form to establish an absence of ready alternatives, which would permit him properly the celebration of the month of Ramadan. With regard to defendants, they have not offered proof of an alternative means of celebrating Ramadan. They have only alleged in conclusory fashion that plaintiff was not restrained from practicing Islam. This is an insufficient basis for the Court to find that there were sufficient alternatives.

Therefore, the Court determines that neither plaintiff nor defendants have met their burden of demonstrating that they are entitled to judgment as a matter of law with respect to plaintiff's First Amendment claim.

### Procedural Due Process Claim

Although plaintiff has not specifically claimed a procedural due process violation, the Court is required to give a liberal reading to pro se complaints. *See Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001). In plaintiff's reply memorandum, he states:

> And even if the court were to find that prison officials['] intrest [sic] of administrative and financial resources are justified. [sic] Then how would a prisoner who may have been absent for the Ramadan services, and who has a legitimte [sic] explanation to know whom to contact about ant [sic] that he may have missed? Or does he have to wait until his name is removed from the Ramadan list before tring [sic] to have his name place [sic] back on the call out list. The Ramadan rules and regulation [sic] does not provide a mechanism for anyone who may have been absent from the Ramadan services due to any of the above mentioned reasons.

(Pl.'s Mem. of Law in Resp. to Defs.' Mot. for Summ. J. (# 33) at 6.) The Court will now analyze this claim under *Sandin v. Conner,* 515 U.S. 472 (1995).

The first question *Sandin* asks whether there exists a liberty or property interest which has been interfered with by the State. *Sandin,* 515 U.S. at 477-78. The Court determines that by denying plaintiff the right [2] to have his name on the Ramadan service list, defendants have interfered with plaintiff's liberty interest. The second question posed is whether the procedures attendant upon that deprivation were constitutionally sufficient. *See Kentucky Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460 (1989). Defendants have repeatedly stated that they gave plaintiff an alternate means of addressing his claim through an informal method.

On or about November 5, 2004, I responded to inmate Lee's complaints about being removed form the Ramadan list. In particular, I advised inmate Lee that his name was removed from the list because of excessive unexcused absences. I advised inmate Lee that if he had a legitimate reason for any of his absences, he should contact me with an explanation. **\*9** (Hallenbeck Declaration at 2.) However, according to DOCS's regulations, an inmate is not required to settle a grievance through informal channels:

> An inmate should seek assistance in resolving a complaint through a guidance unit, program area directly affected, or other existing channels, informal or formal, prior to submitting a formal grievance. However, a facility may not require the use of a "pre-exhaustion" procedure as a condition for filing a grievance. The failure of an inmate to attempt to resolve a problem on his/her own must not preclude the initial submission of the grievance. An inmate should be encouraged to attempt to resolve a problem on his/her own. Failure to do so may result in the dismissal and closing of the grievance at the IGRC hearing.

7 N.Y.C.R.R. § 701.3(a) (2006). Furthermore, the Court finds it significant that plaintiff's grievance was delayed an additional twenty-seven days simply because the Imam

was on vacation. This is longer than the proper time period for handling grievances as stated in DOCS's regulations. 7 N.Y.C.R.R. § 701.7(a)(4) (2006) (requiring a hearing within seven working days after receipt of the grievance, and a decision within two working days of the hearing). Therefore, there exists the possibility that the enforcement of the three-absence rule may impact on plaintiff's procedural due process rights. However, since neither side has specifically addressed this issue, or requested judgment on it, the Court will not make a determination as to whether plaintiff's procedural due process rights were in fact violated.

**Equal Protection Claim**

Nowhere does plaintiff submit evidence in admissible form that he was treated differently from others similarly situated as a result of intentional or purposeful discrimination. *Giano*, 54 F.3d at 1057. Therefore, plaintiff is not entitled to judgment on his equal protection claim. On the other hand, since defendants have shown that plaintiff will be unable to meet his burden of proof at trial on this claim, defendants are entitled to judgment on plaintiff's Equal Protection cause of action.

**Religious Land Use and Institutionalized Persons Act**

Even assuming *arguendo* that he has established a prima facie free exercise claim, plaintiff has presented insufficient evidence to show that his right to exercise his religion was substantially burdened. As stated above in the First Amendment discussion, nowhere does plaintiff even allege that he was left without an alternate means of celebrating Ramadan. Defendants have shown that plaintiff will be unable to meet his burden of proof at trial on this claim, defendants are entitled to judgment on plaintiff's RLUIPA claim.

**Personal Involvement**

Defendants Wenderlich and Woughter assert that claims against them should be dismissed because plaintiff has failed to show their personal involvement. As stated above, five separate ways exist to establish personal involvement. The Court will proceed to analyze each in turn.

 **\*10** First, a plaintiff may establish that a defendant participated directly in the alleged constitutional violation. *Johnson,* 239 F .3d at 254. Here, plaintiff has not submitted evidentiary proof that Wenderlich or Woughter had any direct participation in a claimed constitutional violation.

Second, a plaintiff may establish that a defendant, after being informed of the violation through a report or appeal of the disciplinary action, failed to remedy the wrong. *Id.* Here, after plaintiff filed his grievance, he was afforded a full inmate grievance hearing and was also allowed to appeal to the Superintendent. Although, plaintiff alleges that on October 20, 2004, he "wrote a cover letter to all of the defendant(s) [sic] in this complaint, inquiring as to why my name had been removed from the ramadan [sic] service list."(Compl.¶ 13.), "the mere receipt of a letter of complaint from an inmate is insufficient to establish personal involvement and liability under § 1983."*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Further, plaintiff has failed to submit evidentiary proof in admissible form that either Wenderlich or Woughter was actually involved in the grievance process. Thus, plaintiff has not shown personal involvement through this second means.

Third, a plaintiff may establish that a defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom. In his affidavit, plaintiff states that:

> [i]t is a[sic] undisputed material fact that ... C. Woughter "created" the 'Elmira Correctional Facility Guidelines for (Muslim) Ramadan 2004', and has personal knowledge of his 'policy'.

(Lee Affidavit at 3.) Because plaintiff has submitted undisputed evidence in admissible form of Woughter's involvement in the alleged constitutional violation, defendants are not entitled to dismissal of the claims against Woughter due to lack of personal involvement. However, plaintiff does not allege that Wenderlich was involved in making the policy underlying the alleged constitutional violation. Therefore, the Court will continue the analysis of the last two factors only with regard to Wenderlich.

Fourth, a plaintiff may assert that a defendant was grossly negligent in supervising subordinates who committed the wrongful acts. *Johnson,* 239 F.3d at 254. Here, plaintiff does not allege any facts suggesting that Wenderlich was grossly negligent.

Fifth, a plaintiff may assert that a defendant exhibited deliberate indifference to the rights of others by failing to act on information indicating that unconstitutional acts were occurring. *Id.* Here, there is no allegation that Wenderlich was ever informed of the conduct of which plaintiff complains.

Accordingly, defendants have shown that plaintiff failed to establish personal involvement by Wenderlich. Therefore, the claims against him must be dismissed. On the other hand, plaintiff has met his burden of showing Woughter's personal involvement. Consequently, claims against him may go forward.

**Qualified Immunity**

 **\*11** The uncontested facts show that defendants have established a rule that if a Ramadan celebrant missed three call-outs during Ramadan, his name would be removed from the Ramadan service list. On its face, the Court finds that the rule is not violative of plaintiff's constitutional rights. Moreover, the evidentiary proof establishes that defendants were following this rule when they removed plaintiff's name from the list.

Where federal claims are involved, "[q]ualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Zahra v. Town of Southold,* 48 F.3d 674, 686 (2d Cir.1995) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 73 L.Ed.2d 396, 102 S.Ct. 2727 (1982)); *see also Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996) ("A government employee sued in her individual capacity for damages arising out of her performance of discretionary functions is entitled to qualified immunity where it was objectively reasonable to believe that her acts did not violate clearly established federally protected rights."). Under this test, government officials are protected from liability in connection with their official acts provided that "it is objectively reasonable for [them] to believe that [they are] acting within constitutional and statutory bounds." *Zahra,* 48 F.3d at 686 (quoting *Natale v. Town of Ridgefield,* 927 F.2d 101, 104-05 (2d Cir.1991)). "A plaintiff who seeks damages for violation of constitutional or statutory rights may

overcome the defendant official's qualified immunity only by showing that those rights were clearly established...." *Elder v. Holloway,* 510 U.S. 510, 515 (1994) (citation omitted).

In considering the issue of qualified immunity, the Court concludes that an inmate's right to attend Ramadan service is clearly established. *Muhammad v. San Joaquin County Jail,* No. CIV S-02-0006 LKK CMK P, 2006 WL 1282944, \*7 (E.D.Cal. May 10, 2006).*See also, Smith v. Violi,* No. No. C-92-20202-RMW, 1995 WL 150465, \*3 (N.D.Cal. Mar. 31, 1995) ("as a matter of law, that the law requiring the availability of after-sundown meals during Ramadan to Muslim prisoners who request then is clearly established.") ("This court therefore finds, as a matter of law, that the law requiring the availability of after-dark kosher meals during the Islamic holy month of Ramadan to Muslim prisoners who request them is clearly established."). Since plaintiff has alleged that he was denied a meal after sundown,[3] he has raised a material question of fact which impacts on the question of qualified immunity. However, as stated above, the parties have not briefed this procedural due process issue. Consequently, there is found insufficient evidence for the Court to determine that defendants did not violate this established right of which a reasonable person would have been aware. Therefore, defendants' application for dismissal based upon qualified immunity is denied.

**CONCLUSION**

 **\*12** For the reasons stated above, defendants cross-motion (# 23) is granted to the extent that plaintiff's claims against Wenderlich are dismissed for lack of personal involvement. Plaintiff's motion (# 20) for partial summary judgment, and defendants' cross-motion (# 23) for summary judgment, are, in all other respects denied.

IT IS SO ORDERED.

Footnotes

1    *Wolff v. McDonnell,* 418 U.S. 539 (1974).

2    The Supreme Court stated that, "States may under certain circumstances create liberty interests which are protected by the Due Process Clause."*Sandin,* 515 U.S. at 483-84. Here, the Court assumes, only for the purpose of analysis of this claim, that such a right has been created.

3    "I was denied the right to partake in ramadan [sic] (prayer) and was denied the evening meal."(Inmate Grievance Complaint attached to Compl. at 9.)

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1294417
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond C. MILLER, Sr., Plaintiff,

v.

Randy BOUCHARD, Jail Administrator, St.
Lawrence County Correctional Facility, Dan
Dominie, Assistant Jail Administrator, Peggy
Harper, Sergeant/Grievance Coordinator, St.
Lawrence County Correctional Facility, Defendants.

Civ. No. 9:10–CV–00983
(NAM/RFT).   |   March 4, 2013.

**Attorneys and Law Firms**

Raymond Miller, Sr., Attica, NY, pro se.

Hancock Estabrook Law Firm, Zachary M. Mattison, Esq,
John L. Murad, Jr., Esq., of Counsel, Syracuse, NY, for
Defendants.

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** Plaintiff Raymond Miller, proceeding *pro se* and *in
forma pauperis,* brings this civil rights action, pursuant to
42 U.S.C. § 1983, alleging that Defendants, employees at
the St. Lawrence County Correctional Facility (hereinafter
"SLCCF"), violated his free exercise rights under the First
Amendment by restricting his ability to practice Islam. *See
generally*Dkt. No. 1, Compl. Defendants move for Summary
Judgment, pursuant to Federal Rule of Civil Procedure
56, on the grounds that Plaintiff has failed to exhaust
his administrative remedies as required under the Prison
Litigation and Reform Act ("PLRA"),[1] his claims are
without merit, and his claims for injunctive relief are moot
because he has been transferred to a different facility. *See
generally*Dkt. No. 43, Defs.' Mot. Summ. J. Despite being
provided an extension of time, Plaintiff has not responded to
Defendants' Motion. *See* Text Order, dated Mar. 28, 2012;
Dkt. No. 48, Defs.' Lt.-Brief, dated May 9, 2012. For the
reasons that follow, we recommend that Defendants' Motion
for Summary Judgment be **GRANTED.**

**I. DISCUSSION**

**A. Summary Judgment Standard**

Pursuant to FED. R. CIV. P. 56(a), summary judgment is
appropriate only where "there is no genuine dispute as to
any material fact and the movant is entitled to judgment
as a matter of law."The moving party bears the burden
to demonstrate through "pleadings, depositions, answers
to interrogatories, and admissions on file, together with
[ ] affidavits, if any," that there is no genuine issue of
material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d
Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317,
323 (1986)). "When a party has moved for summary judgment
on the basis of asserted facts supported as required by [Federal
Rule of Civil Procedure 56(e) ] and has, in accordance with
local court rules, served a concise statement of the material
facts as to which it contends there exist no genuine issues to
be tried, those facts will be deemed admitted unless properly
controverted by the nonmoving party."*Glazer v. Formica
Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant
must set out specific facts showing that there is a genuine
issue for trial, and cannot rest merely on allegations or denials
of the facts submitted by the movant. FED. R. CIV. P.
56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d
Cir.2003) ( "Conclusory allegations or denials are ordinarily
not sufficient to defeat a motion for summary judgment
when the moving party has set out a documentary case.");
*Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26
(2d Cir.1994). To that end, sworn statements are "more than
mere conclusory allegations subject to disregard ... they are
specific and detailed allegations of fact, made under penalty
of perjury, and should be treated as evidence in deciding
a summary judgment motion" and the credibility of such
statements is better left to a trier of fact. *Scott v. Coughlin,*
344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13
(2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d
Cir.1995)).

**\*2** When considering a motion for summary judgment, the
court must resolve all ambiguities and draw all reasonable
inferences in favor of the non-movant.*Nora Beverages, Inc.
v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d
Cir.1998)."[T]he trial court's task at the summary judgment
motion stage of the litigation is carefully limited to discerning
whether there are any genuine issues of material fact

to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."*Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest."*Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

"The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically."*Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). Because Plaintiff has failed to raise any question of material fact, the Court will accept facts as set forth in Defendants' Statement of Facts (Dkt. No. 43–1, hereinafter "7.1 Statement"), supplemented by Plaintiff's verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

### B. Summary of Facts

On or about April 21, 2010, Plaintiff, a Muslim inmate at SLCCF, received his Kufi. Compl. at ¶ 6. On May 26, 2010, Plaintiff was told by Defendants Bouchard and Dominie that per SLCCF Policy he was only allowed to wear his Kufi while he was in his cell. *Id.;* Dkt. No. 43–3, SLCCF Inmate Grievance Form Part I (hereinafter "Grievance Form I"), dated June 28, 2010. Plaintiff wrote to Defendants Bouchard and Dominie requesting that they speak with him about this policy and explaining that he could not wear his Kufi in his cell because Muslims do not wear their Kufi where they use the bathroom and there was a bathroom in Plaintiff's cell. Compl. at ¶ 6Instead of speaking directly with Plaintiff, they sent him a note confirming that he could only wear his Kufi inside of his cell. *Id.*

At the time Plaintiff was incarcerated at SLCCF, the Inmate Grievance Procedure at the facility was as follows: (1) within five days of the occurrence giving rise to the grievance the inmate must file a grievance; (2) the Facility Grievance Coordinator would then investigate and issue a written

decision on the grievance within five business days after its receipt; (3) if dissatisfied with the grievance coordinator's decision, the inmate could appeal that decision to the jail administrator within two business days after receipt of the initial determination; (4) the jail administrator would then investigate and issue a written decision on the grievance within five business days after its receipt; (5) if dissatisfied with the jail administrator's decision, the inmate could appeal that decision to the Citizens Policy and Complaint Review Counsel ("CPCRC") within three business days after receipt of the jail administrator's determination; and (6) CPCRC would issue a determination on the appeal within forty-five business days of receipt. *See*Dkt. No. 43–7,SLCCF INMATE RULES AND REGULATIONS MANUAL, effective Aug. 24, 2009, at pp. 34–35 (hereinafter "SLCCF Grievance Procedure"); *see also*N.Y. COMP.CODES R. & REGS. tit. 9, §§ 7032.4 & 7032.5.

**\*3** On June 28, 2012, Plaintiff filed a grievance requesting that he be allowed to wear his Kufi and observe his five daily prayers outside of his cell, and that the facility provide a Muslim Imam to hold Jumah Services on Fridays and help prepare Plaintiff for his religious fast in August (Ramadan).*See* Grievance Form I. That same day, Defendant Harper, the Facility Grievance Coordinator, decided Plaintiff's grievance, determining: (1) that in the interest of safety and security, SLCCF's regulations required Plaintiff not to wear his Kufi or conduct his five daily prayer rituals outside of his cell, however he would be allowed to cover his toilet with a temporary barrier or cover; (2) it was not practicable to have an Imam come to a remote location like SLCCF to service the needs of the facilities two Muslim inmates however, Plaintiff was provided with religious materials and the name and contact information of a religious advisor; and (3) that the facility would provide Plaintiff with a special diet sufficient to meet his "reasonable religious dietary needs." Dkt. Nos. 43–2, Peggy Harper Decl., dated Mar. 14, 2012, at ¶¶ 13–15 & 43–4, Harper Ex. 2, Inmate Grievance Form Part II (hereinafter "Grievance Form II"), dated June 28, 2010, at p. DEF–0008.

Plaintiff appealed Defendant Harper's determination to the Jail Administrator, Defendant Bouchard, who affirmed Defendant Harper's determination on June 30, 2010. Grievance Form II at p. DEF–0008. Plaintiff appealed Defendant Bouchard's determination to the CPCRC on the same day, which was received by the CPCRC on July 6, 2010. *Id.* at p. DEF–0009; Harper Decl. at ¶¶ 16 & 17. Plaintiff filed his Complaint on July 28, 2010. *See* Compl.[2] The CPCRC

issued its final decision on September 22, 2010, determining that Plaintiff could wear his Kufi outside of his cell, but otherwise upheld the prior determinations made by Defendant Harper. Dkt. No. 43–6, Harper Ex. 4, Lt., dated Sept. 22, 2010 (hereinafter "CPCRC Determination").

## C. Exhaustion

The PLRA provides, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies are available are exhausted."42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."*Porter v. Nussle,* 534 U.S. 516, 532 (2002) (citations omitted). Exhaustion is similarly required even if the prisoner asserts futility as an excuse. *See Booth v. Churner,* 531 U.S. 731, 741 n. 6 (2001) (refusing to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.") (cited in*Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001)). Accordingly, the exhaustion requirements apply even where the grievance process does not permit an award of money damages and the prisoner seeks only money damages, provided the grievance tribunal has the authority to take some responsive action. *See Thomas v. Wright,* 2002 WL 31309190, at *5 (N.D.N.Y. Oct. 11, 2002) (citing *Booth v. Churner,* 531 U.S. 731 (2001)).

**\*4** According to the Supreme Court, exhaustion in the context of the PLRA means "proper exhaustion" as that term is understood in the administrative law context. *Woodford v. Ngo,* 548 U.S. 81, 93 (2006)."[P]roper exhaustion of administrative remedies [ ] means using all steps that the agency holds out, and doing so *properly*... [including complying] with an agency's deadlines and other critical procedural rules."*Id.* at 90.Therefore, "we look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures."*Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir.2009) (citing *Jones v. Bock,* 549 U.S. 199, 218 (2007) & *Woodford v. Ngo,* 548 U.S. at 88–90).

In determining whether a prisoner has failed to exhaust all available administrative remedies, the Second Circuit has

instructed district courts to ask: "(1) whether administrative remedies were actually available, (2) whether the defendants forfeited their right to raise the affirmative defense or by their own actions precluded the plaintiff from using administrative grievance procedures, and (3) whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements."*Singh v. Goord,* 520 F.Supp.2d 487, 495–96 (S.D.N.Y.2007) (quoting *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

In his Complaint Plaintiff raised four issues: (1) his inability to wear a Kufi outside of his cell; (2) his inability to perform his five daily prayers outside his cell; (3) the lack of an Imam at the Facility to perform Friday Jumah Services; and (4) that he is only allowed to use his prayer rug inside of his cell. *See generally* Compl. Copies of Plaintiff's grievances and appeals clearly show that he had complained to the facility about the first three issues, however, there is nothing on the record to suggest that he ever filed a grievance regarding restrictions on the use of his prayer rug outside of his cell. Dkt. Nos. 43–3–43–5, Harper Exs. 1–4 (copies of Plaintiff's Grievances and Appeals (collectively referred to hereinafter as "Grievance R."). These records also clearly demonstrate, and Defendants concede, that Plaintiff timely and properly advanced his grievance through each of the initial stages of SLCCF's Grievance Procedure, and that he also filed his final appeal with the CPCRC on July 6, 2010, before commencing the instant action on July 28, 2010. *See* Harper Decl. at ¶¶ 11–12 & 16–17; Grievance R. Defendants now argue that even though Plaintiff properly advanced his grievance and filed his final appeal before filing the instant action, he nonetheless failed to properly exhaust those issues by filing his Complaint before the CPCRC issued its final decision. *See generally* Defs.' Mem. of Law. Additionally, Defendants argue that Plaintiff should be precluded from raising the issue regarding restrictions on the use of his prayer rug because he failed to exhaust that claim by never grieving it at all. *Id.* We agree with Defendants.

**\*5** It is incontrovertible that Plaintiff has failed to exhaust his claim regarding the prayer rug. Not only did Plaintiff fail to grieve this issue, he failed to do so before being transferred out of SLCCF. *See*Dkt. No. 46, Lt. (indicating Plaintiff's address at Attica Correctional Facility); Harper Decl. at ¶ 19. Furthermore, it is clear that Plaintiff was aware of, understood, and had access to SLCCF's Grievance Procedure. The Prison provided him with a copy of the Grievance Procedure prior to entering the facility, and

Plaintiff had successfully grieved other issues. *See* Harper Decl. at ¶ 10; SLCCF Grievance Procedure; Grievance R. Moreover, Defendants properly pled the affirmative defense of exhaustion in their Amended Answer, Dkt. No. 19 at ¶ 28, and Plaintiff has not provided any facts which lead us to believe that Defendants in any way inhibited his ability to take advantage of the Grievance Procedure, or that any special circumstance warrants dismissal of the exhaustion requirement, *see Singh v. Goord,* 520 F.Supp.2d at 495–96. For these reasons, we recommend that Plaintiff's claim regarding his inability to freely use his prayer rug be **DISMISSED WITH PREJUDICE.***See Berry v. Kerik,* 366 F.3d 85, 86 (2d Cir.2004) (finding it appropriate to dismiss inmates un-grieved claim with prejudice where exhaustion had become futile because prisoner had transferred out of the facility where the events giving rise to the grievance occurred without first taking advantage of the administrative remedies available at that facility).

Moreover, having failed to await the results of his final appeal, Plaintiff has failed to exhaust those claims which he did raise in his grievance. The Supreme Court has made it clear that the purpose of the exhaustion requirement is to afford the correctional facility the opportunity to address the complaint internally "on the merits," providing the facility with the opportunity to remedy the situation without the need for litigation, and in turn reducing the quantity and improving the quality of prisoner suits *See Woodford v. Ngo,* 548 U.S. at 90 & 94 (citation omitted). However, "the benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance."*Id.* at 95.That is, exhaution should be both **procedural and substantive.***Amador v. Andrews,* 655 F.3d 89, 104 (2d Cir.2011). Thus, we recommend **GRANTING** Defendants' Motion for Summary Judgment on the ground that Plaintiff failed to exhaust his claims.

However, where the underlying claims have no merit, this Court may dismiss with prejudice despite the failure to exhaust. 42 U.S.C. § 1997e(c)(2) ("In the event that a claim is, on its face, frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief, the court may dismiss the underlying claim without first requiring the exhaustion of administrative remedies."). As discussed below, out of an abundance of caution we have reviewed and found Plaintiff's claims to be without merit. Therefore, we recommend that Defendants' Motion for Summary Judgment be **GRANTED.**

### D. Free Exercise Claims

**\*6** The First Amendment to the United States Constitution provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. CONST. AMEND. I. These provisions are applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See, e.g., Gitlow v. New York,* 268 U.S. 652, 666 (1925) (cited in *Wares v. Vanbebber,* 319 F.Supp.2d 1237, 1243 (D.Kan.2004)). Prisoners retain their right to religious freedom even when incarcerated. *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999). An inmate is entitled to a reasonable accommodation of his religious beliefs. *See id.* (citing *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992); *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975)).

The Supreme Court has held that when a prison policy violates a prisoner's constitutional rights, courts should employ a reasonableness test, as opposed to a stricter standard which would normally be applied in constitutional deprivation cases. *O'Lone v.. Estate of Shabazz,* 482 U.S. 342, 349 (1987); *see also Turner v. Safley,* 482 U.S. 78, 89 (1987). Therefore, a prison regulation that impinges upon an inmate's constitutional rights may be valid, despite such encroachment, if it is reasonably related to legitimate penological interests. *Turner v. Safley,* 482 U.S. at 89; *Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988). The underlying purpose of the implementation of a lower standard is congruous with the notion that "evaluation of penological objectives is committed to the considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination.' " *O'Lone v. Estate of Shabazz,* 482 U.S. at 349 (quoting *Bell v. Wolfish,* 441 U.S. 520, 562 (1979)). The Second Circuit has directed courts faced with constitutional free exercise claims to first assess,

> (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective.

*Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988); *see also Fifth Ave. Presbyterian Church v. City of New York,* 293 F.3d 570, 574 (2d Cir.2002) ("An individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious.") (internal quotation marks and citations omitted) (quoted in *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003)).

We find Plaintiff's surviving issues as follows: (1) that he was prohibited from wearing his Kufi outside of his cell; (2) that he has no place to perform his five daily prayer rituals; and (3) that the prison failed to provide him with a Muslim Imam to facilitate Friday Jummah Services. *See supra* Part I.C; Compl. at ¶ 6.

 *7  The essence of Plaintiff's claims is that under SLCCF regulations he is prohibited from praying or wearing his Kufi while outside of his cell, and because there is a bathroom in his cell, he is likewise unable to pray or wear his Kufi inside his cell, effectively leaving him nowhere to practice his five daily prayer rituals or wear his Kufi. *See* Compl. at ¶ 6; Grievance Form I. Additionally, he claims that because there is no Imam at the prison he is unable to attend Friday Jumah Services. Compl. at ¶ 6. Nonetheless, Defendants argue that the policies at issue here are reasonable and are rationally related to protecting SLCCF's legitimate penological interests in safety, security, and efficiency. *See* Defs.' Mem. of Law at pp. 14–19.

We have little doubt that Plaintiff's beliefs are religious in nature and sincerely held. Plaintiff has averred that it is his religious belief that Muslims should not wear their Kufi "where [they] use the bathroom," and that Muslims do not pray "where [they] urinate or defecate." Compl. at ¶ 6. Likewise, Plaintiff has claimed that it is "a religious obligation for us Muslims" to attend Friday Jumah Services, and that it is his religious practice to wear a Kufi and pray five times a day. *Id.* Defendants have not contested the sincerity of Plaintiff's beliefs nor whether they are religious in nature. Providing Plaintiff with the benefit of every doubt, and in the absence of any evidence to suggest otherwise put forth by Defendants, we find that Plaintiff has at the very least stated a viable claim, and the burden now shifts to Defendants to establish that the policies which led to these deprivations were reasonable and rationally related to some legitimate penological interest. *See Farid v. Smith,* 850 F.2d at 926;*see also Fifth Ave. Presbyterian Church v. City of New York* 293 F.3d at 574.

The Supreme Court has enumerated various factors for courts to consider when ruling upon the reasonableness of a prison policy which allegedly impedes or interferes with a prisoner's constitutional rights:

 [1] there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it [citation omitted] [;]

 [2] whether there are alternative means of exercising the right that remain open to prison inmates[;]

 [3] the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally[; and]

 [4] the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

*Turner v. Safley,* 482 U.S. 78, 89–91 (1987).

"[O]nce prison officials put forward a legitimate penological interest to justify an infringement upon a prisoner's religious free exercise, the burden remains with the prisoner to 'show that these [penological] concerns were irrational.' " *Ford v. McGinnis,* 352 F.3d at 595–96 (quoting *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir.1989)).

 *8  Defendants argue that facilitating Plaintiff's request to provide an Imam to host Friday Jumah Services would significantly burden the facility. Defs.' Mem. of Law at p. 18.In support of this contention Defendants have provided concrete factual information; namely that at the time Plaintiff was incarcerated at SLCCF there were only two practicing Muslim inmates at the facility, and, due to SLCCF's remote location, neither the New York State Correctional Imam, nor any other Imam, were able to visit the facility. *See* Harper Decl. at ¶¶ 13–15.

It is axiomatic that a prison has a legitimate penological interest in effectively managing its expenses and other resources. *See Salahuddin v. Goord,* 467 F.3d 263, 275 (2d Cir.2006). Given the relatively low demand, the unavailability of an Imam, and the remoteness of SLCCF, the Prison's decision to provide Plaintiff with religious materials and contact information for a religious advisor rather than pay the expense of bringing an Imam to the facility appears not only rationally related to promoting SLCCF's legitimate penological interests, but also quite reasonable. Indeed the Supreme Court has observed that not "every religious sect or

group within a prison—however few in number—must have identical facilities or personnel ... nor must a chaplain, priest or minister be provided without regard to the extent of the demand." *Cruz v. Beto,* 405 U.S. 315, 322 n. 2 (1972). Thus we are satisfied that Defendants have met their burden, and the burden now shifts back to Plaintiff to prove that the policy was irrational. *See Ford v. McGinnis,* 352 F.3d at 595–96.

In the face of Plaintiff's silence on the issue, we have no reason to believe that the religious materials or the religious advisor Defendants provided to him was an unreasonable or inadequate alternative means for Plaintiff to receive the religious guidance that he requested. *See Jackson v. Mann,* 196 F.3d at 320 (noting that prisoners are entitled to "reasonable accommodation of [their] religious beliefs"). We cannot think of, and Plaintiff has not suggested any other reasonable alternative leading us to conclude that the solution provided by Defendants is appropriate under the circumstances. *See Turner v. Safely,* 482 U.S. at 89–91. For these reasons, we recommend Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's Jummah claim.

Plaintiff also claims that his First Amendment free exercise rights have been unconstitutionally infringed upon by Defendants' policies restricting his ability to wear his Kufi and pray outside of his cell. The essence of Plaintiff's claims appears to be that these policies have left him with no viable place to pray or wear his Kufi. *See generally* Compl; Grievance R. In an attempt to accommodate Plaintiff's religious needs, Defendants contacted a local Imam to discuss ways to make it possible for Plaintiff to pray in his cell notwithstanding the presence of the toilet. As a result of that discussion they provided Plaintiff with a temporary barrier or shield that could be placed over the toilet while Plaintiff was praying. Harper Decl. at ¶ 13. Furthermore, Defendants argue that their policies prohibiting Plaintiff from exercising these rights outside of his cell were rationally related to their interests in safety and security. Defs.' Mem. of Law at p. 16–17; Harper Decl. at ¶¶ 12 & 21.

**\*9** As noted above, it is axiomatic that a prison facility has a legitimate penological interest in maintaining safety and security within the facility. *See, e.g., O'Lone v. Estate of Shabazz,* 482 U.S. at 350–51. Defendants point out that a Kufi provides an inmate with a place to store or transport contraband and/or weapons. *See* Harper Decl. at ¶ 12. Likewise, removing Plaintiff from his cell, escorting him to a separate area for prayer, and guarding him during

his prayer five times a day would be a severe burden that would jeopardize the safety and security of other parts of the facility because it would require the Facility to re-assign guards from other areas of the prison where they are needed most. *Id.* It is certainly rational to ban the wearing of items that could potentially facilitate the concealment of contraband such as drugs and weapons—items which present clear safety concerns within the confines of a correctional facility. Likewise, it is equally rational to prohibit prayer outside of an inmate's cell where providing that service would require dedicating an inordinate amount of resources to the care of two inmates at the expense, safety, and security of the facility's other officers and inmates. Thus, we are satisfied that Defendants have met their burden of establishing that the policies at issue were rationally related to these legitimate penological interests. *O'Lone v. Estate of Shabazz,* 482 U.S. at 349–50 (noting that the reasonableness standard was designed to "ensure the ability of corrections officials to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration, and avoid[ ] unnecessary intrusion of the judiciary into problems particularly ill suited to resolution by decree") (internal quotations and citations omitted). Thus, the burden now shifts to Plaintiff to prove that the policies are irrational. *See Ford v. McGinnis,* 352 F.3d at 595–96.

As a result of Plaintiff's failure to respond to Defendants' Motion, we have only the arguments put forth in Plaintiff's Complaint from which to cull opposition to Defendants' Motion. Even when construed liberally, and granting Plaintiff every reasonable inference, Plaintiff's Complaint standing alone is simply insufficient to warrant a finding that Defendant's policies were irrational or that the accommodation offered to Plaintiff was unreasonable. Rather, based on the record before us one could easily conclude that providing Plaintiff with a temporary barrier or shield to cover the toilet while he prayed or wore his Kufi while in his cell was a reasonable accommodation. The accommodation provided a readily available alternative to exercising those rights outside of his cell, and imposed a minimal if almost non-existent burden on the facility's staff and other inmates. Moreover, Plaintiff has failed to offer any argument or evidence that a more reasonable accommodation could have been made or that the policy implemented by Defendants was irrational. *See Turner v. Safely,* 482 U.S. at 89–91;*see also Jackson v. Mann,* 196 F.3d at 320. Therefore, because Plaintiff has failed to meet his burden, we recommend that Defendants' Motion for Summary Judgment as to these two claims be **GRANTED.**

## II. CONCLUSION

**\*10** For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 43) be **GRANTED,** and this entire action be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also*28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Footnotes

1    The PLRA is codified at 42 U.S.C. § 1997e, *et. seq.*

2    A *pro se* prisoner's civil complaint is deemed filed when the prisoner delivers it to prison officials for transmittal to the court.*Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993) (*opinion modified on other grounds* ) 25 F.3d 81 (2d Cir.1994).

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 768975
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kurt PHILIP, also known as Kurt Phillip, Plaintiff,
v.
William D. BROWN and Yasin Latif, Defendants.

No. 9:10–CV–0643 (FJS/GHL).    |    Feb. 4, 2011.

**Attorneys and Law Firms**

Kurt Philip, Napanoch, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Charles J. Quackenbush, Esq., of Counsel, Albany, NY, for Defendants.

***REPORT–RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

**\*1**  This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Kurt Philip alleges that Defendants violated his right to equal protection by denying him permission to attend his father's funeral. Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 14.)For the reasons that follow, I recommend that Defendants' motion be denied.

**I. BACKGROUND**

Plaintiff alleges that on March 3, 2009, Defendant Yasin Latif (the chaplain of Eastern Correctional Facility) called Plaintiff into his office, informed Plaintiff that his father had died, and asked if Plaintiff wanted to attend the funeral services. (Dkt. No. 1 ¶¶ 3, 8.) Plaintiff told Defendant Latif that he wanted to attend the services. *Id.* ¶ 9. Defendant Latif completed an application for Plaintiff to attend the services. *Id.* ¶ 16.On the application, Defendant Latif listed the deceased as Plaintiff's stepfather despite being aware that the deceased had adopted Plaintiff in 1988. *Id.* ¶¶ 12,16.On March 9, 2009, Defendant William Brown (the

superintendent of Eastern Correction Facility) denied the application because the deceased was Plaintiff's stepfather. *Id.* ¶ 17, Ex. A ("stepfather not permitted."). Defendant Brown was aware that the deceased had adopted Plaintiff and also knew that the deceased "had been listed as Plaintiff's father on all of his DOCS documentation."*Id.* ¶¶ 12–13.

Plaintiff alleges that Defendants Latif and Brown had previously approved applications by similarly situated inmates to attend the funerals of their stepparents. *Id.* ¶¶ 18–21.Specifically, Plaintiff alleges that inmates Michael Deveaux and William Anthony Evans were each allowed to attend services for their stepparents. *Id.* Plaintiff asserts that because of the similarities between himself, Deveaux, and Evans, "there must have been a malicious purpose for said treatment."*Id.* ¶ 27.He states that he "has done nothing to Latif but fail to join the Muslim community at Eastern Correctional Facility."*Id.* ¶ 28.

On March 16, 2009, Plaintiff filed a grievance with the Institutional Grievance Committee ("IGRC").*Id.* ¶ 23.On March 23, 2009, the IGRC unanimously agreed that Plaintiff should have been permitted to attend the funeral because, at a minimum, the deceased was Plaintiff's legal guardian pursuant to Correction Law § 113 and Directive 4901. *Id.* ¶ 24.

On April 3, 2009, Defendant Brown "personally heard and decided the appeal of the IGRC decision and reversed said decision ...." *Id.* ¶ 25.Plaintiff appealed and on May 13, 2009, the Central Office Review Committee ("CORC") unanimously accepted Plaintiff's grievance "in part." *Id.* ¶ 26.However, the CORC did not specify which part of Plaintiff's grievance it was accepting and which it was rejecting. *Id.*

**\*2**  Plaintiff filed this action on June 1, 2010, seeking money damages. (Dkt. No. 1.) Essentially, Plaintiff's complaint is that Defendants (1) erroneously classified his father as his stepfather; and then (2) denied him permission to attend the funeral on the basis of a policy against funeral visits for stepparents, despite allowing other inmates to attend stepparents' funerals. Defendants now move to dismiss the complaint. (Dkt. No. 14.)Plaintiff opposes the motion. (Dkt. No. 15.)

**II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." Harris v. Mills, 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S.Ct. at 1949.

### III. ANALYSIS

Plaintiff alleges that Defendants violated his right to equal protection by denying him the opportunity to attend his father's funeral. (Dkt. No. 1 ¶ 1.) Defendants argue that the complaint fails to state an equal protection claim. (Dkt. No. 14–1 at 4–5.)

The Equal Protection Clause provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible

considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir.2005) (quoting LeClair v. Saunders, 627 F.2d 606, 609–10 (2d Cir.1980)). Governmental action may also violate the Equal Protection Clause where the defendants intentionally treat the plaintiff "differently from others with no rational basis for the difference in treatment." *Id.* (citing Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). Thus, a plaintiff asserting an equal protection claim must allege facts plausibly suggesting that (1) he was treated differently from similarly situated individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right, acted out of malice, or acted irrationally and arbitrarily.

**\*3** Plaintiff alleges that he was similarly situated to two individuals who received approval to attend the funerals of stepparents. (Dkt. No. 1 ¶¶ 18–19.) Plaintiff alleges that (1) Defendant Latif had "previously submitted the application of his congregant and Eastern Correctional Facility inmate Michael Deveaux (Deveaux) for a funeral/deathbed visit for his stepfather Kenneth Newkirk ... and such application was approved;" and (2) "Brown had designated the approval of William Anthony Evans (Evans) for a funeral visit for Evans' stepmother 68 days before Brown denied Plaintiff's application." *Id.* Defendants do not argue that the complaint fails to sufficiently identify any similarly-situated individuals. (Dkt. No. 14–1 at 6.) I find that the complaint sufficiently alleges that Plaintiff was treated differently from other similarly-situated individuals.

Defendants argue that the complaint fails to state an equal protection claim because (1) Plaintiff has not alleged that he is a member of any protected class; (2) Plaintiff has not alleged that Defendants infringed upon any fundamental right; (3) Plaintiff has not alleged facts plausibly suggesting that Defendants acted out of malice; and (4) there was a rational basis for Defendants' actions. (Dkt. No. 14–1 at 4–6.) For the reasons discussed below, I find that Plaintiff has not alleged that he is a member of any protected class, Plaintiff has not alleged that Defendants infringed upon any fundamental right, Plaintiff has alleged facts plausibly suggesting that Defendant Latif acted maliciously, and Plaintiff has alleged facts plausibly suggesting that Defendant Brown acted irrationally and arbitrarily.

Plaintiff concedes that the complaint does not allege that he was discriminated against based upon his membership in any

suspect class. (Dkt. No. 15 ¶ 3.) Plaintiff does not request leave to amend his complaint to state such a claim. Therefore, I find that Plaintiff has not stated an equal protection claim based upon Plaintiff's membership in any suspect class.

As Defendants correctly note, Plaintiff was not deprived of any fundamental right. In analyzing whether a fundamental right is implicated, courts examine not only equal protection jurisprudence but also whether the right at issue has been held to be a liberty or property interest protected by the Due Process Clause. *See Cruzan v. Mo. Dept. of Health,* 497 U.S. 261, 303–04 (1990) (Brennan, J., dissenting). Neither the United States Constitution nor New York state law creates a protected liberty or property interest in being granted permission to attend a loved one's funeral. *Hamilton v. Smith,* No. 06–CV–805, 2009 U.S. Dist. LEXIS 910321, at *57–58, 2009 WL 3199531, at *19 (N.D.N.Y. Jan. 13, 2009); *Jackson v. Portuondo,* No. 9:01–CV–00379, 2007 U.S. Dist. LEXIS 11621, 2007 WL 607342, at *10–12 (N.D.N.Y. Feb. 20, 2007); *Smith v. Fischer,* No. 9:07–CV–1264, 2009 U.S. Dist. LEXIS 129478, at *41–42, 2009 WL 632890 (N.D.N.Y. Feb. 2, 2009); and *Verrone v. Jacobson,* No. 95 Civ. 10495, 1999 U.S. Dist. LEXIS 3593, at *14, 1999 WL 163197, at *5 (S.D.N.Y. Mar. 23, 1999). [1] Therefore, Plaintiff has not alleged that Defendants deprived him of a fundamental right.

**\*4** Plaintiff has alleged facts plausibly suggesting that Defendant Latif acted maliciously. [2] Defendants argue that Plaintiff has failed to state a claim on a malice theory because "[w]ith no factual basis he simply speculates that there must have been a malicious purpose for his differing treatment."(Dkt. No. 14–1 at 6 .) Defendants do not note Plaintiff's allegation that he "has done nothing to Latif but fail to join the Muslim community at Eastern Correctional Facility."(Dkt. No. 1 ¶ 28.) Accepting the allegations of the complaint as true and granting Plaintiff the speical solicitude to which he is entitled as a *pro se* civil rights litigant, this allegation plausibly suggests, just barely, that Defendant Latif bore animus toward Plaintiff because Plaintiff had not joined the Muslim community at Eastern Correctional Facility. Therefore, I find that the complaint states a class of one equal protection claim against Defendant Latif and recommend that the Court deny Defendants' motion to dismiss the claim against Defendant Latif.

The complaint alleges facts plausibly suggesting that Defendant Brown acted arbitrarily and irrationally. Defendants argue that Defendant Brown acted rationally because he merely "made a mistake by accepting information provided by [P]laintiff's brother [that the deceased was Plaintiff's stepfather] at face value."(Dkt. No. 14–1 at 6.) Defendants' argument misstates the thrust of Plaintiff's complaint. The complaint does not allege simply that Defendant Brown mistakenly classified the deceased as Plaintiff's stepfather and then properly denied the application on that basis. Rather, the complaint alleges that Defendant Brown denied Plaintiff's application to attend his father's funeral on the ground that "stepfather not permitted" despite knowing that the deceased was Plaintiff's adoptive father and despite the fact that he had previously approved other inmates' requests to attend their stepparents' funerals. (Dkt. No. 1 ¶¶ 12–13, 19.) The complaint further alleges that when the IGRC agreed with Plaintiff that he should have been allowed to attend the funeral, Defendant Brown "personally heard and decided the appeal of the IGRC decision and reversed said decision ....." *Id.* ¶ 25. These facts plausibly suggest that Defendant Brown acted irrationally (because he knew that the deceased was Plaintiff's adoptive father rather than his stepfather) and arbitrarily (because he had previously approved other inmates' applications to attend stepparent funerals). Therefore, I find that the complaint states a class of one equal protection claim against Defendant Brown and recommend that the Court deny Defendants' motion to dismiss as to Defendant Brown.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 14) be ***DENIED.***

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

Footnotes

1    Defendants served these unpublished cases on Plaintiff with their moving papers. (Dkt.Nos.14–3, 14–4, 14–6, 14–8.)

2  An equal protection claim premised on the defendant's malicious intent or irrational/arbitrary behavior, rather than on the plaintiff's membership in a suspect class or the implication of a fundamental right, is referred to as a class of one equal protection claim. *Ruston v. Town of Skaneateles,* 610 F.3d 55, 58 (2d Cir.2010); *Assoko v. City of New York,* 539 F.Supp.2d 728, 734–35 (S.D.N.Y.2008).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 7333229
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Aurel SMITH, Plaintiff,

v.

Kenneth PERLMAN, Deputy Commissioner
of Programs, NYS Department of Correctional
Services; Mark Leonard, Director of Ministerial
Services, NYS Department of Correctional
Services; Daniel Martuscello, Superintendent
of Coxsackie Correctional Facility; Captain R.
Shanley, Captain, Acting Deputy Superintendent
of Security at Coxsackie Correctional
Facility; Jeffrey A. Hale; Harry S. Graham,
Superintendent of Auburn Correctional
Facility; G. Robinson, Deputy Superintendent
of Auburn Correctional Facility, Defendants.

No. 09:11–cv–00020 (MAD/CFH). | 
Signed Dec. 18, 2014. | Filed Dec. 19, 2014.

**Attorneys and Law Firms**

Aurel Smith, Attica, NY, pro se.

Office of the New York, State Attorney General, Kevin M.
Hayden, AAG, of Counsel, Albany Office, Albany, NY, for
Defendants.

### MEMORANDUM–DECISION AND ORDER

MAE A. D'AGOSTINO, District Judge.

### I. INTRODUCTION

**\*1** Plaintiff, an inmate currently in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS"), brought this *pro se* action pursuant
to 42 U.S.C. § 1983, alleging that Defendants violated
his constitutional rights under the First and Fourteenth
Amendments, as well as his rights under the Religious Land
Use and Institutionalized Persons Act of 2000 ("RLUIPA").
*See* Dkt. No. 1; Dkt. No. 47. Now before the Court are
Plaintiff's motion to accept the filing of late objections to the
Magistrate Judge's Report–Recommendation and Order and

motion for reconsideration, pursuant to Fed.R.Civ.P. 59(e), of
the Court's March 13, 2014 Order denying Plaintiff's motions
for partial summary judgment and injunctive relief and
granting Defendants' cross motion for summary judgment.
Dkt. No. 93; Dkt. No. 94.

### II. BACKGROUND

The factual background and full procedural history of
this case is set forth in the Court's prior orders, the
parties' familiarity with which is assumed. Relevant here,
on August 23, 2013, Plaintiff moved for partial summary
judgment against Defendants Perlman and Leonard on his
claims alleging violations of the Fourteenth Amendment
and RLUIPA based on the DOCCS policy of limiting religious
family guest events for Muslim inmates to one per year and
against Defendants Perlman, Leonard, Hale, and Graham on
his claims alleging violations of the First and Fourteenth
Amendments and RLUIPA based on Defendants' refusal to
provide Plaintiff with meals combining therapeutic diet and
halal restrictions. Dkt. No. 73. On October 28, 2013, Plaintiff
moved for a temporary restraining order and preliminary
injunction requiring Defendants to accommodate his religious
and medical dietary needs by substituting halal meat for
haram meat in his therapeutic diet. Dkt. No. 79. Defendants
filed an opposition to Plaintiff's motion for partial summary
judgment and cross motion for summary judgment on all
counts on November 27, 2013. Dkt. No. 81.

In a Report–Recommendation and Order dated February 18,
2014, Magistrate Judge Christian F. Hummel recommended
that the Court deny Plaintiff's motions for partial summary
judgment and injunctive relief, grant Defendants' cross
motion for summary judgment, and dismiss this case. Dkt.
No. 90. Neither party filed objections to Magistrate Judge
Hummel's Report–Recommendation and Order by the filing
deadline of March 7, 2014. Finding no clear error or
manifest injustice in Magistrate Judge Hummel's Report–
Recommendation and Order, the Court adopted the Report–
Recommendation and Order in its entirety in an Order dated
March 13, 2014 and entered judgment in Defendants' favor.
Dkt. No. 91; Dkt. No. 92.

On March 24, 2014, Plaintiff filed a letter motion requesting
that the Court accept his late filing of objections addressing
specific portions of Magistrate Judge Hummel's report.
Dkt. No. 93. [1] Plaintiff's primary objection to the Report–
Recommendation and Order was that Magistrate Judge

Hummel erred in concluding that Plaintiff did not respond to Defendants' cross motion for summary judgment, thereby mistakenly taking Defendants' motion as unopposed and evaluating Defendants' factual assertions in the absence of Plaintiff's response and exhibits. *See id.* at 4. Plaintiff then filed a motion for reconsideration of the Court's Order adopting the Report–Recommendation and Order, which again contended that Plaintiff was prejudiced to the extent that Magistrate Judge Hummel's analysis overlooked Plaintiff's response to Defendants' cross motion for summary judgment, reply to the opposition of his motion for partial summary judgment, and related exhibits. *See* Dkt. No. 94–1. Defendants oppose Plaintiff's motion to reconsider, arguing that, "[d]espite his claims to the contrary, Plaintiff's reply papers were accepted for filing before the Report–Recommendation was issued" and that "Plaintiff has failed to dispute the law relied upon by the Court when dismissing his action." Dkt. No. 95 at 5.

## III. MOTION FOR RECONSIDERATION

### A. Legal Standards

**\*2** Rule 59(e) of the Federal Rules of Civil Procedure provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed.R.Civ.P. 59(e). The courts in this Circuit generally permit motions to reconsider grants of summary judgment to be brought under Rule 59(e). *Patel v. Lutheran Med. Ctr., Inc.,* 775 F.Supp. 592, 596 (E.D.N.Y.1991); *see also Travelers Ins. Co. v. Buffalo Reinsurance Co.,* 739 F.Supp. 209, 213 (S.D.N.Y.1990) (vacating a grant of summary judgment pursuant to Rule 59(e)).

The standard for granting a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). Under Rule 59(e), "a court is justified in reconsidering its previous ruling if: (1) there is an intervening change in the controlling law; (2) new evidence not previously available comes to light; or (3) it becomes necessary to remedy a clear error of law or to prevent obvious injustice." *Nossek v. Bd. of Educ. of Duanesburg Cent. Sch. Dist.,* No. 94–CV–219, 1994 WL 688298, \*1 (N.D.N.Y. Nov.10, 1994). A motion for reconsideration "is not to be used as a means to reargue matters already argued

and disposed of by prior rulings or to put forth additional arguments which [a party] could have made but neglected to make before judgment." *Duane v. Spaulding & Rogers Mfg. Inc.,* No. 92–CV–305, 1994 WL 494651, \*1 (N.D.N.Y. Aug.10, 1994) (internal quotations omitted).

### B. Analysis

Here, Plaintiff contends that reconsideration is necessary to prevent manifest injustice because Magistrate Judge Hummel and the Court did not consider his reply papers and exhibits in deciding the underlying motions. In a text order dated February 14, 2014, Magistrate Judge Hummel accepted for filing Plaintiff's reply to the opposition of Plaintiff's motion for partial summary judgment and Plaintiff's response to Defendants' cross motion for summary judgment. Dkt. No. 89. However, the Report–Recommendation and Order stated that "Smith does not oppose defendants' cross motion. Upon requests, this Court twice granted Smith an extension of time to respond to defendants' cross motion, the most recent deadline being February 5, 2014. The deadline expired and Smith never responded." Dkt. No. 90 at 2 (citations omitted). Thus, the Report–Recommendation and Order clearly indicates that despite having accepted Plaintiff's late reply papers, Magistrate Judge Hummel did not consider the reply papers or attached exhibits in evaluating the parties' respective motions.[2] The Court, which adopted Magistrate Judge Hummel's Report–Recommendation and Order in its entirety, also failed to examine Plaintiff's reply papers in its analysis of the parties' respective motions.

**\*3** Thus, Plaintiff's motion for reconsideration does not attempt to raise arguments or evidence Plaintiff neglected to put forth earlier, but rather urges the Court to grant due consideration to overlooked evidence Plaintiff presented. Along with his reply papers, Plaintiff filed approximately 185 pages of exhibits, including, *inter alia,* Defendants' responses to interrogatories, records related to Plaintiff's grievances filed with DOCCS, and various DOCCS internal communications and policy materials. *See* Dkt. No. 88–3. Such evidence "might reasonably be expected to alter the conclusion reached by the court" upon consideration of a motion for summary judgment. *Shrader,* 70 F.3d at 257. In the interest of avoiding manifest injustice, Plaintiff is entitled to have the Court consider this evidence. Accordingly, the Court hereby **ORDERS** that Plaintiff's motion for reconsideration is **GRANTED** and the Court's Order dated March 13, 2014 is **VACATED.**

## IV. RECONSIDERATION AND ORDER

Having thoroughly reviewed Plaintiff's reply papers, attached exhibits, objections to Magistrate Judge Hummel's Report–Recommendation and Order, and motion for reconsideration, the Court now reviews Magistrate Judge Hummel's findings and recommendations.

### A. Standard of Review

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of

material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*4** In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, *2 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment. *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### B. Statement of Material Fact

Defendants argued that Plaintiff's motion for partial summary judgment should be denied because Plaintiff failed to include a Statement of Material Facts as required by N.D.N.Y.L.R. § 7.1(a)(3). Magistrate Judge Hummel found that Plaintiff substantially complied with Local Rule 7.1(a)(3) by filing a supporting memorandum of law and exhibits, a declaration, and an affidavit of service. Having reviewed Magistrate Judge Hummel's reasoning on this issue and finding no clear error, the Court adopts this portion of the Report–Recommendation and Order.

### C. Personal Involvement

Defendants Leonard, Perlman, Graham, Hale, and Martuscello moved for summary judgment on the claims against them based upon lack of personal involvement. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501

(2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Although a defendant that occupies a supervisory position may not be held liable based solely on the defendant's position of authority,

> [t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*5** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

Magistrate Judge Hummel concluded that Defendants Perlman, Leonard, and Graham were personally involved in the alleged constitutional deprivations and should be denied summary judgment on this ground. Magistrate Judge Hummel further concluded that a genuine dispute of material fact existed with respect to Defendant Hale's personal involvement and that summary judgment for Defendant Hale should also be denied on this ground. Upon review, the Court finds no clear error or manifest injustice and adopts this portion of the Report–Recommendation and Order. [3]

Plaintiff objects to Magistrate Judge Hummel's finding that Defendant Martuscello lacked personal involvement in the alleged constitutional violations. Plaintiff alleges that Defendant Martuscello was personally involved in the alleged constitutional violations because when Defendant Martuscello served as Deputy Superintendent of Security, he created a custom of not allowing keeplocked inmates to attend religious services "in an arbitrary and blanketed fashion" or allowed such custom to continue. *See* Dkt. No. 38 at 13; Dkt. No. 93–1 at 20. Defendants Martuscello and Shanley both attested that no such blanket policy existed and that

keeplocked prisoners' requests to attend religious services were handled on a case-by-case basis in accordance with DOCCS Directive 4202. Dkt. No. 81–22 at 4; Dkt. No. 81–28 at 2–3. Directive 4202 directs that "[t]he final decision to permit attendance [at congregate religious services by keeplocked inmates] rests with the Deputy Superintendent for Security." Dkt. No. 81–27 at 4. In support of his claim that such an impermissible blanket policy nonetheless existed and was permitted by Defendant Martuscello, Plaintiff introduced a grievance he submitted on August 19, 2009, in which Plaintiff claimed:

> Today, at approximately 1:05 pm, I encountered D.S.S. Martuscello, in person, while he conducted rounds on the F–3 housing unit. I informed him of my 08/08/09 and 8/15/09 submitted requests to his office. To this D.S.S. Martuscello inquired whether I was confined via keeplock or I.P.C., to which I informed him that I was keeplocked (for a disciplinary infraction). In response thereto, D.S.S. Martuscello immediately, and in absolute terms, stated that I would not be allowed to go (to religious services) under any circumstances as I was a threat to his security. Notingly [sic], the reasons for my infraction weren't even mentioned/discussed.

Dkt. No. 88–3 at 53.

Viewing this evidence in the light most favorable to Plaintiff, the nonmoving party, the Court finds it sufficient to create an issue of material fact with respect to Defendant Martuscello's personal involvement in the creation or continuance of the alleged unconstitutional policy. Defendant Martuscello's alleged statement that Plaintiff would not be permitted to attend religious services solely because he was in disciplinary keeplock can reasonably be viewed as evidence that Defendant Martuscello knew and approved of an informal policy or custom of prohibiting all keeplocked inmates from attending congregate religious services. Permitting an unconstitutional policy to operate is sufficient to establish a supervisor's personal involvement in an alleged constitutional violation. Therefore, Defendant Martuscello's motion for summary judgment on this ground is denied.

**D. First Amendment and RLUIPA Claims**

**\*6** Plaintiff alleges that his First Amendment and RLUIPA rights were violated by Defendants Perlman and Leonard when DOCCS reduced the number of Islamic holy days designated as family events from two to one. Plaintiff also alleges that his rights were violated by Defendants Shanley, Martuscello, Robinson, and Hale when they refused to allow Plaintiff to attend congregate religious services while in keeplock. Finally, Plaintiff alleges that Defendants Perlman, Leonard, Hale, and Graham violated his free exercise rights when they denied Plaintiff's request to incorporate halal meats into his therapeutic diet. [4]

The First Amendment to the United States Constitution guarantees the right to free exercise of religion. U.S. Const. Amend. I. Although "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause," such protection is balanced against "the interests of prison officials charged with complex duties arising from the administration of the penal system," and prisoner's free exercise claims "are therefore judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (internal quotations and citations omitted). "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is 'reasonably related to legitimate penological interests.' *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

In order to prevail on a free exercise claim, a prisoner must show that the defendant's conduct "substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006). [5] A burden is substantial if it interferes with a practice or tenant that " 'is considered central or important' " to the plaintiff's religious exercise. *See Pugh v. Goord,* 571 F.Supp.2d 477, 499 (S.D.N.Y.2008) (quoting *Ford,* 352 F.3d at 593–94). "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Id.* at 275. The burden then "remains with the prisoner to 'show that these [penological] concerns were irrational.' " *Ford,* 352 F.3d at 595 (quoting *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir.1989)).

In making a reasonableness determination, the court must consider the following:

> 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

**\*7** *Benjamin,* 905 F.2d at 574 (citing *Turner,* 482 U.S. at 89–90).

The RLUIPA provides that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). RLUIPA claims are evaluated under principles similar to those applicable to First Amendment claims, but the RLUIPA places a higher burden on defendants, who must show a compelling government interest advanced through the least restrictive means. *See Griffin v. Alexander,* No. 9:09–CV–1334, 2011 WL 4402119, \*10 (N.D.N.Y. Aug. 25, 2011) (citation omitted). For a defendant to show that a practice is the least restrictive means, the defendant must show that it "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Jova v. Smith,* 582 F.3d 410, 416 (2d Cir.2009) (internal quotations omitted). Nonetheless, RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety," and courts are to "apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and

limited resources." *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (internal quotations omitted). RLUIPA does not authorize claims for monetary damages against state officers in their official or individual capacities. *Holland,* 758 F.3d at 224.

### 1. Family Guest Events

Plaintiff alleges that Defendants Perlman and Leonard substantially burdened his sincerely held religious beliefs by removing family guest event designation from Eid–ul–Adha, a Muslim holy day, thereby no longer permitting family guests to attend and participate in the prison's Eid–ul–Adha celebration. [6] DOCCS stopped designating Eid–ul–Adha as a family guest event under a policy change that reduced the number of designated family events for each recognized religion, with the exception of the Native American religion, to one event per year. [7] DOCCS implemented the new policy after consultation with religious leaders and various DOCCS employees. Dkt. No. 81–29 at 2; Dkt. No. 81–30 at 2. Defendants Leonard and Perlman attested that the policy was motivated by the desire to reduce the administrative costs of providing food and security for family events and the increasing difficulty of balancing growing demand for family events by different religions. Dkt. No. 81–29 at 2; Dkt. No. 81–30 at 2.

These interests are rationally related to the policy of limiting nearly all recognized religions to only one family guest event per year. Plaintiff contends that reducing the number of family events is not rationally related to reducing administrative costs because inmates pay the facility commissary a meal charge of $1.95 per adult guest and $0.50 per child guest for family event guests. *See* Dkt. No. 93–1 at 24; Dkt. No. 88–3 at 174. This argument assumes, however, that DOCCS incurs no other costs in hosting family events. Plaintiff provides no evidence in support of his related argument that the cost of holding a family guest event for Eid–ul–Adha is insignificant. *See* Dkt. No. 88 at 37–38. Plaintiff also points to additions to the family events calendar for other religions as evidence that Defendants faced no administrative burden in balancing demand for events. *See* Dkt No. 88 at 34–35. This argument ignores that the new family events were added for religions that previously had no family events designated. The fact that the policy change enabled DOCCS to accommodate more religious groups strengthens Defendants' claim that it was rationally related to the need to balance demand from numerous groups. Lastly, Plaintiff's argument that the fact that no family event

is currently scheduled for the weekend on which Eid–ul–Adha is celebrated takes too narrow a view of administrative burden, namely that DOCCS incurs no administrative burden in holding a family guest event if the event is not in direct conflict with another guest event. *See* Dkt. No. 93–1 at 22.

**\*8** Under the new policy, Plaintiff has alternative means of exercising his religious rights. Plaintiff acknowledges that despite the policy change, he may continue to observe Eid–ul–Adha, as DOCCS still holds a celebration for the holiday that incorporates a special menu, prayer, and a day off from work. *See* Dkt. No. 93–1 at 24; Dkt. No. 88–3 at 145. Plaintiff introduced no evidence that he cannot fully observe Eid–ul–Adha without family guests present. In fact, Plaintiff admitted that when DOCCS did permit family members to attend Eid–ul–Adha, he never had a family guest attend the celebration. *See* Dkt. No. 81–3 at 13. [8]

Further, Plaintiff proffered no alternative for accommodating his rights that would satisfy the government's interests. His only suggested accommodations were for DOCCS to revert to its former policy recognizing Eid–ul–Adha as a family event or to recognize all "holy day events, beyond the once a year restriction available for all religious groups, to those holy days in which family and guest participation is integral or important thereto." *See* Dkt. No. 93–1 at 25–27. Neither option would serve Defendants' interest in reducing fiscal and administrative burdens.

Therefore, Plaintiff has not shown that Defendants' asserted penological interests unreasonably burdened Plaintiff's religious beliefs. Accordingly, Defendants' motion for summary judgment on Plaintiff's First Amendment claims arising out of the DOCCS family event policy is granted. In light of the foregoing analysis, the Court also finds that, even if the policy change substantially burdened Plaintiff's religious exercise, Defendants' conduct advanced a compelling government interest through the least restrictive means. Therefore, Defendants' motion for summary judgment on Plaintiff's RLUIPA claim on this ground is also granted.

### 2. Attendance at Friday Services

Plaintiff alleges that Defendants Shanley and Martuscello violated his First Amendment and RLUIPA rights by denying him permission to attend weekly Jum'ah congregate services at Conxsackie Correctional Facility on three occasions while Plaintiff was in disciplinary keeplock in August 2009. Plaintiff also alleges that Defendants Robinson and

Hale violated his First Amendment rights by denying him permission to attend weekly Jum'ah services at Auburn Correctional Facility while Plaintiff was in disciplinary keeplock in May 2011.

In *O'Lone v. Estate of Shabazz,* while evaluating the validity of a prison regulation limiting Muslim prisoners' ability to attend Jum'ah, the Supreme Court recognized the centrality of Jum'ah services to the Islamic faith, noting that "[t]here is no question that respondents' sincerely held religious beliefs compelled attendance at Jumu'ah." 482 U.S. 342, 345, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Generally, the courts "have long held that prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible." *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989). Prisoners in disciplinary confinement do not lose the right to attend religious services solely because of their confinement; "prison officials must make individual determinations on a case-by-case basis as to the need for exclusion." *Id.* (quoting *Leon v. Harris,* 489 F.Supp. 221, 225 (S.D.N.Y.1980)); *see also Mawhinney v. Henderson,* 542 F.2d 1, 3 (2d Cir.1976) ("[N]ot every prisoner in segregation can be excluded from chapel services; because not all segregated prisoners are potential troublemakers, the prison authorities must make some discrimination among them").

**\*9** However, courts have consistently found protecting institutional security and inmate safety to be a legitimate, compelling penological interest justifying the denial of attendance at religious services. *See, e.g., O'Lone,* 482 U.S. 342, 350, 107 S.Ct. 2400, 96 L.Ed.2d 282 (finding that the regulation that forced prisoners to miss Ju'mah services was "justified by concerns of institutional order and security"); *Salahuddin v. Jones,* 992 F.2d 447, 449 (2d Cir.1993) ("In this case, appellant was in SHU for fighting with another inmate. Given that appellant posed a threat to the safety of other prisoners and that the state forbade only congregate religious services and not his solitary practice of religion, the state's purpose was legitimate"); *Salahuddin,* 467 F.3d at 277 ("[P]rison officials must have been pursuing the interest in inmate safety when limiting [the plaintiff]'s religious exercise. The defendants' burden on summary judgment is to 'point[ ] to [something] in the record suggesting that the [denial of religious exercise] *was viewed as* preventing [threats to inmate safety]" (quoting *Turner,* 482 U.S. at 98)).

In this case, Plaintiff contends that Defendants denied his requests to attend Jum'ah while in keeplock pursuant to an unofficial blanket policy of denying all keeplocked prisoners' requests to attend congregate religious services. Defendants Shanley and Robinson both attested that they address each keeplocked inmate's request to attend congregated services on a case-by-case basis, pursuant to DOCCS Directive 4202, and denied Plaintiff's requests because he was determined to have presented a threat to the operation of the facility. *See* Dkt. No. 81–22; Dkt. No. 81–31. Specifically, Defendant Shanley identified Plaintiff's disciplinary history, including threatening violent conduct, a physical interaction with a correctional officer, and creating a disturbance while being escorted to a religious service, and Plaintiff's reason for being in keeplock, which was threatening physical violence toward correction officers and urging inmates to participate in detrimental actions, as the basis for denying Plaintiff's requests. Dkt No. 81–22. Defendant Robinson indicated that he denied Plaintiff's requests because of Plaintiff's October 2010 violent conduct, fighting, and creating a disturbance and April 2010 assault of prison staff. Dkt. No. 8131.[9] Morever, Defendant Martuscello attested that Coxsackie Correctional Facility had no blanket policy of denying keeplocked inmates' requests. Dkt. No. 81–28.

Defendants' contentions that Plaintiff's requests were denied on an individual basis are supported by Plaintiff's own exhibits, including DOCCS Directive 4202, which describes the process by which keeplocked inmates can request to attend religious services, *see* Dkt. No. 88–3 at 61; two memoranda from Defendant Shanley indicating that "[a]fter a careful review of [P]laintiff's facility records, and for the safety and security of the facility, I have denied [Plaintiff]'s request to attend Religious Services while he is on keeplock status," Dkt No. 88–3 at 55, 58; and Plaintiff's grievances, Dkt. No. 88–3 at 53–54, 57. The fact that the Inmate Grievance Resolution Committee recommended that one of Plaintiff's grievances be accepted in part because Defendant Shanley should have provided Plaintiff with a fuller explanation for the basis of the denial of Plaintiff's request does not make Defendant Shanley's denial defective. Rather, the Court finds ample evidence in the record, including the above-cited memoranda, that Defendant Shanley denied Plaintiff's requests to protect facility safety and security. The only evidence Plaintiff introduced of an implicit blanket policy of denying all keeplocked inmates' requests was his alleged conversation with Defendant Martuscello. Plaintiff's unsupported assertion is not sufficient to create a genuine issue of material fact regarding the existence of such a policy, which Defendants unanimously denied.

**\*10** Finally, the Court acknowledges that Plaintiff had no alternative means of participating in Ju'mah, as Ju'mah requires congregate worship. However, the Supreme Court in *O'Lone* rejected this argument as being fatal to the reasonableness of a prison regulation restricting prisoners from attending Ju'mah that protected institutional security and explained:

> Our decision in *Turner* also found it relevant that "alternative means of exercising the right ... remain open to prison inmates." There are, of course, no alternative means of attending Jumu'ah; respondents' religious beliefs insist that it occur at a particular time. But the very stringent requirements as to the time at which Jumu'ah may be held may make it extraordinarily difficult for prison officials to assure that every Muslim prisoner is able to attend that service. While we in no way minimize the central importance of Jumu'ah to respondents, we are unwilling to hold that prison officials are required by the Constitution to sacrifice legitimate penological objectives to that end.... Here, similarly, we think it appropriate to see whether under these regulations respondents retain the ability to participate in other Muslim religious ceremonies.

482 U.S. at 351–52 (citation omitted). Plaintiff's ability to worship and pray individually in his keeplock cell thus afforded him some alternative means of exercising his religious rights, and Plaintiff has suggested no alternative or less restrictive means of protecting institutional security that would have permitted him to participate in Ju'mah.

Based on the foregoing, the Court finds that the burdens on Plaintiff's religious exercise were reasonably related to legitimate penological objectives, and Defendants had no less restrictive means of furthering those objectives. Defendants' motion for summary judgment on Plaintiff's First Amendment and RLUIPA claims on this issue is therefore granted.

### 3. Dietary Restrictions

Plaintiff contends that Defendants Perlman, Leonard, Hale, and Graham violated his First Amendment and RLUIPA rights by failing to incorporate halal meats into the therapeutic diet Plaintiff receives pursuant to a physician's approval.

Prison officials are required, at minimum, to provide inmates with nutritionally adequate meals, but otherwise retain "considerable discretion" over dietary decisions. *Walker v. Fischer,* No. 10–CV–01431, 2012 WL 1029614, \*6 (N.D.N.Y. Mar. 26, 2012). However, the Second Circuit

has "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597 (citations omitted). "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004). Even so, courts "are reluctant to grant dietary requests where the cost is prohibitive, or the accommodation is administratively unfeasible." *Benjamin,* 905 F.2d at 579 (citations omitted). Further, "[c]ourts have consistently held that DOCCS' Religious Alternative Meal ["RAM"] is sufficient to sustain Muslim prisoners' good health without violating dietary laws and that a strictly Halal diet is not required." *DeBlasio v. Rock,* No. 9:09–CV–1077, 2011 WL 4478515, \*20 (N.D.N.Y. Sept.26, 2011) (citation omitted).

**\*11** In the present matter, Plaintiff currently receives the therapeutic "Controlled A" diet, which is high fiber, low cholesterol/low fat, and low sodium, at the request of Plaintiff's health care provider. The Controlled A menu contains meats that are haram, or prepared in a manner that violates the tenets of Islam. Plaintiff requested that Defendants provide him with a special diet combining the Controlled A diet with halal meats, which are prepared in a manner consistent with the laws of Islam. Defendants refused his request, noting that per the DOCCS Medical Nutritional Therapy Manual, "[r]eligious menus are not available in combination with any therapeutic diet restrictions. [M]any of the religious selections are not compatible with therapeutic diet requirements." Dkt. No. 88–3 at 85. Plaintiff contends he is thus forced to choose between a diet suited to his medical needs and one which satisfies the dictates of his religious beliefs.

Plaintiff does not contend that Islam requires him to consume halal meat with any specific frequency or indeed at all, but rather that it prohibits him from consuming haram meat. The RAM diet, which courts have consistently approved of as sufficient to meet Muslim prisoners' dietary and religious needs, only includes one halal meat entree per week. *See* Dkt. No. 81–34 at 3. Plaintiff does not dispute that he remains free to choose the RAM diet, which complies with his religious beliefs, and does not claim that he is forced to consume the haram meats on the Controlled A diet when they are provided to him.[10] However, because haram meats are a prevalent component of the Controlled A diet, and the RAM diet would not fulfill Plaintiff's specific medical needs, the Court finds that Plaintiff's religious exercise is burdened by

Defendants' refusal to provide him a meal option suited to his therapeutic needs that also complies with his religious beliefs. *See* Dkt. No. 81–37 (listing two typical weekly menus for the Controlled A diet, each of which feature non-halal meats in at least twelve meals).

Defendants' refusal to serve Plaintiff a special menu combining elements of the RAM and Controlled A diets is justified by the legitimate penological concern of meeting the disparate dietary needs of approximately 54,700 inmates in an economically viable way. *See* Dkt. No. 816. "[I]t is well established that DOCS has a legitimate interest in cost-effectively meeting the religious dietary needs of multiple inmate groups." *Majid v. Fischer,* No. 07–CV–4585, 2009 U.S. Dist. LEXIS 71616, *18–19 (S.D.N.Y. July 31, 2009); *see also Hamilton v. Smith,* No. 9:06–CV–0805, 2009 WL 3199520, *4 (N.D.N.Y. Sept.30, 2009)* ("It is not a reasonable demand that prison officials supply every inmate with their personal diet requests for every meal" (internal quotations omitted)). There is clearly a rational relationship between this interest and the policy, which offers numerous menus tailored to meet different inmates' needs in a cost-effective manner by following a standardized state-wide menu prepared under considerations of "the palatability of the food to inmates, nutritional quality, accommodation of religious requirements and therapeutic needs, security implications, and cost containment." Dkt. No. 81–34 at 2. Defendants' refusal to permit Plaintiff to incorporate RAM entrees of his choosing into his diet also serves the legitimate purpose of maintaining the therapeutic integrity of the medical diet. For example, Elizabeth Culkin, assistant director of the DOCCS Office of Nutritional Services and a registered dietitian, attested that the halal chicken patty offered on the RAM diet that Plaintiff sought to have included in his diet was too high in sodium to meet the restrictions of the Controlled A diet. *Id.* at 5.

**\*12** Second, Plaintiff does not contest that Defendants make halal meat available to Muslim prisoners, including Plaintiff, numerous times per year pursuant to special menus for religious observances. Ms. Culkin attested that Muslim inmates may also obtain halal meats to supplement their diets through care packages or their facility's commissary. Dkt. No. 81–34 at 3. Although Plaintiff alleges that halal meat is not sold at his current facility's commissary, Ms. Culkin attested that inmates may petition their facilities to have specific products sold at the commissary. *Id.* Therefore, Plaintiff has alternative means of exercising his religious beliefs.

Third, incorporating nutritionally appropriate halal entrees into the Controlled A menu would burden prison administrative and fiscal resources. Ms. Culkin attested that the cost of a single low sodium halal chicken entree suitable to the Controlled A diet is $0.78, while a single comparable non-halal chicken entree costs $0.43. *Id.* at 5. Ms. Culkin calculated that making this substitution just once per week for the 2,890 inmates currently on the Controlled A and B diets would cost DOCCS $52,598 annually. *Id.* Plaintiff contends that such a substitution would cost DOCCS only $109 .20 annually because only three Controlled A diet recipients at the Attica Correctional Facility are Muslim. Dkt. No. 88 at 24. However, Plaintiff provides no support for his contention that only three Muslim prisoners at his facility require a therapeutic diet, and overlooks the fact that DOCCS operates its menus on a standardized, state-wide basis in the interest of cost containment. Further, the Court agrees with the *Hamilton* court, which found that under similar circumstances, " '[e]ven where the marginal cost and administrative burden of providing a specialized religious diet would be small or negligible, a rational nexus exists between a prison's dietary policies and its legitimate administrative and budgetary concerns.' " *Hamilton,* 2009 WL 3199520 at *5 (quoting *Furnace v. Arceo,* No. C 06–4209, 2008 WL 618907, *8 (N.D.Cal. Mar.3, 2008)).

Plaintiff's proffered alternatives to accommodate his rights include that DOCCS replace the haram proteins in all prison menus with halal proteins. Dkt. No. 88 at 26. In light of Ms. Culkin's uncontroverted assertion that halal proteins are more expensive than non-halal proteins, this option would not satisfy Defendants' legitimate penological interest in meeting prisoners' nutritional needs in a cost-effective manner. *See* Dkt. No. 81–34. A second alternative Plaintiff suggests is that DOCCS provide him with Ensure dietary supplements. Dkt. No. 88 at 27. Plaintiff has proffered no evidence that he requested such supplements or that Defendants denied him such supplements under their current policy. Finally, Plaintiff suggests that DOCCS provide Muslim inmates with prepackaged halal meals. Dkt. No. 88 at 26. Plaintiff provides no evidence that these prepackaged meals are consistent with the restrictions of his therapeutic diet, are available to DOCCS for purchase, or would be cost-effective. Thus, Plaintiff has offered no viable less restrictive means of accommodating his rights that are consistent with Defendants' valid penological interests.

**\*13** For the above reasons, Defendants' motion for summary judgment on Plaintiff's free exercise and RLUIPA claims on this issue is granted.

**E. Equal Protections Claims**

Plaintiff contends that his rights under the Fourteenth Amendment were violated by Defendants Perlman and Leonard when DOCCS reduced the number of Islamic holy days designated as family events but did not similarly reduce the number of Native American religious family guest events. Plaintiff also contends that Defendants Perlman, Leonard, Hale, and Graham violated his rights when they refused to incorporate halal meats into Plaintiff's therapeutic diet but provided Jewish inmates kosher meals "satisfying both their medical and religious needs." Dkt. No. 47 at 17–18; Dkt. No. 47–4 at 10.

The Fourteenth Amendment to the United States Constitution provides in relevant part that "nor [shall any State] deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const. amend. XIV, § 1*. "To prove a violation of the Equal Protection Clause, ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir.2005). In the prison context, "the Supreme Court has specifically held that ... the Equal Protection clause does not require that 'every religious sect or group within a prison ... must have identical facilities or personnel.' " *Pugh*, 571 F.Supp.2d at 502 (quoting *Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)). The Second Circuit has applied the *Turner* standard to equal protection claims, such that "even if plaintiffs can demonstrate that two groups are similarly situated, disparate treatment may still be warranted if the government can demonstrate that the distinctions are 'reasonably related to legitimate penological interests.' " *Id.* (quoting *Benjamin*, 905 F.2d at 572). This standard requires courts to "determine whether 'the groups are so similar that discretion has been abused.' " *Benjamin*, 905 F.2d at 575 (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977)).

*1. Family Guest Events*

In this case, Plaintiff claims that Defendants violated his equal protection rights by reducing the number of religious events at which family guests are permitted for Muslim inmates but not Native American inmates. It is undisputed that under the new policy, DOCCS reduced the number of religious events

designated as family guest events to one event per year for all recognized religions except the Native American religion. Defendants argue that the exception for Native Americans is justified because in 1999, DOCCS agreed by stipulation to designate eight Native American holy days as family guest events, pursuant to DOCCS' recognition that "Native Americans believe that family ... is important to the religious celebration and for that reason it does not separate religiously from family celebrations and allows the eight sacred seasonal holy days of the Longhouse to be celebrated in a unique way as described herein." *See* Dkt. No. 81–4 at 12.

**\*14** Plaintiff contends that Muslim and Native American inmates are similarly situated because both "require family and guest participation as integral aspects of their holy day celebrations." Dkt. No. 93–1 at 58. On the other hand, Plaintiff asserts that Muslim inmates and the other religious groups that had family event days reduced are not similarly situated because the other religious groups "do not have any set holy day as a family event, but decide which ones they will celebrate as such at some time throughout the year." *Id.* at 59.[11] Defendant Leonard acknowledged in his response to Plaintiff's interrogatories that the DOCCS Muslim Chaplains objected to the reduction in family events because "religious holidays can be considered family days." Dkt. No. 88–3 at 47. However, Defendant Hale indicated that the decision to reduce all religious groups to one family guest event was made after Defendant Perlman "determined that having only one family day event in no way limited the religious practices of the inmate population of any religious faith." *Id.* at 21. This statement is consistent with the denial of Plaintiff's grievance regarding the change in family event policy, which stated, in relevant part:

> Per Ministerial Services, Central Office allows one family event per year, with the exemption of the Native American faith group. A Native American religious ceremony is observed with a family meal. The other religions do not require a family meal as part of the religious observance. Other religious holidays can be observed without a family event scheduled.
>
> Dkt. No. 73–3 at 31. Defendants have consistently justified the policy's different treatment of Native American inmates and inmates practicing all other recognized religions as based on a legitimate penological interest of accommodating what DOCCS perceives as a unique need to incorporate family members into Native American religious celebrations, pursuant to a stipulation DOCCS

has adhered to since 1999. This interest is rationally related to the DOCCS policy exception for Native American holy days. Plaintiff has introduced no evidence that Defendants' refusal to permit a similar exception for Muslims was the result of intentional or purposeful discrimination.

Morever, Plaintiff has failed to introduce any evidence demonstrating that he is so similarly situated with the Native Americans such that Plaintiffs abused their discretion. Accordingly, the Court has no basis for finding that Defendants abused their discretion in adhering to a stipulation recognizing eight annual family guest events for Native American inmates. Therefore, Defendants' motion for summary judgment on this ground is granted.

### 2. *Dietary Restrictions*

Plaintiff also contends that Defendants violated his equal protection rights by refusing to incorporate halal proteins from the RAM diet into Plaintiff's therapeutic diet while providing Jewish inmates the "hot kosher" meal option at Green Haven Correctional Facility. Plaintiff claims that the hot kosher program is provided to Jewish prisoners whose medical needs render the standard kosher menu, known as the Cold Alternative Diet ("CAD"), inappropriate. However, Plaintiff proffered no evidence in support of his claim that the hot kosher diet satisfies both the religious and dietary needs of Jewish inmates requiring specific therapeutic diets, as Plaintiff requires. The record establishes only that the hot kosher meal program satisfies the Jewish dietary doctrine, and is devoid of any evidence that the program satisfies specific medical needs not met by the CAD. *See* Dkt. No. 88–3 at 22. In fact, an internal DOCCS communication regarding the Green Haven hot kosher program offered by Plaintiff as evidence of disparate treatment indicates that the program is intended for "more observant and religiously astute" inmates, not inmates requiring therapeutical diets. Dkt. No. 88–3 at 98. Similarly, DOCCS Directive 4202 describes eligibility to participate in the hot kosher program as "based upon past religious history and approval by the Office of Ministerial and Family Services," not medical concerns. *Id.* at 108. Further, the record indicates that all religious diets are strictly followed and cannot be combined with therapeutic menus, with no exception for Jewish inmates or reference to the hot kosher diet as a means of accommodation. *See* Dkt. No. 88–3 at 23, 29, 77. In the absence of any support for Plaintiff's unsubstantiated claim that Jewish inmates with medical dietary needs receive a special diet that accommodates their specific therapeutic and religious needs, Plaintiff has failed to show any disparity in treatment and raises no genuine issue of material fact on his equal protection claim. Based on the

foregoing, the Court grants Defendants' motion for summary judgment on this ground.

### F. Qualified Immunity

**\*15** Defendants contend that even if Plaintiff established a constitutional violation, they are entitled to qualified immunity. Qualified immunity "shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted).

> For a constitutional right to be clearly established for purposes of determining whether an officer is entitled to qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Mollica v. Volker,* 229 F.3d 366, 370–71 (2d Cir.2000) (quoting *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (internal quotations and emphasis omitted). "Where the right at issue in the circumstances confronting [the government officials] ... was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity 'if ... it was objectively reasonable for them to believe their acts did not violate those rights.' " *Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007) (quotation and other citation omitted).

"Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New York,* 612, F.3d 149, 165 (2d Cir.2010) (citations omitted). "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness.... That is, '[e]ven if the right at issue

was clearly established in certain respects ... an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.' " *Id.* (quotations omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact. *See Zellner,* 494 F.3d at 367 (citing *Kerman v. City of New York,* 374 F.3d 93, 109 (2d Cir.2004)) (other citations omitted).

> The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.,* whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court. However, '[a] contention that ... it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case.' "

**\*16** *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman,* 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe,* 332 F.3d 68, 81 (2d Cir.2003) (quotation omitted); *see also Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995) (quotation omitted).

In the present matter, Magistrate Judge Hummel concluded that because Plaintiff's allegations did not show that Defendants violated Plaintiff's constitutional rights, Defendants are entitled to qualified immunity. Upon review, the Court finds no clear error or manifest injustice and adopts this portion of the Report–Recommendation and Order.

In addition, the Court finds that a reasonable official would not believe that he was violating Plaintiff's clearly established constitutional rights by the conduct described here. As to the family guest events, Defendants reduced the number of family event days for all religions, with the exception of the Native American religion, because of the increased number of requested family events, their associated costs, and the limited number of available weekends on which to hold the events.

The exception for the Native American religion was made because of a stipulation in place and the centrality of family participation to Native American religious holidays. In light of these legitimate penological interests, a reasonable official would not conclude that implementing or following the policy violated Plaintiff's constitutional rights.

As to Plaintiff's restriction from Jum'ah, an inmate's general right to attend congregate religious services is clearly established. However, a prison's ability to restrict that right based on legitimate security concerns is also well-established. The law requires an individual determination of the risk a keeplocked inmate poses to security. Therefore, a reasonable official would not understand denying Plaintiff's requests to attend Jum'ah while in keeplock to violate Plaintiff's rights where Defendant made individual determinations that Plaintiff posed a threat to facility security.

As to the failure to incorporate halal meals into Plaintiff's therapeutic diet, an objectively reasonable officer would not believe that the options provided to Plaintiff violated his rights. This finding is supported by the fact that the RAM diet is widely accepted by courts as nutritionally and religiously appropriate for Muslim inmates, by the availability of other sources of halal meat to Plaintiff, and by the uniform manner in which DOCCS prohibited combinations of therapeutic and religious diets.

**\*17** Based on the foregoing, the Court finds that Defendants are entitled to qualified immunity, and grants Defendants' motion for summary judgment on this alternative ground.

## G. Preliminary Injunctive Relief

Finally, Magistrate Judge Hummel concluded that Plaintiff was not entitled to a temporary restraining order or preliminary injunction. The Court has reviewed Magistrate Judge Hummel's reasoning and conclusion on this issue and finds no clear error. Accordingly, this portion of the Report–Recommendation is adopted and Plaintiff's motion for a temporary restraining order and preliminary injunction is denied.

## V. CONCLUSION

For the reasons stated above, the Court arrives as the same conclusions as Magistrate Judge Hummel as to the proper disposition of the parties' respective motions on full review

and incorporation of Plaintiff's opposition papers. Although the Court disagrees with Magistrate Judge Hummel's recommendation regarding the personal involvement of Defendant Martuscello, the Court's finding on this issue does not alter the Court's conclusion that Defendants are entitled to summary judgment on all counts of Plaintiff's complaint. Therefore, the Court hereby

**ORDERS** that Plaintiff's motion for reconsideration is **GRANTED** and the Court's Order dated March 13, 2014 is **VACATED;** and the Court further

**ORDERS** that the Report and Recommendation by United States Magistrate Judge Christian F. Hummel (Dkt. No. 90) is rejected in part and accepted in part for the reasons set forth herein; and the Court further

**ORDERS** that Plaintiff's motion for partial summary judgment (Dkt. No. 73) is **DENIED;** and the Court further

**ORDERS** that Defendants' cross motion for summary judgment (Dkt. No. 81) is **GRANTED;** and the Court further

**ORDERS** that Plaintiff's motion for a temporary restraining order and preliminary injunction (Dkt. No. 79) is **DENIED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Footnotes

1   Plaintiff asserts that he deposited his objections in a mailbox at the Attica Correctional Facility, where he is currently housed, on February 28, 2014, and the facility returned the objections to him on March 6, 2014 for insufficient postage. *Id.* at 2–3. Plaintiff contends that he did not have access to a postage scale to determine sufficient postage for his filings because he was not permitted to visit the law library where the postage scale is located between the time of the issuance of the Report–Recommendation and Order and the deadline for filing his objections. *Id.* at 3. Because the Court received Plaintiff's objections to the Report–Recommendation and Order after issuing its Order, the Court will treat the motion as one for reconsideration in conjunction with the Plaintiff's subsequent motion.

2   The Court's view that Plaintiff's reply papers were in fact overlooked, despite Defendants' arguments to the contrary, is reinforced by the fact that the Report–Recommendation and Order does not include a single reference or citation to Plaintiff's reply papers or exhibits outside of the language quoted above.

3   Plaintiff agrees with Magistrate Judge Hummel's conclusions, but objects to his analysis pertaining to Defendant Perlman's personal involvement because it did not address Defendant Hale's interrogatory response asserting that Defendant Perlman made the decision to reduce the number of Islamic family guest events. Dkt. No. 88–3 at 21. The Court notes that this fact is disputed by Defendant Perlman's own interrogatory, *see* Dkt No. 88–3 at 40, and agrees with Magistrate Judge Hummel's conclusion that even if Defendant Perlman did not personally make the final decision to institute this policy, his actions in carrying out the policy were sufficient for a finding of personal involvement at the summary judgment stage. Plaintiff also objects that Magistrate Judge Hummel did not address the fact that "by signing into effect the CORC decision, Defendant Hale signed into effect departmental memoranda to be acted upon thenceforth." This fact does not substantively impact the personal involvement analysis, which focuses not on the effect of denying a grievance, but rather whether the official "proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." *Molano v. Bezio,* No. 10–CV–6481L, 2012 WL 1252630, *5 (W.D.N.Y. Apr.13, 2012) (quotations omitted).

4   In light of Plaintiff's numerous specific objections to Magistrate Judge Hummel's Report–Recommendation and Order based on facts and arguments from Plaintiff's reply papers and exhibits, the Court will make *de novo* determinations on Plaintiff's constitutional and RLUIPA claims.

5   As Magistrate Judge Hummel noted in his Report–Recommendation, "[i]n the Second Circuit, it is uncertain whether the 'substantial burden' test, or a lesser 'burdened' test is employed in carrying out a free exercise claim analysis." Dkt. No. 90 at 18 (citations omitted); *see also Holland v. Goord,* 785 F.3d 215, 220 (2d Cir.2014) ("It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs" (internal quotations omitted)). The Court need not decide which standard is appropriate because it finds that Defendants' conduct was justified by legitimate penological interests.

6    Defendants do not dispute that Plaintiff's religious beliefs are sincerely held.

7    The Court will address the policy's exception for Native Americans in its discussion of Plaintiff's Fourteenth Amendment claims, *infra.*

8    Plaintiff claims that other prisoners' visitors were in fact Plaintiff's guests at unspecific events. *See id.* at 68–69. He introduces no evidence in support of this claim.

9    Plaintiff argues that "*Salahuddin v. Goord* ... rejected the practice of prison officials justifying preclusion from services due to infractions incurred at other facilities besides the one at which services are held." Dkt. No. 93–1 at 31. However, in *Salahuddin,* the Second Circuit reversed a grant of summary judgment for the defendants because they claimed they denied the plaintiff's request to attend services based on safety considerations, but "[did] not point to any record evidence that suggests that the denial of religious exercise while in disciplinary keeplock ... was actually viewed as preventing threats to inmate safety.... Post hoc justifications with no record support will not suffice." 467 F.3d at 276–77. As the Court discusses below, there is ample record evidence here that Defendants' denials were actually based on safety concerns, and the Court does not read *Salahuddin* as requiring safety concerns to be based solely on an inmate's history at the facility at which he is in keeplock.

10    Plaintiff claims that the RAM diet causes him adverse digestive and/or gastrointestinal reactions but provides no evidence in support of this claim. *See* Dkt. No. 88 at 15. Notably, Plaintiff was placed on the Controlled A diet because of his high blood sugar and creatine levels, not because of any gastrointestinal complications produced by the general population or RAM diets. *See id.* at 10. Further, in response to Plaintiff's arguments that the soy-based components of the RAM diet make the RAM diet generally unsuitable to meet prisoners' nutritional needs, the Court again notes that "[c]ourts have consistently held that DOCCS' Religious Alternative Meal ["RAM"] is sufficient to sustain Muslim prisoners' good health." *DeBlasio,* 2011 WL 4478515 at *20.

11    Plaintiff's evidence in support of this claim is his own recounting of personal conversations he had with Protestant and Catholic inmates, *see* Dkt. No. 88 at 33–34, the fact that the annual holy day given family event status for the Protestant and Catholic religions can vary annually, *see* Dkt. No. 88–3 at 157, 161, and a page from a text by Dr. Mandouh N. Mohamed, an associate professor at American Open University, which states that one common error concerning the celebration of Eid–ul–Adha Muslims may make is "[n]ot accompanying family members to attend Eiid," Dkt. No. 88–3 at 102.

---

2014 WL 4188077
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Kouriockein VANN, Plaintiff,
v.
Brian FISCHER, et al., Defendants.

No. 11 Civ.1958(KPF). | Signed Aug. 25, 2014.

*OPINION AND ORDER*

KATHERINE POLK FAILLA, District Judge.

**\*1** Plaintiff Kouriockien Vann, proceeding *pro se* and currently incarcerated at Green Haven Prison, brings this action against numerous prison officials and administrators alleging (i) that the regulations of the New York State Department of Corrections and Community Supervision ("DOCCS") have impaired his constitutional right to the free exercise of his religious beliefs, and thus violated the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment; and (ii) that prison officials have impermissibly abused him and subjected him to retaliatory and harassing conduct. Pending before the Court is Defendants' motion for summary judgment as to all claims. As to Plaintiff's constitutional claims, the Court finds that, to the extent the challenged DOCCS directives burden Plaintiff's religious exercise, any burden is outweighed by the critical penological interests that are served by the directives, which are as well the least restrictive alternatives available. Plaintiff's retaliation claims, by contrast, are procedurally barred, either because of Plaintiff's failure to exhaust available administrative remedies or because of claim preclusion. Accordingly, Defendants' motion is granted in its entirety.

**BACKGROUND** [1]

**A. Factual Background**

Plaintiff brings this suit pursuant to 42 U.S.C. § 1983, claiming violations of his Free Exercise and Equal Protection rights under the First and Fourteenth Amendments, and of the Religious Freedom Restoration Act of 1993 ("RFRA"), Pub.L. No. 103–141, 107 Stat. 1488, *codified at* 42 U.S.C.

§§ 2000bb through 2000bb–4. (Am. Compl. 3 of 22). Most of these claims arise from incidents in which prison officials deprived Plaintiff of the ability to wear the sacred beads necessary to the practice of his Santeria faith, or harassed him for wearing them. [2] One incident occurred upon Plaintiff's arrival at Downstate Correctional Facility ("Downstate") in January 2010. Another happened during his transport from Sing Sing Correctional Facility ("Sing Sing") to Attica Correctional Facility ("Attica") in September 2010. And a series of allegedly abusive and harassing incidents transpired in late 2010 and 2011, while Plaintiff was housed at Attica.

**1. Plaintiff's Free Exercise Claims**

The first alleged violation of Plaintiff's constitutional rights occurred upon Plaintiff's arrival at Downstate on January 4, 2010, when several defendants seized his sacred beads. (Am. Compl. 4 of 22). [3] According to Plaintiff, during his initial intake, unnamed corrections officers sought to confiscate Plaintiff's beads as contraband. (Vann Dep. 41–43). Plaintiff alleged that he was pressed against the wall during this search, and that one corrections officer screamed in his face. (*Id.* at 44). [4] Defendant Zuran, a sergeant at Downstate, approached as Plaintiff's beads were confiscated. [5] Plaintiff sought Zuran's assistance, explaining that he believed he had a legal right to possess his beads. (*Id.* at 42). Plaintiff even provided Zuran with a copy of an earlier decision from this District, *Campos v. Coughlin,* 854 F.Supp. 194 (S.D.N.Y.1994), that is discussed at greater length below. (*Id.*).

**\*2** As Zuran reviewed the decision, Defendant Twyman, a chaplain at Downstate, entered the draft room where this search was ongoing. (Vann Dep. 45–46). Twyman told Plaintiff and the officers that the beads were indeed permitted within the facility, once they had been examined and approved. (*Id.* at 46). Plaintiff reluctantly acquiesced, removing the beads and placing them in a bag. (*Id.*). The beads and Plaintiff's Santeria books were taken for examination. (*Id.* at 47). The religious texts were returned about a week later (*id.* at 48), and the beads were returned about two weeks after that (*id.* at 49).

The second alleged violation of Plaintiff's free exercise rights occurred during his transit from Sing Sing to Attica on September 27, 2010. (Vann Dep. 56–57). An unnamed security team informed Plaintiff that he could not wear his sacred beads while in transit. (*Id.* at 58–59). Defendant Mumin, a chaplain at Sing Sing, was nearby at the time. (*Id.*

at 59). Plaintiff again reluctantly acquiesced; the beads were placed in a bag and left in Plaintiff's possession during his transfer to Attica. (*Id.* at 60).[6]

Defendants submit that the officers involved in each of these incidents acted, as they were obliged to do, in accordance with applicable procedures (Def. 56.1 ¶¶ 26, 34–39, 46–55), and that those procedures are appropriate (*id.* at ¶¶ 35–37). Defendants also point to Plaintiff's acknowledgement that neither Downstate Superintendent Perez, nor Sing Sing Superintendent Heath—both named Defendants—had any involvement in these incidents. (*Id.* at ¶¶ 33, 40, 56; *see also* Vann Dep. 56–59).

**2. Plaintiff's Retaliation Claims**
Plaintiff alleges four separate incidents of abuse or harassment at Attica, each of which is claimed to constitute a violation of his rights. As to each, Defendants respond that Plaintiff did not exhaust his administrative remedies prior to commencing his lawsuit on March 17, 2011. (Def. 56.1 ¶¶ 58–60, 66–67).

First, Plaintiff alleges that on November 30, 2010, he suffered physical and sexual assault.[7] He claims that named Defendants LoDestro and Keenan, along with six other unnamed officers, encircled him while armed with batons; that his watch was confiscated; that he was punched; and that he was gratuitously groped while undergoing a pat-frisk search. (Vann Dep. 84, 90–99). Plaintiff did not identify any injury resulting from this incident or seek medical assistance as a result. (Def. 56.1 ¶¶ 73–74). Plaintiff pursued the state prison grievance process and obtained a final adverse determination regarding this incident on March 30, 2011. (Pl. Opp. Ex. B (Dkt.# 120–1) 32 of 51).[8]

Second, according to Plaintiff, on March 12, 2011, Defendants Corcoran and Fleckenstein censured Plaintiff regarding the visibility of his Santeria beads above the collar line of his shirt, suggesting that if he continued to wear them he should not leave his cell. (Vann Dep. 62–65). Both Defendants later that day repeated to Plaintiff their criticism of his wearing his beads. (*Id.* at 65–66). Plaintiff pursued the state prison grievance process and obtained a final adverse determination regarding this incident on July 6, 2011. (Pl. Opp. Ex. B (Dkt.# 120) 74–79 of 87).

**\*3** Third, on June 29, 2011—after filing the Complaint on March 17, 2011, and before filing the Amended Complaint on

August 30, 2011—Plaintiff was again confronted about the exposure of his beads above the neckline of his sweatshirt. Defendant Corcoran took Plaintiff out of line, photographed him from two angles (Pl. Opp. Ex. B (Dkt.# 120–1) 2 of 51), and wrote him a ticket for the exposed beads (*id.* at 1 of 51). Plaintiff claims that Corcoran used unwarranted harsh and harassing language. (Pl. Opp. Ex. B (Dkt.# 120) 63 of 87; Vann Dep. 77). More pointedly, Plaintiff contends that he was singled out in retaliation for naming Corcoran in the instant Complaint, which was served on Corcoran in May 2011. (Vann Dep. 77–78).

Defendant Borawski conducted a disciplinary hearing on July 2, 2011, to adjudicate the consequences of this ticket; at that hearing, Plaintiff was found guilty of displaying his sacred beads. (Pl. Opp. Ex. B (Dkt.# 120–1) 4 of 51). Plaintiff alleges that this disciplinary hearing was unfair because Borawski improperly refused to permit Plaintiff to call Deputy Superintendent Dolce as a witness and otherwise showed bias in his comments during the hearing. (*Id.* at 4–7 of 51; Am. Compl. 9 of 22). Plaintiff started the state prison grievance process, and received an adverse decision from the superintendent regarding his grievance on December 5, 2011. Plaintiff never sought an appeal of the decision. (Pl. Opp. Ex. B (Dkt.# 120) 63 of 87).[9]

Finally, on July 26, 2011—also before the filing of the Amended Complaint—Defendants Spaulding and LoDestro entered Plaintiff's cell to conduct a search. (Am. Compl. 9 of 22; Pl. Opp. Ex. B (Dkt.# 120) 81 of 87). While within his cell, Plaintiff alleges, Spaulding poured a glass of water on Plaintiff's Santeria books and threw them on his bed, and then hurled certain of Plaintiff's personal items out of his cell. (Vann Dep. 110–11). LoDestro, meanwhile, disarranged Plaintiff's legal paperwork. (*Id.* at 111). Spaulding applied jelly to Plaintiff's shirts and legal paperwork. (*Id.* at 112). At some point during this episode, Plaintiff alleges Spaulding did something to desecrate Plaintiff's Santeria altar. (*Id.* at 115; Am. Compl. 9 of 22; Pl. Opp. Ex. B (Dkt.# 120) 81 of 87 (alleging Spaulding "touched and violated all items on [Plaintiff's] shrine")). Plaintiff did not pursue the formal grievance process, but instead wrote a letter of complaint directly to the superintendent. (Pl. Opp. Ex. B (Dkt.# 120) 81 of 87). Plaintiff received an adverse response in a memorandum on August 28, 2011, but neither sought an appeal nor initiated a formal grievance process. (*Id.* at 84 of 87).

**B. Procedural Background**

**1. The Complaint and Its Amendment**
Plaintiff filed the Complaint in this action on March 17, 2011, bringing claims pursuant to 42 U.S.C. § 1983 and RFRA. (Dkt.# 1). He filed the Amended Complaint on August 30, 2011, adding several defendants and adding claims relating to events that took place after the filing of the original Complaint. (Dkt.# 29). Taken together with the original Complaint, [10] Plaintiff seeks both injunctive relief guaranteeing his right to practice his Santeria faith in prison and monetary damages. (Compl. 6 of 11; Am. Compl. 10 of 22).

**2. The Motion to Dismiss**
 **\*4** Defendants moved to dismiss the Complaint on September 12, 2011 (Dkt. # 26–27), and Plaintiff opposed that motion on October 17, 2011 (Dkt.# 35). The Court stayed the motion to dismiss to permit service of the Amended Complaint to be effected on all Defendants. (Dkt.# 36). [11] Defendants thereafter renewed their motion to dismiss, which motion was fully briefed on March 9, 2012. (Dkt.# 42–43, 53–54).

On June 21, 2012, the Court issued an Order granting in part and denying in part Defendants' motion to dismiss. (Dkt.# 71). First, the Court dismissed Plaintiff's claims under RFRA, as it is inapplicable to state governments after *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). (*Id.* at 16–17). However, the Court construed Plaintiff as raising statutory religious exercise claims under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), Pub.L. 106–274, 114 Stat. 803, *codified at* 42 U.S.C. §§ 2000cc through 2000cc–5, and found those claims survived any motion to dismiss. (*Id.* at 17).

Second, the Court concluded that it was appropriate to join Plaintiff's claims arising from incidents at Attica with his claims arising from incidents at Downstate and Sing Sing, even though Attica lies outside this District. (Dkt. # 71 at 7–9). The Court concluded that the Attica claims were "logically related" to Plaintiff's free exercise and equal protection claims. (*Id.* at 8). As those claims were properly venued in the Southern District, the Court found that the Attica claims could be permissibly joined in this action. (*Id.*). Third, the Court dismissed certain individual Defendants from this action for lack of personal involvement. Finally, the Court dismissed Plaintiff's § 1983 claims for money damages

against all Defendants in their official capacities; limited such claims to Defendants in their personal capacities; and allowed Plaintiff's claims for injunctive relief to stand against Defendants in their official capacities. (*Id.* at 15–16).

**3. The Instant Motion**
At the close of discovery, on October 25, 2013, Defendants moved for summary judgment as to all of Plaintiff's claims (Dkt.# 107–113); Plaintiff opposed that motion on November 25, 2013 (Dkt.# 115–120); and Defendants replied on December 11, 2013 (Dkt.# 121). On April 21, 2014, the Court ordered Defendants to provide supplementary briefing and certain additional documentary evidence by May 6, 2014, and invited Plaintiff to respond. (Dkt.# 124). After some delays, all submissions in response to this Order were submitted by July 10, 2014. (Dkt.# 125–127, 130, 132–138).

**DISCUSSION**

**A. Applicable Law**

**1. Summary Judgment Generally**
Under Fed.R.Civ.P. 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

 **\*5** The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322; *see also Selevan v. N .Y. Thruway Auth.,* 711 F.3d 253, 256 (2d Cir.2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on

an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson,* 477 U.S. at 248, 250; *see also Celotex,* 477 U.S. at 323–24; *Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986) (citing *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010) (quoting *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995) (internal quotation marks and citations omitted)); *see also Vargas v. Transeau,* 514 F.Supp.2d 439, 442 (S.D.N.Y.2007) (observing that "the mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat summary judgment (internal quotation marks and citations omitted)), *aff'd sub nom. Vargas v. Pfizer, Inc.,* 352 F. App'x 458 (2d Cir.2009) (summary order).

### 2. Summary Judgment in *Pro Se* Cases

When considering a motion for summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano,* 604 F.3d 732, 740 (2d Cir.2010) (citing *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,* 424 F.3d 195, 205 (2d Cir.2005)). In a *pro se* case, the Court must go one step further and liberally construe the party's pleadings "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

**\*6** Nonetheless, a *pro se* litigant must still be held to the normal requirements of summary judgment, and "bald assertion[s]," unsupported by evidence, will not overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Stinson v. Sheriff's Department,*

499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended"). Litigants "should be on notice from the very publication of Rule 56(e) that a party faced with a summary judgment motion may not rest upon the mere allegations or denials of the party's pleading and that if the party does not respond properly, summary judgment, if appropriate, shall be entered against him." *Champion v. Artuz,* 76 F.3d 483, 485 (2d Cir.1996) (quoting *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) (internal quotation marks omitted)).

### B. Analysis

### 1. The Court Will Consider Plaintiff's Arguments Despite His Failure to Comply with Local Rule 56.1

Despite Plaintiff's failure to submit a statement pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules"), the Court will exercise its discretion to review the record independently in consideration of Plaintiff's arguments. Local Rule 56.1 requires a party moving for summary judgment to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1(a). The movant's asserted facts are deemed to be admitted unless specifically controverted by the statement served by the opposing party. Local Rule 56.1(c).

*Pro se* litigants are "not excused from meeting the requirements of Local Rule 56.1." *Wali v. One Source Co.,* 678 F.Supp.2d 170, 178 (S.D.N.Y.2009). Even where there is incomplete compliance with the Local Rules, the Court retains discretion "to consider the substance of the plaintiff's arguments." *Id.* (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) ( "[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted))); *see also Hayes v. Cnty. of Sullivan,* 853 F.Supp.2d 400, 406 n. 1 (S.D.N.Y.2012) ("In light of Plaintiff's pro se status, the Court overlooks his failure to file a Local Rule 56.1 Statement and conducts its own independent review of the record.").

Defendants filed a Rule 56.1 Statement on October 15, 2013. (Dkt .# 113). Plaintiff then filed a document that he labeled his "[S]tatement Pursuant to Rule 56.1 of Undisputed Material

Facts." (Dkt.# 115). This document, however, does not adhere to the requirements of Rule 56.1(b): it does not rebut the assertions in Defendants' Local Rule 56.1 Statement, nor does it cite evidence in support of its own assertions. Nonetheless, the Court accepts Plaintiff's statement, his opposition papers to Defendants' motion for summary judgment, and his supporting exhibits as a statement pursuant to Rule 56.1 and a counterstatement to Defendants' 56.1 Statement.

### 2. The Court Will Dismiss Monetary Claims Made Against Defendants Who Lack Personal Involvement

**\*7** Before addressing the merits of Plaintiff's claims, the Court must resolve one other preliminary matter. Plaintiff has not demonstrated, and the record does not support, the requisite personal involvement for Defendants Heath, Perez, Dolce, and Bradt. As such, the Court will dismiss all monetary claims as to those defendants.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven,* 720 F.3d 133, 138 (2d Cir.2013) (citations omitted). The Second Circuit has held that the personal involvement of a supervisory defendant may be shown by evidence that:

> [i] the defendant participated directly in the alleged constitutional violation, [ii] the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, [iii] the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, [iv] the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or [v] the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [12]

"[T]he fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." *Thomas v. Coombe,* No. 95 Civ. 10342(HB), 1998 WL 391143, at \*6 (S.D.N.Y. July 13, 1998). Nor is a supervisor liable under § 1983 when she receives a letter and forwards it to the appropriate staff personnel to handle, but takes no other action. *Ramos v. Artuz,* No. 00 Civ. 0149(LTS) (HBP), 2001 WL 840131, at \*8 (S.D.N.Y. July 25, 2001). Only "where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint)" can the supervisor be held personally involved for § 1983 purposes. *Walker v. Pataro,* No. 99 Civ. 4607(GBD)(AJP), 2002 WL 664040, at \*13 (S.D.N.Y. Apr. 23, 2002) (collecting cases).

As a matter of law, the mere receipt of Plaintiff's letters by Defendants Perez and Bradt is insufficient to establish personal involvement, as is Plaintiff's cryptic and conclusory assertion that he spoke to Defendant Heath "[b]efore ... transit." (*See* Vann Dep. 56, 58–59, 75; Def. 56.1 ¶ 81). Likewise, Plaintiff's conversation with Defendant Dolce regarding his beads does not establish the latter's involvement in a constitutional violation (Vann Dep. 75), nor, more importantly, does Plaintiff's strategic decision to name Dolce as a defendant solely "to get her testimony" (*id.* at 104).

Plaintiff might nonetheless assert that these defendants remain liable under the *Colon* standard because they "allowed the continuance" of "a policy or custom under which unconstitutional practices occurred." *Colon,* 58 F.3d at 873. Even if that standard survives *Iqbal,* Plaintiff cannot satisfy it, because he has never suggested any of these defendants was aware of what he contends is the constitutional infirmity of DOCCS policies before any of the incidents took place. Summary judgment is thus granted as to Plaintiff's monetary claims against Defendants Heath, Perez, Bradt, and Dolce. And while equitable claims against these Defendants are not procedurally foreclosed, *see Davidson v. Scully,* 148 F.Supp.2d 249, 254 (S.D.N.Y.2001), as explained at length in the remainder of this Opinion, Plaintiff's constitutional claims fail on the merits.

### 3. Plaintiff's Free Exercise Rights Were Not Violated

**\*8** Plaintiff argues that his religious rights were violated by the requirements imposed by Directive # 4202 that he conceal his beads while wearing them and that he obtain approval to wear his beads while incarcerated, and by the restriction imposed by Directive # 4917 that he not wear his beads while in transit. Even accepting Plaintiff's version of events, he has not identified a genuine issue of material fact.

### a. Directive # 4202 Does Not Violate the Constitution

DOCCS Directive # 4202 governs the religious practices of inmates, including the possession and use of religious beads. [13] Concerning religious beads other than rosary or dhikr beads, the Directive allows an inmate to "request a permit to possess and wear, but not display, religious beads, ... which can be documented and supported on a theological basis for use in the practice of an inmate's documented religion." Directive # 4202 N.2.c(1). The Directive limits the color of such beads to "[o]nly those colors documented and supported on a theological basis in the practice of an inmate's documented religion...." *Id.* If an inmate receives a permit for beads pursuant to this directive, those beads "may be worn only underneath clothing so they are not visible ." *Id.* at N.2.c(2). Rosary and dhikr beads, in contrast, may "be possessed in one's hands but not worn or displayed" and, even then, only in the color black. *Id.* at N.2.b.

Inmates may separately request permits for and wear certain other specifically identified religious items, including religious pendants such as "crucifixes, crosses, pentacles, Thor's hammers, Stars of David, chais, Native American rosettes and crescents with stars and/or moons." Directive # 4202 N.2.a(1). An authorized inmate may only wear his authorized religious pendant, like other religious beads as set out in Directive # 4202 N.2.c, "underneath clothing so it is not visible," *id.* at N.2.a(2)(a), and may affix that pendant only to a metal chain or, in the case of a Native American Rosette, to a fabric or leather cord, *id.* at N.2.a(2) (b).

Reading Plaintiff's various submissions broadly, as the Court is obliged to do, Plaintiff lodges two distinct complaints about this directive. First, he objects to the regulation's requirement of wearing his sacred beads entirely under his clothes so as to avoid their visibility (the "Concealment Requirement"). Second, he objects to the permit process which, on his arrival at Downstate on January 4, 2010, required him to surrender his sacred beads and wait three weeks for their return (the "Approval Process"). The Court will address these arguments in turn; neither succeeds.

### i. Free Exercise in the Correctional Context Generally

Prison regulations ostensibly impairing the religious exercise of prisoners are assessed " 'under a reasonableness test less restrictive than that ordinarily applied': a regulation that burdens a protected right passes constitutional muster 'if it is reasonably related to legitimate penological interests.' " *Salahuddin v. Goord,* 467 U.S. 263, 274 (2d Cir.2006)

(quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). "[A] prisoner mounting a freeexercise challenge 'must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.' " *Hall v. Ekpe,* 408 F. App'x 385, 388 (2d Cir.2010) (summary order) (quoting *Salahuddin,* 467 F.3d at 274–75). [14] " 'The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct.' Once defendants carry this burden of production, 'the burden remains with the prisoner to show that these articulated concerns were irrational.' " *Id.* (internal citations omitted).

**\*9** A "substantial burden on religious exercise exists when an individual is required to 'choose between following the precepts of [his] religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of [his] religion ... on the other hand.' " *Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 348 (2d Cir.2007) (quoting *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)).

In assessing whether a given regulation is "reasonably related" to a legitimate penological interest, courts must first determine whether the challenged regulation or action "has a valid, rational connection to a legitimate governmental objective." *Salahuddin,* 467 F.3d at 274. Then courts must consider several factors: "whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Id.*

### ii. The Concealment Requirement Is Constitutionally Appropriate

The Concealment Requirement of Directive # 4202 does not violate the Free Exercise Clause because it is not a burden, and certainly not a substantial one, on Plaintiff's exercise of religion; moreover, it is reasonably calculated to address the important penological interest of preventing inmate violence. Plaintiff claims the requirement that he wear his sacred beads entirely under his clothes is a violation of his right to exercise his religion. Undoubtedly, during his time at various correctional facilities since the beginning of 2010, Plaintiff has experienced adverse consequences occasioned by the visibility of his beads above the neckline of his shirt. He has been reprimanded and photographed, and has

undergone involuntary searches. He has received misbehavior reports and been subjected to disciplinary action. Still and all, Plaintiff cannot show that the Concealment Requirement "substantially burdens his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274.

It is undisputed that Plaintiff's beliefs are sincerely held. It is also undisputed that wearing his sacred beads is the "main tenet" of his religious practice. (Am. Compl. 12 of 22; Def. Br. 12). But Plaintiff cannot demonstrate that the Concealment Requirement imposes a burden on his ability to pursue his religion. For starters, Plaintiff has not indicated that his religion requires him to publicly display (as opposed to wear) the beads. Moreover, Plaintiff admits that there are reasons other than that requirement that he chooses to wear his beads under his shirt. Plaintiff testified at his deposition that there were two reasons why he wore his beads under his shirt: first, to "keep [them] close ... to the skin," and second, to keep them "away from the view of others so that [he does not] cause any type of disturbances or anything...." (Vann Dep. 14–15). The requirement imposed by DOCCS regulations did not even number among his rationales for doing so. It is possible, in contradiction to Plaintiff's sworn testimony, that the requirement of concealed wear does somehow burden his religious practice. If that were the case, however, any such burden is not a substantial one.

 **\*10** In the event that the Second Circuit eventually decides that the "substantial burden" test does not apply to free exercise claims (*see* n. 14 *supra* ), the Court will also consider whether any burden exists. Plaintiff might argue that his anxiety over the possibility of receiving misbehavior reports and disciplinary sanctions when the beads emerge from the neckline of his clothes constitutes a burden to his religious practice. As Plaintiff has made clear, he believes he has an unmitigated right to "wear and possess [his] beads, period." (Vann Dep. 49). Even if the Court were to accept this remarkably broad reading of the Free Exercise Clause, however, Defendants have unmistakably demonstrated that the Concealment Requirement "has a valid, rational connection to a legitimate governmental objective," *Salahuddin,* 467 F.3d at 274, namely, prison security.

It is undisputed that inmates display specific colors to demonstrate alignment with gang factions within the correctional system; prohibiting the display of such colors decreases the risk of inter-faction violence. (First Kirkpatrick Decl. ¶ 6.e). Requiring inmates to keep beads concealed beneath their clothes decreases the likelihood that such

beads can be used for unauthorized purposes. (*Id.;* First Morris Decl. ¶ 9). "Conduct expressly aimed at protecting prison security is 'legitimate' beyond question and is in fact 'central to all other correctional goals.' " *Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004) (quoting *Thornburg v. Abbott,* 490 U.S. 401, 415, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)). And the requirement of concealing sacred beads while worn is unmistakably rationally related to these two goals: inmates can still pursue their religious practice while obviating the risk that religious articles may be used, deliberately or inadvertently, to promote gang violence or for other destabilizing purposes. [15]

Not only does the Concealment Requirement seek to achieve a legitimate penological goal, but it also passes the "reasonableness" test outlined in *Salahuddin.* The first inquiry is whether inmates have "an alternative means of exercising the burdened right." *Salahuddin,* 467 F.3d at 274. Plaintiff and others similarly situated can accommodate their Santeria practice despite the requirement of concealed wear. Santeria adherents like Plaintiff can wear clothing with higher necklines, or simply remember to tuck in the beads periodically. This minimal imposition on Plaintiff's time and planning cannot plausibly outweigh the significant interest secured by Directive # 4202.

The next inquiry under the "reasonableness" test examines "the impact on guards, inmates, and prison resources of accommodating the right." *Salahuddin,* 467 F.3d at 274. The impact on the corrections system of accommodating Plaintiff's desire to "wear [his] beads, period" (Vann Dep. 49), without restrictions, could be dramatic: inflamed tensions between rival factions and increased inmate violence. (First Morris Decl. ¶ 9; First Kirkpatrick Decl. ¶ 6.e).

 **\*11** The final prong of the "reasonableness" test inquires whether there exists "alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Salahuddin,* 467 F.3d at 274. In this case, there does not; indeed, the current regime is itself that alternative accommodation.

Plaintiff relies very heavily, in this litigation as well as throughout his time within the corrections system, on *Campos v. Coughlin,* 854 F.Supp. 194 (S.D.N.Y.1994), apparently the only other case in this District to examine the regulations governing the wearing of Santeria beads in prison. Contrary to Plaintiff's intimations, the decision is not precedential; more importantly, the decision only confirms the appropriateness

of the directives challenged here. In *Campos,* a 1993 revision to the relevant DOCCS regulation had permitted inmates to possess religious beads but not to wear them under any circumstances. 854 F.Supp. at 198–99. Then–District Judge Sonia Sotomayor found that this regulation, prohibiting even the wearing of beads under clothing, had no rational relationship to the penological interests put forward there, which were identical to those put forward here. *Id.* at 207–09, 211. She also found, critically, that the regulation left Santeria practitioners with no alternative means to practice their religion, and that permitting such inmates to wear sacred beads under their clothes would have a minimal impact on the corrections system. *Id.* at 211.

Ultimately Judge Sotomayor ruled that "the wearing of the [sacred] beads under the plaintiffs' clothing, out of sight and without intent to display them publicly, is a simple and convenient alternative to an absolute ban on wearing beads." *Id.* at 212. In short, what Judge Sotomayor championed is precisely what Plaintiff now decries. The Court finds that the limitations on Plaintiff's ability to wear his beads do not offend the First Amendment because he is permitted to wear his beads pursuant to regulations that are reasonably calculated to minimize inmate violence. More than that, the Court concludes, as *Campos* suggested, that the Concealment Requirement is the least restrictive approach DOCCS could adopt to ensure that religious items like Plaintiff's beads can be worn within correctional facilities without risking violence. *See Campos,* 854 F.Supp. at 207–08 (holding that prohibiting inmates from wearing beads under their clothing was not the least restrictive means to advance penological interests because concealed beads would do so with fewer burdens on inmate free exercise rights). [16] For these reasons, the Concealment Requirement does not violate the Free Exercise Clause.

### iv. The Approval Process Is Not Constitutionally Impermissible

This Court further understands Plaintiff to argue that Directive # 4202's requirement that religious beads be confiscated, examined, and approved before their introduction into the corrections system (the "Approval Process") is also unconstitutional. Specifically, Plaintiff argues that this procedure is "archaic" (Pl.Opp.10); that it "shouldn't take that long" (Vann Dep. 53); and *Campos* should prohibit any approval process that requires the surrender, even if temporary, of his sacred beads (*id.* at 49). Plaintiff's challenge to the Approval Process can be

perceived either under the First Amendment, assessed under the "reasonableness" analysis, or as a procedural due process claim, analyzed under *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). It passes muster under either analysis.

### (a) The Process Does Not Run Afoul of the First Amendment

 **\*12** The Approval Process does not violate Plaintiff's free exercise rights under the First Amendment because it is reasonably related to a legitimate penological interest and because it satisfies the "reasonableness" test. Forfeiting his Santeria beads altogether while facility staff conducts the Approval Process necessarily constitutes a substantial burden on Plaintiff's religious practice: Plaintiff regards the removal of his beads as religiously forbidden (outside certain well-defined activities, none of which is implicated here). (Vann Dep. 122).

But even the substantial burden imposed here is justified if reasonably related to a legitimate penological interest. *Salahuddin,* 467 F.3d at 275. It is well settled that a "prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime," *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), but "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration," *Jones v. N. Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977).

Defendants have met that "relatively limited" burden, *Hall,* 408 F. App'x at 388, of demonstrating that the Approval Process serves a legitimate penological purpose. The regulations regarding religious beads are designed to avoid inter-faction violence and limit the supply of potentially dangerous articles within correctional facilities. (First Morris Decl. ¶ 9; First Kirkpatrick Decl. ¶¶ 6.a, 6.d, 6.e). Pursuing these goals requires more than simply requiring inmates to keep beads concealed: the beads themselves must be inspected to ensure they do not contain contraband or pose a threat to prison staff or inmates. *See* Directive # 4202 N.c(1); First Kirkpatrick Decl. ¶¶ 6.a, 6.b. Plaintiff does not argue that requiring individual sets of ostensibly religious beads to be inspected is an irrational approach to insuring that such beads do not impermissibly threaten prison security, nor could he plausibly make such an argument.

Analogously, courts have upheld many regulations designed to prevent the introduction of contraband into correctional facilities, even when imposing significant costs to inmate dignity. For example, the Supreme Court has upheld prison regulations that: required strip and body cavity searches of inmates after every contact visit with individuals from outside the institution, even where such visitors were searched before the visit and the visit was conducted under continuous surveillance, *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); banned contact visits entirely, *Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); permitted random, suspicionless searches of inmate cells and lockers, *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); and even required body cavity and strip searches of individuals arrested for, but not convicted of or even charged with, minor offenses, *Florence v. Board of Chosen Freeholders of Cnty. of Burlington,* ––– U.S. ––––, 132 S.Ct. 1510, 182 L.Ed.2d 566 (2012). Facilities may open and inspect all incoming mail to inmates. *Word v. Croce,* 169 F.Supp.2d 219, 228 (S.D.N.Y.2001) (" 'legitimate security and penological interests have been held to outweigh a prisoner's interest in mail' " (quoting *Cruz v. Jackson,* No. 94 Civ. 2600(RWS), 1997 **WL** 45348, at *9 (S.D.N.Y. Feb.5, 1997))). Corrections officers may reject certain items sent through the mail (such as blank greeting cards) when they pose identified risks to prison security, even in the face of First Amendment freedom of expression challenges. *Sadler v. Lantz,* No. 07 Civ. 1316(CFD), 2011 **WL** 4561189, at *5–7 (D.Conn. Sept.30, 2011). Accordingly, it is perfectly rational for DOCCS policy to require a period of time to inspect putatively religious articles and verify that they pose no threat to the correctional environment.

*13 So much established, the Court turns to the "reasonableness" test. First, the Court considers "whether prisoners have alternative means of exercising the burdened right." *Salahuddin,* 467 F.3d at 274. This first inquiry weighs heavily against Defendants: while Plaintiff's sacred beads were undergoing inspection, he had no alternative means of religious practice whatsoever, a deprivation he found extremely distressing and even, he claims, deleterious to his physical health. (Vann Dep. 53–55).

The second inquiry, however—"the impact on guards, inmates, and prison resources of accommodating the right," *Salahuddin,* 467 F.3d at 274—weighs heavily in favor of Defendants: the cost of accommodating Plaintiff's religious exercise during this period would be significant. The integrity of the facility's security would be undermined each time an inmate sought approval for ostensibly religious beads, and while the Approval Process was unfolding the facility's staff and inmate population would be at risk of increased violence prompted by or committed using such beads or contraband concealed within them.

Third, there are no obvious "alternative means," *Salahuddin,* 467 F.3d at 274, by which DOCCS could accomplish its identified goals without requiring Plaintiff to surrender his beads for some length of time. If an inmate is wearing his beads, conducting a firsthand inspection would be impractical and likely ineffectual. And of course, if ostensibly religious beads actually contained contraband, their introduction into the inmate population before inspection would render any such subsequent inspection, no matter how accomplished, entirely pointless.

Plaintiff might justifiably point to the fact that inmates are permitted to wear certain religious articles like crucifixes mounted on metal chains without undergoing the Approval Process, and argue that allowing him the same liberty would necessarily constitute a less restrictive means of protecting prison security. Such an accommodation, however, would misperceive the rationale informing the Approval Process itself. In the judgment of DOCCS personnel, beads like Plaintiff's pose distinctive risks of concealing contraband and provoking violence via display of colors associated with particular inmate factions—risks different from and more severe than those posed by the thin chain suspending a crucifix. (First Kirkpatrick Decl. ¶¶ 6.a, 6.b, 6.e; First Morris Decl. ¶ 9). And courts must "accord prison administrators 'wideranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security,' " *Cabral v. Strada,* 513 F. App'x 99, 101 (2d Cir.2013) (summary order) (quoting *Wolfish,* 441 U.S. at 547), even in the context of claimed infringement on sincere religious belief, *Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996).

Plaintiff has offered no basis for the Court to conclude that DOCCS' judgment regarding the appropriate precautions required for different categories of religious items does not deserve that deference. Nor, without more, can Plaintiff prevail simply by asserting that it "shouldn't take that long" (Vann Dep. 53) for prison staff to conduct the Approval Process. The Court will not interrogate the professional assessment of prison personnel as to how rigorous and extensive the Process must be. (*See* First Kirkpatrick Decl.

¶¶ 6.a, 6.b (discussing the requirements for fully examining beaded necklaces to ensure they do not threaten prison security)).

 **\*14** In sum, the Approval Process is the least restrictive infringement on inmates' religious rights available, and so necessarily does not impose on inmates' religious practice more than is permitted by law. The Court does not, by coming to this conclusion, in any way denigrate the sincerity of Plaintiff's beliefs or the significance of even a temporary government-mandated interruption in his religious practice. But the burden imposed by this regulation, though significant, does not go further than is required to protect prison inmates and personnel and so it necessarily does not offend the Constitution.

### (b) Plaintiff Was Afforded Procedural Due Process

The Court also construes Plaintiff's submissions as mounting a procedural due process attack on the Approval Process under the Fourteenth Amendment, based on the deprivation of his sacred beads after they were confiscated for inspection and approval at Downstate. This claim also fails. Case law suggests that several arguments are available to Plaintiff on these facts; he could argue that the Approval Process: (i) is "unevenhanded," as in *Campos;* (ii) is designed not for a genuine interest, but for the central administration to gain better control over facility staff, as in *Campos;* or (iii) deprives Plaintiff of an adequate "opportunity to be heard," under the *Mathews* factors.

In *Campos,* Judge Sotomayor considered the DOCCS process at issue in that case under the framework set out in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to assess " 'whether the plaintiff was deprived of a protected interest, and, if so what process [the plaintiff] was due. ' " *Campos,* 854 F.Supp. at 212 (quoting *Farid v. Smith,* 850 F.2d 917, 924 (2d Cir.1988) (alteration in *Campos* )). *Mathews* instructs that courts should examine three factors in assessing claims of unwarranted deprivations:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal

and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335. She concluded that the plaintiffs in *Campos* had an unmistakable free exercise interest that would be impaired by the temporary confiscation of their sacred beads during the approval process at issue; that there was "more than an opportunity of erroneous deprivation in that there has been an actual deprivation ... even after local prison administrators recognized the sincerity of plaintiffs' religious beliefs"; and that there would be no additional burdens whatsoever to permitting individuals to continue wearing their beads while the approval process was ongoing. *Campos,* 854 F.Supp. at 212. This was because, Judge Sotomayor explained, the approval process implicated by her case was designed "to properly establish the religious nature of plaintiffs' requests ... [and] to assess the genuine nature of their religious beliefs with respect to the use of beads." *Id.* Given that "only Santeria adherents" were required to seek approval for the use of their beads and to forfeit their religious items during the approval process, the approval process was clearly unevenhanded. *Id.* Finally, the process required both the facility and the Central Office at Albany to sign off on a particular set of beads before approval would be granted; defendants admitted this procedure was intended to enable central DOCCS administration to gain better control over facility staff, and not to pursue a genuine interest in identifying sincere religious practitioners. *Id.* at 212–13.

 **\*15** *Campos* is plainly distinguishable from the instant case. First, unlike in *Campos,* Directive # 4202's Approval Process is not "unevenhanded." Campos, 854 F.Supp. at 212. All religious jewelry, including more "traditional" religious pendants like crucifixes, must "be consistent with [the inmate's] documented religion." Directive # 4202 N.2. Nor does this process put corrections personnel in the problematic position of interrogating inmates to confirm their commitment to a religion; the question is only whether a given religious article aligns with the religious identity an inmate has declared, either on his entry into the DOCCS system (First Morris Decl. ¶ 7), or after changing his religious affiliation during incarceration (*id.* Ex. A 12).

Also unlike in *Campos,* Directive # 4202's Approval Process serves a legitimate government interest. It was designed not to ensure the religious sincerity of inmates seeking to wear specific religious articles, but rather to protect prison security by ensuring that beads entering a facility are indeed religious articles and pose no threat to the facility, its staff, or the inmate

population. The latter is an indisputably great government interest. Nor is the Approval Process principally designed to assert uniform DOCCS standards regarding religious articles in the face of varying facility-by-facility practice, a flaw that doomed the process *Campos* examined. The only involvement of the Central Office here is to provide a remedy for incorrect facility determinations, not a mandatory approval mechanism for each reviewed item. Put simply, *Campos* is not on point.

Applying the *Mathews* analysis directly to the challenged process itself counsels for upholding the Approval Process as an adequate provision of due process. An inmate has an "opportunity to be heard," *Mathews,* 424 U.S. at 333, as he may file a written statement both in the first instance at the facility and at the Central Office review level. [17] *See Hewitt v. Helms,* 459 U.S. 460, 476, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (holding that "[o]rdinarily a written statement by the inmate" will suffice, even in hearings regarding the imposition of increased restraints on personal liberty during incarceration), *methodology receded from, Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see also Gittens v. Lefevre,* 891 F.2d 38, 41 (2d Cir.1989) (finding inadequate a prison policy of confining prisoners pending disciplinary hearings because "no provision [was] made for an inmate to file any statement, written or oral"); *Batista v. Kelly,* 854 F.Supp. 186, 192 (W.D.N.Y.1994) (concluding that new regulations providing inmates with "the right to make a written statement prior to the hearing" cured the procedural infirmity identified in Gittens), *aff'd,* 50 F.3d 2 (2d Cir.1995). Whether that opportunity to be heard is adequate depends, as always, on balancing the Mathews factors.

Plaintiff has an important private interest under the First Amendment in retaining his sacred beads—wearing them is a vital element of his religious practice. *See Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (holding that inmates retain religious rights). But the risk of an erroneous deprivation is extremely low: step one of the Approval Process inquires whether the item is a genuine religious article given the inmate's own identification of his religious identity; step two ensures that the item poses no hidden threat to prison security. Assuming that the beads in question are what they purport to be, a Santeria practitioner like Plaintiff faces no significant risk of erroneous deprivation of his sacred beads beyond the time necessary for the Approval Process itself.

**\*16** Next, there are no appropriate alternative safeguards, given the animating purpose of the Approval Process, that

could better secure the property rights of inmates like Plaintiff who seek to wear religious beads. In *Campos,* the stated purpose of the regulation at issue was to determine whether an individual inmate's claim of religious practice involving a specific set of sacred beads was authentic. Given that aim, there was an obvious alternative: permitting inmates to continue wearing beads, concealed, while the approval process unfolded. *Campos,* 854 F.Supp. at 212. The Approval Process at issue here, however, has a fundamentally different rationale: protecting the safety of the correctional environment. "Given 'the necessity for quick action ... or the impracticality of providing any predeprivation process' in such circumstances," there simply is no appropriate set of alternative procedural safeguards. *Diaz v. Coughlin,* 909 F.Supp. 146, 150 (S.D.N.Y.1995) (quoting *Parratt v. Taylor,* 451 U.S. 527, 539, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). Directive # 4202 provides both for expedient evaluation of the status of the beads and for swift appeal of adverse decisions. And under Directive # 4202, more than one remedy is available to an inmate frustrated with a denial of his application; both the inmate grievance process, *see Diaz,* 909 F.Supp. at 150, and state court Article 78 proceedings, *see Chalif v. Artus,* No. 03 Civ. 0713(GTS)(DRH), 2009 WL 4263467, at \*2 n. 6 (N .D.N.Y. Nov. 24, 2009), allow inmates to challenge property deprivations. *See Spinelli v. City of New York,* 579 F.3d 160, 175 (2d Cir.2009) (holding that exigent circumstances could justify failing to provide pre-deprivation process, but not post-deprivation process).

The state's interests here are weighty: ensuring that no dangerous or fraudulent items enter a correctional facility, and preventing possible interfaction violence or other unauthorized uses of an ostensible set of sacred beads. Protecting prison security is "central to all other correctional goals," *Shakur,* 391 F.3d at 113, and a government interest of incontestably great moment. As the Supreme Court has instructed,

> "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for

deference to the appropriate prison authorities."

*Jones,* 433 U.S. at 126 (quoting *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)).

Despite the threat to security represented by items like Plaintiff's beads, the Approval Process outlined in Directive # 4202 ensures that inmates have the benefit of substantial procedural safeguards for their property rights. It represents the most appropriate balance of the rights of inmates with the critically important objective of protecting prison security. There is no doubt, as acknowledged above, that Plaintiff regards this deprivation as a severe infringement on his rights. But in the prison context "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Sandin v. Conner,* 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Approval Process does not violate Plaintiff's right to procedural due process.

## b. Directive # 4202 Does Not Violate RLUIPA

**\*17** The Court has previously construed Plaintiff as raising claims under RLUIPA. (Dkt. # 71 at 17). As set forth in the remainder of this subsection, Directive # 4202 does not violate this statute any more than it violates the First Amendment.

### i. RLUIPA Generally

"Under RLUIPA, a plaintiff must demonstrate that the state has imposed a substantial burden on the exercise of his religion; however, the state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest." *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (citing 42 U.S.C. § 2000cc–1(a)).

RLUIPA does not afford a plaintiff a cause of action for money damages against individual defendants in either their official capacities, *Sossamon v. Texas,* —— U.S. ——, ——, 131 S.Ct. 1651, 1663, 179 L.Ed.2d 700 (2011), or their individual capacities, *Washington v. Gonyea,* 731 F.3d 143, 145 (2d Cir.2013). Plaintiffs may, however, seek injunctive relief against officials in their official capacities. *See Sossamon,* 131 S.Ct. at 1658 (holding that "a waiver of sovereign immunity to other types of relief does not waive immunity to damages"); *id.* at 1666 (Sotomayor, J.,

dissenting) (observing that "the majority appears to accept that equitable relief is available to RLUIPA plaintiffs"); *see also Goode v. Bruno,* No. 10 Civ. 1734(SRU), 2013 **WL** 5448442, at \*7 (D.Conn. Sept.30, 2013) (permitting a RLUIPA claim for injunctive relief to continue past summary judgment).

### ii. Applying RLUIPA to Directive # 4202

The Court has already concluded that the Concealment Requirement does not substantially burden Plaintiff's religious rights and, even if so, is the least restrictive means by which DOCCS may pursue the compelling interest of avoiding violence among inmates. The Court has also concluded that the Approval Process, while indisputably burdening Plaintiff's religious exercise, is also the least restrictive means to advance the compelling interests of preventing the introduction of contraband into correctional facilities and attendant inmate violence. These conclusions suffice also to rebuff Plaintiff's RLUIPA challenge to Directive # 4202.

## c. Directive # 4917 Does Not Violate the Constitution

Plaintiff also challenges Directive # 4917 (the "Transit Ban") based on the September 27, 2010 incident during his transit from Sing Sing to Attica. Many of his claims echo those raised as to Directive # 4202. For analogous reasons, his claims as to Directive # 4917 fail as well.

Under the Transit Ban, inmates may only wear a specific set of items while in transit between facilities, including: a wedding band, a handkerchief, prescription eye glasses, approved religious head coverings, false teeth, and hearing aids. Directive # 4917 III.B.3. Additionally, Jewish inmates may wear tallit katans and Native American inmates may wear Native American medicine bags; in both cases, these items must be completely concealed beneath their clothing. This policy is designed to ensure safety in transit by controlling unauthorized items that might be used as weapons against personnel or inmates. (First Kirkpatrick Decl. ¶ 4).

### i. Applying the First Amendment to the Transit Ban

**\*18** As noted, Plaintiff was not permitted to wear his beads when he was transferred from Sing Sing to Attica on September 27, 2010. (First Morris Decl. ¶ 13). A corrections officer removed the beads, using gloves, placed them in an envelope, and returned the envelope to Plaintiff to carry during transit. (Vann Dep. 60). [18]

Directive # 4917 does not violate the First Amendment. Just as with the Approval Process under Directive # 4202, the Transit Ban under Directive # 4917 imposes a substantial burden on Plaintiff's religious practice. When Plaintiff was transferred from one facility to another, he was compelled to remove his beads, violating the central tenet of his religious practice.

Plaintiff does not contest, and could not credibly do so, that there is a legitimate penological purpose in preventing violence during inmate transit, a period of heightened risk to corrections personnel and other inmates from the increased likelihood of efforts at escape. (First Kirkpatrick Decl. ¶ 4). Thus the question is whether preventing inmates from wearing unapproved items is reasonably related to this obviously important goal. *Salahuddin,* 467 F.3d at 274. The Court concludes that it is. Inmate transit is a highly controlled environment in which prisoner freedom is at an absolute minimum to guarantee the safety of all the individuals involved and maximize control of corrections personnel over the transit environment. (First Kirkpatrick Decl. ¶ 4). Inmates in transit forfeit custody and control over all their personal possessions, which are bagged and delivered separately; they also face extremely strict and specific limits on the number and variety of items they may transfer from one facility to another via DOCCS transportation, and must either ship or abandon any property in excess of those limits. *See generally* Directive # 4917 III. Accommodating the right in question— construed here as the right to wear unapproved religious items during transit—would come at a very high cost, as it would introduce sources of significant unpredictability and potential risk into a highly unstable and dangerous environment.

No plausible alternatives to the Transit Ban could solve the problem of danger during inmate transit. Plaintiff has not disputed that religious beads such as his pose a potential threat in the transit environment. And Colonel Michael Kirkpatrick, the Director of the DOCCS Correction Emergency Response Team, explained that no means existed to mitigate the risks posed by religious beads such as Plaintiff's during inmate transit. (Second Kirkpatrick Decl. ¶ 17). Nor could Plaintiff argue that the different treatment accorded certain other religious items bolsters his position or undercuts Defendants'. Such an argument would overlook the meaningful differences between an article such as Plaintiff's sacred beads and the religious articles presumptively approved for wear during transit. The only religious articles Directive # 4917 permits in transit are very specific religious or cultural garments like the tallit or the kufi. Directive # 4917 III.B.3. Notably, inmates are not permitted to wear religious jewelry or accessories, such as crucifixes, Stars of David, or pentacles during transit. Excluding items of this type embodies a correctional judgment that they represent, as a category, a source of elevated risk and instability in the transit environment: a length of beads or metal chain poses more threat of violence than a cloth head covering. (First Kirkpatrick Decl. ¶¶ 6.a–6.e). Permitting inmates to wear items falling into this category would ignore those risks and jeopardize inmate and personnel safety. (Second Kirkpatrick Decl. ¶ 17).

 **\*19** The Transit Ban is a reasonable solution to advancing the vital penological interest at issue. Even where, as here, an inmate suffers a substantial religious burden by having to remove an item the wearing of which he regards as a religious obligation, the consequent costs are more than justified by the benefits for other inmates and corrections personnel. The Transit Ban is also, as far as the Court can tell, the least restrictive approach to balancing inmate rights with safety concerns during inter-facility transfers.

### d. Directive # 4917 Does Not Violate RLUIPA

The Transit Ban unmistakably creates a substantial burden to inmate free exercise rights. But the Court has already concluded that the Transit Ban is the least restrictive means by which DOCCS could advance the penological interest of ensuring safety during transit. As discussed at length above, any other approach would substantially increase the risk to inmates and prison personnel. As the least restrictive means by which DOCCS could solve the problem of transit, Directive # 4917 does not violate RLUIPA and Plaintiff may not obtain an injunction against its enforcement. [19]

### 4. Plaintiff's Right to Equal Protection Was Not Violated

Separately, the Court understands Plaintiff to raise two different classes of equal protection challenges. The first is that Directives # 4202 and # 4917, as drafted, impose heavier burdens on Plaintiff than on adherent of other religions by subjecting him to requirements others do not face, specifically, the Approval Process and the Transit Ban. The second is that corrections officers selectively enforced the Concealment Requirement to impose an unequal burden on Plaintiff: other inmates were not punished, he claims, when their religious articles inadvertently became visible, while he routinely attracted negative attention and disciplinary action when his beads came into view above the neckline of his

clothes. Neither of these claims states an equal protection violation.

**a. Equal Protection Generally**

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Supreme Court has explained that the clause embodies "a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

To attack the content of a government policy as violating the Equal Protection Clause, "claimants must prove purposeful discrimination, directed at an identifiable or suspect class." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (internal citations omitted). Alternatively, to win a claim of selective enforcement, a plaintiff must prove "that he was intentionally treated differently from other similarly situated individuals; ... and that the disparate treatment was either (a) irrational and wholly arbitrary or (b) motivated by animus." *Kellogg v. New York State Dep't of Corr. Servs.,* No. 07 Civ. 2804(BSJ)(GWG), 2009 **WL** 2058560, at \*3 (S.D.N.Y. July 15, 2009). The Second Circuit has expanded on this latter test, explaining that a plaintiff must prove that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir.2005), *overruled on other grounds by Appel v. Spiridon,* 531 F.3d 138 (2d Cir.2008). "In such a 'class of one' case, the existence of persons in similar circumstances who received more favorable treatment than the plaintiff is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *Id.* (citing *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 565, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)).

**\*20** "As a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury." *Harlen Associates v. Inc. Vill. of Mineola,* 273 F.3d 494, 501 n. 2 (2d Cir.2001). "This rule is not absolute, however, and a court can properly grant summary judgment where it is clear that

no reasonable jury could find the similarly situated prong met." *Id.* (citing *Cruz v. Coach Stores,* 202 F.3d 560, 568 (2d Cir.2000)).

The Second Circuit has ruled that the "reasonableness" First Amendment standard for prisoner free exercise claims also applies to prisoner equal protection claims. *See Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.1990); *Pugh v. Goord,* 571 F.Supp.2d 477, 502 (S.D.N.Y.2008). "Thus, even if plaintiffs can demonstrate that two groups are similarly situated, disparate treatment may still be warranted if the government can demonstrate that the distinctions are 'reasonably related to legitimate penological interests.' " *Pugh,* 571 F.Supp.2d at 502 (quoting *Benjamin,* 905 F.2d at 574)).

**b. The DOCCS Directives Do Not Violate the Equal Protection Clause**

Turning first to his claims under Directive # 4202, Plaintiff cannot successfully argue that the Approval Process violates the Equal Protection Clause. It is true that the Approval Process imposes different requirements on inmates who wear certain religious items, such as crucifixes, that are not on the approved list; the chain may be visible, but the pendant must be kept concealed. But Plaintiff is simply not similarly situated to such inmates. The metal chain required for pendants like crucifixes, *see* Directive # 4202 N.2.a(2)(b), does not pose the same risks to prison security as the colors painted on Plaintiff's sacred beads. (First Morris Decl. ¶ 9; First Kirkpatrick Decl. ¶ 6.e). In particular, compared to a thin chain, beads like Plaintiff's pose a higher risk both of concealing contraband and of displaying colors to signify gang membership. (First Kirkpatrick Decl. ¶¶ 6.a–6.e). Plaintiff does not dispute that wearing identifying colors provides a device by which inmates can seek to undermine prison security. (Vann Dep. 14–15 (admitting he prefers wearing his beads concealed to keep them "away from the view of others so that [he did not] cause any type of disturbances or anything....")). A nondescript chain supporting a religious pendant does not pose the same risk. Plaintiff is not similarly situated with the prisoners whose different treatment under the Approval Requirement prompts his complaint here.

Even if Plaintiff were somehow similarly situated with inmates whose religious articles did not face the Approval Process imposed by Directive # 4202, the directive still survives Equal Protection scrutiny. As the Court has already determined, the Approval Process is (i) reasonably related

to the legitimate penological purpose of ensuring prison security and (ii) the least restrictive means of advancing this goal. For precisely these reasons, the Approval Process satisfies the reasonableness analysis appropriate under the Equal Protection Clause.

**\*21** The Transit Ban of Directive # 4917 is no different. Plaintiff claims that only "non-traditional religious practices" suffer from burdens imposed by the Transit Ban. (Pl.Opp.8). But that simply is not true: no religious jewelry, including crucifixes, Stars of David, or pentacles, is pre-approved for inmate wear during transit. All inmates wearing such items face the same constitutional burden as did Plaintiff. These inmates are not similarly situated with those inmates whose religious or cultural garments are pre-approved for transit wear: a length of chain or of beads is simply different, from the perspective of ensuring safety during the potentially volatile inmate transit process, than a tallit or a kufi.

Finally, the Transit Ban also withstands Plaintiff's Equal Protection challenge because it is rationally related to ensuring inmate and personnel safety during transit. Indeed, the Court has held that the Transit Ban, like the Approval Process and the Concealment Requirement, is the least restrictive means by which DOCCS could pursue this vital end.

**c. Plaintiff Was Not the Victim of Selective Enforcement**

The Court also construes Plaintiff to argue the Concealment Requirement was selectively enforced against him. (*See* Vann Dep. 64 ("I couldn't help the way my beads show behind my neck line.... It's as if I'm wearing a gold chain with a cross pendant."); *id.* at 80 ("[O]ther practitioners of other religions wear their chains and ... their chains show ...."); *see also* Pl. Opp. 16 ("In other situations, pendants are worn by practitioners of other faiths of choice, that are traditional, and those practitioners aren't harassed, or written misbehavior reports. Even though their necklaces are visible at their neckline, why is that?")). Plaintiff's frustration, however, does not constitute an Equal Protection violation. First, Directive # 4202 does not require the chain of a religious pendant to be concealed: only the pendant itself is required to "hang underneath clothing so it is not visible." *Id.* at N.2.a(1)(a). Beads like Plaintiff's, in contrast, are treated as a single unit and required to be concealed in their entirety. *Id.* at N.2.c(2). What Plaintiff perceives as selective enforcement is actually a straightforward application of the regulations as written.

Nor does the differing treatment manifest in the Concealment Requirement itself constitute an Equal Protection violation. As Plaintiff himself acknowledged (Vann Dep. 14–15), his colored sacred beads pose a distinctive threat to the correctional environment, one not posed by black rosary or dhikr beads [20] or by the metal or leather used to suspend religious pendants. Thus, neither the enforcement nor the content of the Concealment Requirement offends the Equal Protection Clause. More fundamentally, Plaintiff has failed to identify a genuine issue of material fact concerning the constitutionality of Directives # 4202 and # 4917. [21]

**5. Plaintiff May Not Maintain His Claims Arising from Incidents at Attica in This Action**

**a. Plaintiff Failed to Exhaust Administrative Remedies Relating to Each Incident**

**i. Exhaustion Generally**

**\*22** The Prisoner Litigation Reform Act of 1995 ("PLRA"), Pub.L. No. 104–134, Title VIII, 110 Stat. 1321–71 (1996), *codified as amended at* 42 U.S.C. § 1997e, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 ..., or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). This means that prisoners must "make full use of the prison grievance process" available to them, *Woodford v. Ngo,* 548 U.S. 81, 94, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), irrespective of the form of relief they seek, *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

New York State DOCCS requires inmates to pursue three levels of review for grievances to obtain proper exhaustion: they must file a grievance with the Inmate Grievance Resolution Committee ("IGRC") in their facility; appeal an adverse IGRC decision to the superintendent of the facility; and appeal an adverse superintendent decision to the Central Office Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5. "Only after the CORC has denied an appeal may the inmate bring the matter into federal court." *Martinez v. Ravikumar,* 536 F.Supp.2d 369, 371 (S.D.N.Y.2008).

**ii. Plaintiff Failed to Exhaust**

Plaintiff did not exhaust his administrative remedies with respect to any of the incidents at Attica prior to filing a complaint regarding that incident in federal court. Thus his claims must be dismissed.

Plaintiff complained of two incidents at Attica in the original Complaint he filed on March 17, 2011. Irrespective of Plaintiff's confusion over dates, the first incident in fact took place on November 30, 2010. Plaintiff obtained a final adverse determination from CORC regarding that incident on March 30, 2011. (Pl. Opp. Ex. B (Dkt.# 120–1) 32 of 51). The second incident took place on March 12, 2011. He obtained a final adverse determination from CORC on July 6, 2011. (*Id.* (Dkt.# 120) at 79 of 87). Plaintiff filed the Complaint in this action before exhausting the grievance process with respect to either claim and so he is barred from litigating them here. *See Woodford,* 548 U.S. at 94 (holding that administrative remedies must be fully exhausted before bringing a suit); *see also Neal v. Goord,* 267 F.3d 116, 123 (2d Cir.2001) (affirming dismissal for failure to exhaust when a plaintiff received a CORC response after filing the complaint), *overruled on other grounds, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

Plaintiff subsequently filed an Amended Complaint on August 30, 2011. The timing of this amended pleading introduces two complexities into the exhaustion analysis. The first is whether Plaintiff can be considered to have exhausted his administrative remedies under the PLRA as it concerns the November 2010 and March 2011 incidents. At the time the Amended Complaint was filed, Plaintiff had received final determinations from CORC on those grievances. " '[I]t is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect.' " *Pagan v. New York State Div. of Parole,* No. 98 Civ. 5840(FM), 2002 WL 398682, at *4 (S.D.N.Y. Mar.13, 2002) (quoting *Harris v. City of New York,* 186 F.3d 243, 249 (2d Cir.1999)). However, a claim in an amended pleading that "asserts a claim ... that arose out of the conduct, transaction, or occurrence set out —or attempted to be set out—in the original pleading" is regarded as relating back to the original complaint; that is, a claim in an amended complaint that functionally duplicates a claim in an original pleading is regarded as having been brought at the time of that original pleading. Fed.R.Civ.P. 15(c)(1)(B). To the extent that the Amended Complaint restates Plaintiff's allegations from the original Complaint regarding the November 2010 and March 2011 incidents,

those claims were "brought" for the purposes of the PLRA when the original Complaint was filed on March 17, 2011. Thus both claims remain barred for failure to exhaust despite Plaintiff's Amended Complaint.

**\*23** The second complexity the Amended Complaint introduced was new allegations regarding the June 29, 2011 and July 26, 2011 incidents. These incidents do not relate back to the original Complaint because they did not arise from the same "conduct, transaction, or occurrence" as stated in the original Complaint. Fed.R.Civ.P. 15(c)(1)(B). Though related, these incidents occurred at different times and with different motivations. Indeed, Plaintiff concedes that these summer 2011 incidents were motivated not by alleged animus towards Plaintiff's religious practice, but rather by a desire to retaliate against Plaintiff for bringing this lawsuit. (Vann Dep. 77–78, 115–16).[22] Thus, contrary to Defendants' argument, just because the later incidents "post-date the bringing of this action" does not require that Plaintiff's claims arising from those incidents be dismissed. (Def.Br.15). *Cf. Shariff v. Coombe,* 655 F.Supp.2d 274, 284 (S.D.N.Y.2009) (examining an amended complaint filed after the effective date of the PLRA that introduced some new claims while repleading claims raised in the original complaint filed before the PLRA became effective, and ruling that the new claims did not relate back to the original complaint and so were subject to the PLRA's exhaustion requirement, while the original claims were not).

Nonetheless, Plaintiff also failed to exhaust his administrative remedies with respect to these new incidents included in the Amended Complaint. Accordingly, he is barred from bringing them in this action. The third Attica incident took place on June 29, 2011. Plaintiff received an adverse decision from the superintendent regarding his grievance on December 5, 2011. (Pl. Opp. Ex. B (Dkt.# 120) 63 of 87). Plaintiff did not seek an appeal from the superintendent's judgment, meaning Plaintiff never exhausted his administrative remedies. (*Id.*). Even if he ultimately did so, he did not do so before filing the Amended Complaint.

The final Attica incident took place on July 26, 2011. Plaintiff did not apparently file a formal grievance regarding this search incident, instead choosing to write a letter of complaint directly to the superintendent. (Pl. Opp. Ex. B (Dkt.# 120) 81 of 87). He received a memorandum in response to that letter on August 28, 2011, from an Attica captain, advising that in the facility's judgment, "there was no evidence to support [Plaintiff's] allegation" of an improper search. (*Id.* at

84 of 87). Plaintiff never began the formal grievance process with respect to this incident. Even were the letter from the superintendent to be construed as a response to a grievance as contemplated by the DOCCS regulations, Plaintiff never appealed that grievance to CORC. And even if he did so at some later date, he did not obtain a final disposition of his appeal from the superintendent's August 28, 2011 letter before he filed the Amended Complaint two days later on August 30, 2011. Having failed to exhaust the grievance procedure before he filed the Amended Complaint, Plaintiff is barred from complaining of the July 26 incident here.

**b. Plaintiff Is Precluded from Litigating the Legal Adequacy of the July 2, 2011 Disciplinary Hearing**

**\*24** Plaintiff also challenges the disciplinary hearing held on July 2, 2011, regarding the ticket Defendant Corcoran wrote on June 29, 2011, for Plaintiff's beads being visible above his shirt collar. Plaintiff alleges that the hearing officer, Defendant Borawski, was biased against him and violated his due process rights by failing to allow him to call Defendant Deputy Superintendent Dolce as a witness. Dolce's testimony was essential, Plaintiff argues, because he alleges Dolce told him that he (Plaintiff) would no longer face discipline for wearing his religious beads so that they were visible above the collar of his shirt. (Pl.Opp.12, 19).

Plaintiff appealed that disciplinary hearing via an Article 78 proceeding in New York State court where he raised exactly the arguments he raises here. (Dkt. # 133–1 at 16–19). The New York State Supreme Court held that Plaintiff's petition was "without merit." (*Id.* at 43–44). Because of this state court ruling, Plaintiff is precluded from complaining of the disciplinary hearing here.

**i. Issue Preclusion Generally**

The Full Faith and Credit Statute, 28 U.S.C. § 1738, "requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged." *Kremer v. Chem. Const. Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). Under New York law, issue preclusion —or, as it has sometimes been termed, collateral estoppel —arises when a litigant asserts in a proceeding an issue of fact or law raised in a prior proceeding and two criteria are satisfied: (i) the issue "necessarily [was] decided in the prior action and is decisive of the present action"; and (ii) the prior action offered "a full and fair opportunity to contest the decision now said to be controlling." *Schwartz v. Pub.*

*Adm'r of Bronx Cnty.,* 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969). "The party seeking the benefit of collateral estoppel bears the burden of proving the identity of the issues, while the party challenging its application bears the burden of showing that he or she did not have a full and fair opportunity to adjudicate the claims involving those issues." *Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir.1991).

The Second Circuit has held that when legal questions are determined in a prison disciplinary hearing and reviewed in an Article 78 proceeding, issue preclusion applies to those questions unless the litigant seeking to avoid preclusion can show that procedural deficiencies in the underlying disciplinary hearing had "some significant effect" on the adequacy of the subsequent statecourt review. *Giakoumelos v. Coughlin,* 88 F.3d 56, 60 (2d Cir.1996); *see also Fludd v. Fischer,* —— F. App'x ——, No. 12–3641–pr, 2014 **WL** 2535247, at \* 1 (2d Cir. June 6, 2014) (summary order) (finding preclusion where the issues in the federal litigation were raised and resolved in a previous Article 78 proceeding and there were "no procedural deficiencies in either the Article 78 proceeding or the [prison disciplinary] hearing that produced some significant effect on the review of these issues or otherwise prevented [the federal plaintiff] from fully litigating them in the Article 78 proceeding"). "Although a § 1983 claim for damages is not barred by a judgment in an Article 78 proceeding, a federal plaintiff nonetheless may still be barred by the doctrine of collateral estoppel or issue preclusion from relitigating issues that were determined in that proceeding." *Robinson v. Scully,* No. 89 Civ. 7244(RJW), 1993 **WL** 340998, at \*4 (S.D.N.Y. Aug.23, 1993).

**ii. Plaintiff Is Precluded from Raising Here the Issues Previously Decided in the Article 78 Proceeding**

**\*25** With respect to the July 2 disciplinary hearing at Attica, Plaintiff argues that Borawski was biased against him and that it was a due process violation to deny his request to call Dolce as a witness. (Am. Compl. 9 of 22; Vann Dep. 79–81). These are precisely the arguments Plaintiff raised in his Article 78 proceeding challenging the hearing. (*See* Dkt. # 133–1 at 18–19 of 87). Those issues were decided against Plaintiff in the state court judgment. (*Id.* at 43–44 of 87).

Plaintiff has made no showing that he lacked a full and fair opportunity to litigate these claims in state court. "Parties to a previous Article 78 proceeding generally have had a full and fair opportunity to litigate the issues raised in that proceeding." *Rahman v. Acevedo,* No. 08 Civ. 4368(DLC), 2011 **WL** 6028212, at \*5 (S.D.N.Y. Dec.5, 2011) (citing

*DiSorbo v. Hoy,* 343 F.3d 172, 183 (2d Cir.2003)). Moreover, Plaintiff does not argue he was unable to introduce evidence at the Article 78 proceeding that, introduced here, might produce a different result. Just as in *Giakoumelos,* were "the district court to review the merits of all of [Plaintiff's] claims it appears that it would have before it essentially the same record ... that [the court in the Article 78 proceeding] had before it. 88 F.3d at 61.

Instead, Plaintiff makes three arguments against preclusion. (Dkt.# 130).[23] First, he argues that his claims here, made pursuant to Section 1983, "cannot be characterized as the same" as the claims brought in his Article 78 proceeding because "the relief" sought in the two actions is different. (*Id.* at 1 of 7). Plaintiff is correct that the instant Section 1983 action, in which he may seek money damages for constitutional violations, seeks relief unavailable in an Article 78 proceeding. For that reason he is not precluded from bringing a claim in the first place. *See Giakoumelos,* 88 F.3d at 61 (citing *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986)). But Plaintiff's argument confuses claim preclusion with issue preclusion. While Plaintiff may be permitted to bring a particular type of *claim* in this proceeding, he may not relitigate specific *issues* that have already been decided against him in state court.

Second, Plaintiff argues that his state court action did not challenge the issues he raises here. (Dkt. # 130 at 1 of 7). This is simply not true, as a cursory examination of his petition in the Article 78 proceeding and the ensuing judgment reveals. (*See* Dkt. # 133–1 at 18–19 of 87 (arguing in the state court proceeding that "[Plaintiff] was denied his constitutional and statutory right to call witnesses at his disciplinary hearing" and "was denied the right to a neutral and detached hearing officer"); *id.* at 43–44 of 87 (ruling that "[t]he hearing officer properly denied the request for the testimony of the Deputy Superintendent" and that "the record fails to support the petitioner's contention that the determination in the case flowed from bias on the part of the hearing officer").

**\*26** Finally, Plaintiff argues that Defendants should have raised the issue of preclusion "sooner." (Dkt. # 130 at 1–2 of 7). It is true that "collateral estoppel, like res judicata, is an affirmative defense ... [and, as] such, it normally must be pled in a timely manner or it may be waived." *Curry v. City of Syracuse,* 316 F.3d 324, 330–31 (2d Cir.2003). The Supreme Court has explained that the purpose of requiring timely pleading of preclusion claims "is to give the opposing party notice of the plea of estoppel and a chance to argue, if he can,

why the imposition of an estoppel would be inappropriate." *Blonder–Tongue Labs., Inc. v. Univ. of Illinois Found.,* 402 U.S. 313, 350, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). The Second Circuit has, on this basis, accepted preclusion defenses when raised long after the pleading stage where the non-movant has meaningful "notice and an opportunity to respond." *Curry,* 316 F.3d at 331. In *Curry,* the preclusion argument was not raised until the defendant's reply brief in further support of its motion for summary judgment. *Id.* Nonetheless, because the plaintiff had the opportunity to file a sur-reply opposing preclusion, the Second Circuit concluded that, absent a showing of some prejudice to the plaintiff, the preclusion argument was not waived on timeliness grounds. *Id.*

Here, Plaintiff has been on notice of Defendants' preclusion argument since they first moved for summary judgment. (Def.Br.8–9). He had an opportunity to object to that argument in his opposition brief and did not do so. Out of solicitude for Plaintiff's *pro se* status, the Court ordered Defendants to file supplementary briefing on this topic and to produce the entire court file from the Article 78 proceeding. (Dkt.# 124). Plaintiff replied, raising several tailored and thoughtful objections to preclusion. (Dkt.# 130). Though those arguments proved unavailing, many lawyers could not have mounted as able an assault on Defendants' preclusion argument. There can be no doubt that Plaintiff had meaningful "notice and an opportunity to respond" on this topic. *Curry,* 316 F.3d at 331.

Thus, the Court finds Plaintiff is precluded from litigating the issues of Dolce's hearing testimony and Borawski's bias, because they were raised in his Article 78 proceeding. Summary judgment is granted against Plaintiff's claims arising from his July 2 disciplinary hearing.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED as to Plaintiff's religious discrimination, equal protection, and due process claims relating to his sacred beads and his due process claims arising from the July 2 disciplinary hearing at Attica. He has failed to exhaust his administrative remedies regarding the remainder of his claims arising from alleged events at Attica and so those claims are DISMISSED.

The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 107 and to close the case.

**\*27** SO ORDERED.

Footnotes

1    The facts are drawn from the Amended Complaint ("Am.Compl."), the deposition of Kouriockien Vann ("Vann Dep."), the Declaration of Cheryl Morris ("First Morris Decl.") and its associated exhibits ("First Morris Decl. Ex."), the First Declaration of Michael Kirkpatrick ("First Kirkpatrick Decl."), the Second Declaration of Michael Kirkpatrick ("Second Kirkpatrick Decl."), and the exhibits attached to Plaintiff's opposition to Defendants' motion for summary judgment ("Pl.Opp.Ex."). Where references include page citations in the format "1 of X," the citation uses the pagination imposed by the Court's electronic case filing ("ECF") system. Because of the unusual manner in which certain exhibits were docketed, the corresponding docket number is also provided with each citation to those exhibits.

Defendants' memorandum of law in support of their motion for summary judgment is referred to as "Def. Br.," Plaintiff's opposing brief as "Pl. Opp.," and Defendants' reply memorandum as "Def. Reply." Plaintiff's Statement of Undisputed Facts is referred to as "Pl. 56.1," and Defendants' Statement of Undisputed Facts as "Def. 56.1."

For ease of reference, the Court will adopt the parties' practice of referring to the individual defendants by surname alone.

2    For a more extensive discussion of this element of Santeria belief and practice, *see Campos v. Coughlin,* 854 F.Supp. 194, 201–02 (S.D.N.Y.1994).

3    While the Amended Complaint erroneously indicates that this alleged event took place on January 4, 2011 (Am. Compl. 4 of 22), Plaintiff confirmed at his deposition that it actually took place on January 4, 2010 (Vann Dep. 40–41). This incident was subsequently grieved under grievance number 11967–10. (Pl. Opp. Ex. A (Dkt.# 120) 46–48 of 87).

4    Plaintiff clarified at his deposition that his claim concerning this incident derives not from any alleged harassment, but from the violation of his religious rights arising from the confiscation of his beads. (Vann Dep. 45). And, indeed, Plaintiff did not name any of the initial security team as defendants in this action.

5    Defendants' counsel has advised that this defendant's surname is in fact Zupan, but the Court will adopt the nomenclature used consistently by Plaintiff.

6    Plaintiff received a misbehavior report, or "ticket," for initially refusing the order to remove his sacred beads (Vann Dep. 60–61; Pl. Opp. Ex. B (Dkt.# 120) 52 of 87), for which he ultimately received disciplinary sanctions once at Attica (Vann Dep. 61).

7    The record contains conflicting accounts of when this event took place. Plaintiff has, inexplicably and contrary to documentary evidence, maintained that it occurred on February 15, 2011. (Am. Compl. 4 of 22; Pl. Opp. 6; Vann Dep. 89, 98). As is clear from the grievance paperwork Plaintiff himself submitted to this Court, this incident actually took place on November 30, 2010. (Pl. Opp. Ex. A (Dkt.# 120) 27 of 87; Ex. B (Dkt.# 120–1) 15–23, 26–32 of 51). Plaintiff has provided no records relating to anything taking place on February 15, 2011, nor has Plaintiff alleged that more than one incident like this occurred. In any event, this discrepancy in date is immaterial to the resolution of this action.

8    The Court ordered Defendants on April 21, 2014, while this motion was under consideration, to produce "all records related to Plaintiff's grievances regarding the complained-of incidents at Attica Correctional Facility," to the extent such records had been produced in discovery. (Dkt.# 124). Defendants produced those records on May 20, 2014. (Dkt.# 125). The grievance records Defendants produced exactly tally in this respect with the grievance records Plaintiff offered in opposition to Defendants' motion. Accordingly, the Court will rely on Defendants' representation that there are no other records of Plaintiff's grievances from Attica.

9    Plaintiff filed a state court action pursuant to Article 78 of the New York Civil Practice Law and Rules, appealing the result of the July 2, 2011 disciplinary hearing. Article 78 proceedings may be used, among other things, to challenge whether a state entity made "a determination in violation of lawful procedure, ... affected by an error of law or was arbitrary or capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed; or ... whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence." N.Y. C.P.L.R. § 7803.

Plaintiff argued in his Article 78 proceeding, as he does here, that Borawski was biased and that the denial of his request to call Dolce as a witness was a violation of due process. (Dkt.# 133; Vann Dep. 82–83). The New York State Supreme Court held that Plaintiff's petition was "without merit," concluding that excluding Dolce's testimony was proper and did not impair Plaintiff's ability to defend himself in the disciplinary hearing in any way, and that Borawski showed no bias. (Dkt.# 133–1 at 43–44 of 87).

10    In liberally construing this *pro se* Plaintiff's pleadings, the Court takes both documents together; it seems that Plaintiff intended his Amended Complaint to supplement, and not supplant, his original Complaint.

11  This matter, originally before the Honorable Thomas P. Griesa, United States District Judge for the Southern District of New York (Dkt. # 5), was at that time before the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York (Dkt.# 32). It was transferred to the undersigned on June 19, 2013. (Dkt.# 90).

12  The Supreme Court's decision in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," *Grullon,* 720 F.3d at 139. However, as the Court concludes that Plaintiff has failed to show the personal involvement of certain defendants under any standard, it need not resolve that outstanding question. *See also Doe v. Whidden,* 557 F. App'x 71, 72 n. 1 (2d Cir.2014) (summary order). *But see Zappulla v. Fischer,* No. 11 Civ. 6733(JMF), 2013 **WL** 1387033, at *9 (S.D.N.Y. Apr.5, 2013) (outlining varying judicial approaches to the *Colon* standard post-*Iqbal* ).

13  On July 24, 2014, after briefing on the instant motion was fully submitted, DOCCS issued a revision of Directive # 4202. For the purposes of deciding the instant motion, the Court considers the January 18, 2008 Directive that was in place when the events at issue occurred; for this reason, it is the 2008 version that is cited in this Opinion. As it happens, the Court cannot discern that the 2014 revision, which is striking in its vagueness, makes any substantive changes to the actual policies and procedures of DOCCS. Rather, the revision appears to continue to require a request and approval process, as well as compliance with Departmental policies such as the Concealment Requirement discussed below.

As it concerns "other" religious beads, the January 18, 2008 version of Directive # 4202 read:

c. *Other beads.*

(1) An inmate may request a permit to possess and wear, but not display, religious beads, excluding Rosary and Dhikr beads, which can be documented and supported on a theological basis for use in the practice of an inmate's documented religion. Only those colors documented and supported on a theological basis in the practice of an inmate's documented religion will be approved. The request should be in writing to the facility Coordinating Chaplain. Within 14 days of receipt, (1) the Coordinating Chaplain will determine the validity of the request based upon the inmate's documented religion and theological rationale and (2) the Deputy Superintendent for Security will determine if the requested beads are of such size or design that they can be used as a weapon, used to conceal contraband, or otherwise constitute any threat to the safety and security of the facility. If the request is approved, the facility will issue a special permit to the inmate and notify the Deputy Commissioner for Facility Operations. If the facility denies the request, the inmate may appeal to Central Office by writing to the Director of Ministerial and Family Services, who will consult with the Deputy Commissioner for Correctional Facilities and issue a decision within 7 days of receipt. If approved by Central Office, the beads will be registered at the facility and a special permit issued to the inmate which will be transferable system wide.

(2) Beads for which a special permit has been granted may be worn only underneath clothing so they are not visible.

(*See* First Morris Decl. Ex. A, DOCCS Directive # 4202 N.2.c(1)-(2)). The July 2014 revision reads:

C. *Other Beads:* An inmate may request to possess any approved religious beads, colors and other specifications must be in compliance with Departmental policy.

DOCCS Directive # 4202 XIV.C. (July 24, 2014), *available at* http:// www.doccs.ny.gov/Directives/4202.pdf.

14  Whether the "substantial burden" test still applies in claims raised under the First Amendment remains an open question. *Holland v. Goord,* No. 13–2694–pr, 758 F.3d 215, 2014 **WL** 3360615, at *4 (2d Cir. July 10, 2014) ("It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.' " (quoting *Salahuddin,* 467 F.3d at 274–75)).

It is customary in this District, absent any contrary instruction from the Second Circuit, to assume that the substantial burden test survives. *See, e.g., Washington v. Chaboty,* No. 09 Civ. 9199(PGG), 2011 **WL** 102714, at *8 n. 6 (S.D.N.Y. Jan.10, 2011), aff'd in part, rev'd in part on other grounds sub nom. *Washington v. Gonyea,* 538 F. App'x 23 (2d Cir.2013), and aff'd in part sub nom. *Washington v. Gonyea,* 731 F.3d 143 (2d Cir.2013). Given the Second Circuit's recent reiteration of its reluctance to revisit this issue, the Court will adhere to the custom of this District and assume that the substantial burden test applies here.

15  Plaintiff argues that "plaintiff is not [displaying his beads] intentionally" (Pl.Opp.4) and that any such display is "to no fault of the plaintiff's" (*id.* at 9). Defendants do not contest this. But the regulations do not impose liability solely for intentional violations. Nor would such a standard be sensible: given that the penological interest at issue is the prevention of inmate violence provoked by the visibility of potentially gang-affiliated colors, the visibility of Plaintiff's beads imperils that interest whether deliberate or not.

16  *Campos* was decided while RFRA's "least restrictive means" requirement was still in effect, before the Supreme Court invalidated RFRA as to state and local governments. The enactment of RLUIPA once again imposed the "least restrictive means" test as to institutionalized persons.

17  It is worth noting that the brief deprivation of which Plaintiff principally complains here, arising from the January 4, 2010 incident at Downstate, was resolved in his favor without any effort on his part. On his account, he arrived at Downstate, surrendered his beads for inspection, and had them returned with a permit for him to sign, all without his involvement. (Vann Dep. 46–49).

18    At first blush, there appears to be a conflict in the record about the availability of permits allowing inmates to wear religious articles other than those specifically identified in Directive # 4917 during transit. Plaintiff and a DOCCS representative both believed for a time that DOCCS issued such permits. (Pl. Opp. Ex. A (Dkt.# 120) 43 of 87; First Morris Decl. ¶¶ 12–13). This belief, however, stems from a misunderstanding of a now-suspended DOCCS practice regarding "local permits" for religious items. (Second Kirkpatrick Decl. ¶¶ 13–14). A searching review of the record confirms that inmates were never permitted to wear items such as Santeria beads "during a transport away from the security of a correctional facility." (*Id.* at ¶ 17).

19    As noted above, RLUIPA does not permit plaintiffs to seek money damages.

20    Regulations require rosary and dhikr beads to be entirely black. Directive # 4202 N.2.b.

21    Even were the Court to have found a constitutional violation in one of the challenged DOCCS directives, Defendants would have qualified immunity from monetary damages in their individual capacities. "Qualified immunity protects government officials from liability where the officials' conduct was not in violation of a clearly established constitutional right." *Sudler v. City of New York,* 689 F.3d 159, 174 (2d Cir.2012) (internal quotation marks omitted), *cert. denied,* —— U.S. ——, 133 S.Ct. 2777, 186 L.Ed.2d 219 (2013). Qualified immunity is an affirmative defense and defendants asserting it bear the burden of proof. *See Lore v. City of Syracuse,* 670 F.3d 127, 149 (2d Cir.2012). " 'If the conduct did not violate a clearly established constitutional right, or if it was objectively reasonable for the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity.' " *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir.2011) (quoting *Gilles v. Repicky,* 511 F.3d 239, 244 (2d Cir.2007)) (alterations in *Doninger* ).

      The instant record discloses no evidence of violation of a clearly established constitutional right. Even if *Campos* were precedential, which it is not, it is clear that DOCCS revised the directives to address precisely the infirmities that then-Judge Sotomayor identified in that decision. Similarly, given the many judicially approved regulations designed (i) to protect the correctional environment from contraband and (ii) to safeguard inmates and prison personnel, defendants could not have been on clear notice that Plaintiff had an unfettered right to "wear and possess [his] beads, period." (Vann Dep. 49).

22    Conversely, the earlier incidents, both of which took place before the original Complaint was filed, could not possibly have been motivated by an intent to retaliate against Plaintiff for bringing this lawsuit.

23    Plaintiff also insists in his reply that he requested that his *pro bono* counsel in the Article 78 proceeding appeal the adverse Wyoming County Supreme Court judgment to the Appellate Division, and that his counsel failed to do so. (Dkt. # 130 at 1, 5 of 7). Even had the decision been appealed, "[u]nder New York law, 'the mere pendency of an appeal does not prevent the use of the challenged judgment as the basis of collaterally estopping a party to that judgment in a second proceeding.' " *DiSorbo,* 343 F.3d at 183 (quoting *Amica Mut. Ins. Co. v. Jones,* 85 A.D.2d 727, 728, 445 N.Y.S.2d 820 (2d Dept.1981)). And whether Plaintiff's attorney defied Plaintiff's wishes or committed misconduct, though perhaps relevant elsewhere, simply has no effect here.

---